**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

THE ROMAN CATHOLIC ARCHDIOCESE OF
NEW YORK; CATHOLIC HEALTH CARE
SYSTEM; THE ROMAN CATHOLIC DIOCESE
OF ROCKVILLE CENTRE, NEW YORK;
CATHOLIC CHARITIES OF THE DIOCESE OF
ROCKVILLE CENTRE; and CATHOLIC
HEALTH SERVICES OF LONG ISLAND,

                   Plaintiffs,

       -against-

KATHLEEN SEBELIUS, in her official capacity
as Secretary of the U.S. Department of Health and
Human Services; HILDA SOLIS, in her official
capacity as Secretary of the U.S. Department of
Labor; TIMOTHY GEITHNER, in his official
capacity as Secretary of the U.S. Department of
Treasury; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; U.S. DEPARTMENT
OF LABOR; and U.S. DEPARTMENT OF
TREASURY,

                 Defendants.

SUMMONS ISSUED

CV 12 2542

Civil Action No.:

COGAN, J.

**COMPLAINT**

JURY TRIAL DEMANDED

2012 MAY 21 AM 10: 38
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK
FILED
CLERK

    1.    This lawsuit is about one of America's most cherished freedoms: the freedom to

practice one's religion without government interference. It is not about whether people have a

right to abortion-inducing drugs, sterilization, and contraception. Those services are freely

available in the United States, and nothing prevents the Government itself from making them

more widely available. Here, however, the Government seeks to require Plaintiffs—all Catholic

entities—to violate their sincerely held religious beliefs by providing, paying for, and/or

facilitating access to those products and services. American history and tradition, embodied in

the First Amendment to the United States Constitution and the Religious Freedom Restoration

Act ("RFRA"), safeguard religious entities from such overbearing and oppressive governmental

action. Plaintiffs therefore seek relief in this Court to protect this most fundamental of American rights.

2.      Plaintiffs are Catholic religious entities that provide a wide range of spiritual, educational, and social services to residents in New York, Catholic and non-Catholic alike, regardless of their faith. The Archdiocese of New York and the Diocese of Rockville Centre, for example, serve New York families through their many charitable programs and through the education of students in their respective school systems. Catholic Charities of the Diocese of Rockville Centre offers a host of social services to address the basic needs of the poor, troubled, weak, and oppressed. Catholic Health Services of Long Island ("CHSLI") is an integrated healthcare delivery system that serves hundreds of thousands of Long Islanders each year, providing care that extends from the beginning of life to helping people live their final years in comfort, grace, and dignity. And Catholic Health Care System and its affiliates, collectively ArchCare, The Continuing Care Community of the Archdiocese of New York ("ArchCare"), provides compassionate care to frail and vulnerable people unable to fully care for themselves and seeks to improve the quality of the lives of those individuals as well as their families.

3.      Plaintiffs' work is guided by and consistent with Roman Catholic belief, including the requirement that they serve those in need, regardless of their religion. This is perhaps best captured by words attributed to St. Francis of Assisi: "Preach the Gospel at all times. Use words if necessary." As Pope Benedict has more recently put it, "love for widows and orphans, prisoners, and the sick and needy of every kind, is as essential to [the Catholic Church] as the ministry of the sacraments and preaching of the Gospel. The Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word." Pope Benedict XVI, Deus Caritas Est ¶ 22 (2006). Or as Cardinal Timothy Dolan, the Archbishop of New York, has

taught: "We don't serve people because they're Catholic, we serve them because *we* are, and it's a moral imperative for us to do so." In accordance with these beliefs, Catholic individuals and organizations consistently work to create a more just community by serving any and all neighbors in need, Catholic and non-Catholic alike.

4. Artificial interference with the creation of life, including through abortion, sterilization, and contraceptives, is contrary to Catholic doctrine.

5. Defendants, however, have promulgated various rules (collectively, the "U.S. Government Mandate") that force Plaintiffs to violate their sincerely held religious beliefs. Under the U.S. Government Mandate, many Catholic and other religious organizations are required to provide health plans to their employees that include and/or facilitate coverage for abortion-inducing drugs, sterilization, and contraception in violation of their sincerely held religious beliefs. Ignoring broader religious exemptions from other federal laws, the Government has crafted a narrow exemption from this Mandate for certain "religious employers" who can convince the Government that they satisfy four criteria:

- "The inculcation of religious values is the purpose of the organization";
- "The organization primarily employs persons who share the religious tenets of the organization";
- "The organization primarily serves persons who share the religious tenets of the organization"; and
- "The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."

Thus, in order to safeguard their religious freedoms, religious employers must plead with the Government for a determination that they are sufficiently "religious."

6. Plaintiffs Archdiocese of New York and Diocese of Rockville Centre do not know whether the Government will conclude that they satisfy the definition of a "religious employer" under the impermissibly vague terms of the exemption. And, in order to find out, they must submit to an intrusive governmental investigation into whether, in the Government's view, their "purpose" is the "inculcation of religious values"; whether they "primarily" employ "persons who share [their] religious tenets," even though they hire persons of many faiths; and whether they "primarily" serve Catholics, even though their schools, parishes, and social services are open to all.

7. The definition of "religious employer," moreover, excludes Catholic Charities of Rockville Centre, CHSLI, and ArchCare even though they are "religious" organizations under any reasonable definition of the term. To even attempt to qualify as a "religious employer" under the terms of the U.S. Government Mandate's exemption, these Plaintiffs may be required to stop serving non-Catholics and fire non-Catholic employees—actions that would betray their religious commitment to serving all in need without regard to religion and threaten to undermine the Church's vaunted tradition of service to others. Such a definition means that Catholic organizations would have to stop asking, "are you hungry?" and ask instead, "are you Catholic?" before extending services.

8. The U.S. Government Mandate, including the exemption for certain "religious employers," is irreconcilable with the First Amendment, the RFRA, and other laws. The Government has not shown any compelling need to force Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilization, and contraception, or for requiring Plaintiffs to submit to an intrusive governmental examination of their religious missions. The Government also has not shown that the U.S. Government Mandate is narrowly tailored to

-4-

advancing any interest in increasing access to these services, as these services are already widely available and nothing prevents the Government from making them even more widely available by providing or paying for them directly through a duly-enacted law. The Government, therefore, cannot justify its decision to force Plaintiffs to provide, pay for, and/or facilitate access to these services in violation of their sincerely held religious beliefs.

9. Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

## I.   PRELIMINARY MATTERS

10. Plaintiff The Roman Catholic Archdiocese of New York is a New York not-for-profit corporation. Its principal place of business is 1011 First Avenue, New York, New York 10022. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

11. Plaintiff ArchCare is a New York not-for-profit corporation. Its principal place of business is 205 Lexington Avenue, New York, New York 10016. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

12. Plaintiff The Roman Catholic Diocese of Rockville Centre, New York is a New York not-for-profit corporation created by a special act of the state legislature in 1958. Its principal place of business is 50 North Park Avenue, Rockville Centre, New York 11570. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

13. Plaintiff Catholic Charities of the Diocese of Rockville Centre is a New York not-for-profit corporation. Its principal place of business is 90 Cherry Lane, Hicksville, New York

11801. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

14.     Plaintiff CHSLI is a New York not-for-profit corporation. Its principal place of business is 992 North Village Avenue, Rockville Centre, New York 11570. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

15.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services ("HHS"). She is sued in her official capacity.

16.     Defendant Hilda Solis is the Secretary of the U.S. Department of Labor. She is sued in her official capacity.

17.     Defendant Timothy Geithner is the Secretary of the U.S. Department of Treasury. He is sued in his official capacity.

18.     Defendant U.S. Department of Health and Human Services is an executive agency of the United States within the meaning of RFRA and the Administrative Procedure Act ("APA").

19.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

20.     Defendant U.S. Department of Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

21.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702; 28 U.S.C. §§ 2201, 2202; and 42 U.S.C. § 2000bb-1.

22.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants. Absent a declaration resolving this controversy and the validity of the U.S.

Government Mandate, Plaintiffs are uncertain as to their rights and duties in planning, negotiating, and/or implementing their group health insurance plans, their hiring and retention programs, and their social, educational, and charitable programs and ministries, as described below.

23.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

24.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

25.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

A. '    **The Archdiocese of New York**

26.     Plaintiff Archdiocese of New York encompasses 370 parishes serving ten counties in New York City and the lower Hudson Valley, including in New York, Bronx, and Richmond Counties in the boroughs of Manhattan, the Bronx, and Staten Island, respectively, as well as Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester Counties in the lower Hudson Valley of New York State. The Archdiocese was created as the Diocese of New York in 1808, and was elevated to an Archdiocese on July 19, 1850.

27.     His Eminence, Timothy Cardinal Dolan, was named Archbishop of New York by Pope Benedict XVI on February 23, 2009. On November 16, 2010, Cardinal Dolan was elected president of the United States Conference of Catholic Bishops. On January 6, 2012, Pope Benedict XVI announced that Cardinal Dolan was to be appointed to the College of Cardinals and Cardinal Dolan was elevated in the Consistory on February 18, 2012.

28.     Though the Archdiocese includes a community of over 2.5 million Catholics, its services reach out to individuals of all faiths. The Archdiocese administers a variety of programs and organizations that help support parishes and schools; students and their families;

retired, current and future clergy and religious; and countless men, women, and children in need of social services regardless of faith.

29.     For instance, through Catholic Charities of the Archdiocese of New York, over 356,000 individuals are served on an annual basis through 90 Catholic Charities agencies and 300 neighborhood and community sites. Catholic Charities helps solve the problems of New Yorkers in need—non-Catholics and Catholics alike—and seeks to uphold the dignity of each person as made in the image of God by serving the basic needs of the poor, troubled, frail and oppressed of all religions. Catholic Charities collaborates with parishes as well as non-Catholic and Catholic partners to build a compassionate and just society. Through a network of administered, sponsored and affiliated agencies, Catholic Charities delivers, coordinates, and advocates for quality human services and programs touching almost every human need. The services of Catholic Charities of the Archdiocese of New York include the following:

- **Protecting and Nurturing Children and Youth**—25,000 youth in sports and recreational programs; 310 children adopted by loving families; 6,545 children placed in safe foster care; 4,100 children and teens in after school programs; 1,850 children in summer camps; 8,100 children in day-care/Head Start;

- **Feeding the Hungry and Sheltering the Homeless**—6,500,000 meals served in parish and community food programs; 4,800 families saved from homelessness; 2,545 people placed in temporary or transitional housing; 8,430 people in emergency overnight shelters; 6,524 families in affordable housing;

- **Strengthening Families and Resolving Crises**—4,500 families supported to stay together; 35,000 people received needed social services; 7,900 people provided training, orientation, and job placement; 1,600 women helped during unplanned pregnancies; 15,100 individuals received counseling; 12,568 people helped with emergency financial assistance;

- **Supporting the Physically and Emotionally Challenged**—2,700 pre-schoolers in early intervention and special education; 800 individuals in safe and secure residences; 930 people with mental illness supported in their own homes; 329 individuals received individual therapy; 6,141 teens and adults treated for drug and alcohol abuse; 1,250 visually and hearing impaired people trained for independence; and

- **Welcoming and Integrating Immigrants and Refugees**—3,378 families counseled and protected from exploitation; 40,651 calls answered in 18 languages; 445 breadwinners helped to obtain authorization to work; 417 immigrants reunited with the families; 281 refugee and asylee families resettled; and 291 immigrants taught English.

30.     In addition, the Archdiocese of New York is committed to providing young people of all religious backgrounds with a high-quality, faith-based education in some of the poorest neighborhoods in New York.

31.     There are 246 Catholic schools located in the Archdiocese, including 50 secondary schools, 8 special education schools, and 188 elementary schools.

32.     Nearly, 70% of the students enrolled in the 92 designated elementary and secondary inner-city schools in Manhattan, the Bronx and Staten Island come from homes living at or below the federal poverty line.  Enrollment is 93% minority and 36% non-Catholic.  Over half of these students come from single-parent households.  Archdiocesan Catholic schools enable their students and their families to overcome enormous odds and break the cycle of poverty through education.   Fully 95% of graduates from the Archdiocese's Inner-City Scholarship Fund ("ICSF") pursue college or university studies, including at distinguished institutions such as Harvard, Yale, MIT, Fordham, and Georgetown.

33.     Indeed, Transfiguration Elementary School, serving the Chinese community, has 82% non-Catholic students while St. Brigid School in the East Village of Manhattan serves 90% non-Catholic students.  Similarly, St. Mark the Evangelist School in Harlem has a student body that is 84% non-Catholic, and the non-Catholic populations of Our Lady of Grace School, St. Mary School, and Saints Philip and James School, all located in the Bronx, are all more than 80%.  These schools are just a few of many examples of Archdiocesan schools serving large populations of non-Catholic students.

34.     In the graduating class of 2011, 95% of the Archdiocese's Catholic high school graduates attended two- or four-year colleges and/or universities. Additionally, the average scores of Archdiocesan high schools on the five basic Regents exams (English, Integrated Algebra, Living Environments, Global History and Geography, U.S. History) exceeded that of the average scores on these exams in the New York State public high schools.

35.     The Archdiocese offers a variety of tuition assistance programs for those in economic need. Archdiocesan-sponsored scholarship programs serve 8,285 K-12 students, awarding an average overall scholarship of $2,142.

36.     Further, the Cardinal's Scholarship Programs serve 8,285 students:  the Cardinal's Scholarship Program (funded by the Children's Scholarship Fund, ICSF, Partnership for Inner-City Education, and the Archdiocese) serves 5,760 students in grades K-8, with an average scholarship amount of $1,945; the Cardinal's Scholarship Program (non-ICSF) serves 217 K-8 students on Staten Island with an average scholarship of $1,851; and the Cardinal's Scholarship Program (funded by the Partnership) serves 642 students in grades 9-12 with, on average, a $3,502 scholarship. The "Be a Student's Friend" Scholarship Program serves 1,666 students in grades K-12 and provides an average scholarship of $2,339.

37.     The Archdiocese and it parishes and institutions employ nearly 10,000 people, including 1,452 priests, 379 religious men and women, and 7,923 lay people. The Archdiocese does not know how many of its employees are Catholic.

38.     The Archdiocese operates a self-insured health plan. That is, the Archdiocese does not contract with a separate insurance company that provides health care coverage to its employees. Instead, the Archdiocese itself functions as the insurance company underwriting its employees' medical costs. The Archdiocese's medical plan is administered by United Health

-10-

Care and its pharmaceutical coverage is administered by CareMark and Catholic Mutual Group. These third parties handle the administrative aspects of the Archdiocese's self-insured employee health plans, but they bear none of the risks for benefits nor are they obligated to pay health care providers.

39.     The plan year for the Archdiocese begins on January 1.

40.     The Archdiocese's self-insured health plan does not meet the Affordable Care Act's definition of a "grandfathered" plan because the plan has recently enacted significant increases to the 10% employee contribution requirements and increased the co-payment requirements for higher earning employees.

41.     The Archdiocese does not know how many of the 5,498 individuals that participate in its health plan are Catholic and does not know how many of those whose needs are met through the Archdiocese's programs are Catholic.

42.     It is therefore unclear whether the Government will conclude that the Archdiocese qualifies as a "religious employer" under the narrow exemption from compliance with the U.S. Government Mandate.

43.     Moreover, determining whether an organization—such as the Archdiocese— qualifies for the exemption will require the Government to engage in an intrusive inquiry, based on an understanding of religion that is inconsistent with the Catholic faith, into whether, in the view of the Government, (1) the Archdiocese's "purpose" is the "inculcation of religious values"; (2) whether the Archdiocese "primarily" employs "persons who share [its] religious tenets," even though it generally hires employees without regard to their religion and does not know how many Catholics it employs; and (3) whether it "primarily" serves such people, even though its schools and social services are open to all, without regard to their religion.

44. Regardless of the outcome, the Archdiocese strongly objects to such an intrusive and misguided governmental investigation into its religious mission.

**B.    ArchCare**

45. ArchCare, known as the "Continuing Care Community of the Archdiocese of New York," is a non-profit healthcare organization with over 4,000 employees. ArchCare is guided a dedication to and appreciation for the dignity of all human life and by the Archdiocese's commitment to serving the sick and the frail in New York City and the Greater New York area.

46. ArchCare is a central part of the health care ministry of the Archdiocese of New York. As Cardinal Dolan has stated: "Through the vital ministry of ArchCare, the Archdiocese of New York provides health care and continuing support in the name of Jesus to those in our community who have lost the opportunity to live independently or alone due to advancing age, injury or disability."

47. As such, ArchCare seeks to assure the presence of Catholic values in caring for a diverse medical population, including children with developmental disabilities, the elderly, individuals requiring renal dialysis, and those living with Huntington's disease, Alzheimer's disease, and HIV/AIDS.

48. The mission of ArchCare is to foster and provide faith-based holistic care to frail and vulnerable people unable to fully care for themselves. With an emphasis on not only physical well-being, but also the mind and spirit of those it serves, ArchCare treats individuals with respect, compassion and dignity, and seeks to improve the quality of the lives of individuals within its care as well as their families.

49. Among the guiding values of ArchCare are justice, inclusiveness, respect, integrity, benevolence, humility, and spirituality. In living these core values, ArchCare commits

-12-

itself to the recognition that those with the greatest needs often have the least resources, and thus provides the same quality of care to the disenfranchised and less-fortunate of New York as it does to those who have been more fortunate.

50.     With over 2,500 beds and more than 700 nurses, ArchCare is one of the largest Catholic continuing care systems in the nation, with a broad array of services including home care, hospice, a long-term acute care hospital, and adult day health care centers.

51.     ArchCare offers individualized comprehensive care services through its network of in-home care, seven nursing homes, eight residential locations, and several out-patient facilities located throughout New York City in the boroughs of Manhattan, Staten Island, and the Bronx, as well as in Dutchess and Orange Counties.

52.     The facilities in ArchCare's network, which together administer care to more than 6,000 patients, include the following:

- **Carmel Richmond Healthcare and Rehabilitation Center** ("Carmel Richmond")—a home-like, 300-bed residential facility in Staten Island, New York, served by the Carmelite Sisters for the Aged and Infirm, is a religious community nationally renowned for setting the standard for excellence in care of the elderly. Carmel Richmond offers residents continuous, 24-hour skilled nursing and medical care, administered by a team of 70 affiliated physicians and more than 500 nurses, professionals, and support staff. Services for the nearly 1,000 patients cared for at Carmel Richmond include dentistry, ophthalmology, audiology, social services, psychology, podiatry, nutrition therapy, recreation therapy, pain management, and hospice care. The Carmelite Sisters work to maintain the dignity, comfort, and connection to the community of the residents through recreational, socialization, and activity programs, including daily Mass and religious services, a café, a beauty salon and barber shop, and gathering rooms, as well as a garden and outdoor space. Through its state-of-the-art rehabilitation facilities and highly skilled rehabilitation therapists, Carmel Richmond has a proven record of achievement in restoring residents to their optimal level of independence. More than 90% of the people admitted for short-term rehabilitation return to their communities within their targeted time frame. The short-term rehabilitative services include pain management and coordinated treatment plans personalized for each resident in physical, occupational, and speech therapy. Carmel Richmond also offers an Adult Day Health Care

Program, available for individuals who wish to remain at home, but who need limited health care services.

- **Ferncliff Nursing Home** ("Ferncliff")—a 328-bed residential home located in Rhinebeck, New York. Ferncliff provides its residents with continuous, 24-hour skilled holistic care that addresses not only physical needs, but social, psychological, emotional, and spiritual needs, as well. Ferncliff provides the 580 patients it serves with access to its private 36-acre grounds, and through its 18 consulting physicians offers treatment in psychiatry, psychology, podiatry, ophthalmology and optometry, neurology, gastroenterology, orthopedics, and dentistry. Short-term rehabilitation services for residents who have suffered a stroke or who have undergone major surgery or other medical procedures include speech, physical, and occupational therapy, as well as pain management. These programs are designed to assist the elderly and vulnerable to return to their normal routines and independent lives as quickly as possible. Ferncliff also offers religious services.

- **Kateri Residence** ("Kateri")—a 520-bed skilled nursing and rehabilitation center located in Manhattan. Kateri serves the community of the Upper West Side and provides short- and long-term rehabilitative care on an in-patient and out-patient basis to over 960 patients. Kateri offers over 30 consulting physicians in various medical fields, as well as hospice, pain management, and speech, physical, recreation, and occupational therapies.

- **Mary Manning Walsh Home** ("Mary Manning")—a completely refurbished 362-bed facility located in Manhattan. Mary Manning, operated by the Carmelite Sisters, serves the East Side community and offers long-term care and short-term rehabilitation services to nearly 1,390 patients. Mary Manning provides similar continuing care services as those offered by Kateri through access to numerous physicians and also maintains a vibrant community for its residents through the presence of outdoor facilities, a barber shop and beauty parlor, and common gathering areas.

- **San Vicente de Paúl Catholic Healthcare Center** ("San Vicente")—a 200-bed residential skilled nursing and rehabilitation healthcare facility located in the Bronx that is designed to meet the special needs of elderly members of New York's Latino communities. Since opening in 1992, it has become a cornerstone in the rebirth of its Bronx neighborhood. San Vicente provides the same high quality, 24-hour short-term and long-term care services as are offered at its sister facilities and offers transportation and meals to its out-patients in need. The bilingual staff, ethnic food, and special social events it provides all reflect San Vicente's commitment to providing much-needed services to its surrounding community and the more than 240 patients it treats. A special unit is dedicated to serving those needing intensive rehabilitative services for a short period before returning to their independent lives at home. San Vicente also offers access to several consulting physicians and an Adult Day Health Care Program.

- **St. Teresa's Nursing and Rehabilitation Center** ("St. Teresa's")—a 98-bed skilled nursing facility offering highly-personalized and comprehensive long-term eldercare and short-term rehabilitation to approximately 275 patients in Middletown, New York. St. Teresa's offers its residents and out-patients the same continuum of care provided by its sister facilities with access to several consulting physicians, and provides a vital meeting space for the elderly of its community. Indeed, 25% of all patients who have undergone rehabilitation at St. Teresa's return to the facility to participate in daily activities and receive health services.

- **Terence Cardinal Cooke Health Care Center** ("Cooke Center")—a continuing care facility located near Central Park in Manhattan that provides compassionate medical care to over 1,570 patients from emerging and under-served populations. The Cooke Center provides long-term care for the frail elderly and those with complex medical conditions, as well as short-term subacute rehabilitative services for those recovering from surgery or other ailments. As a comprehensive skilled nursing facility, the Cooke Center provides access to nearly 50 physicians and offers health care services to a diverse medical population, such as children with developmental disabilities, the elderly, individuals requiring renal dialysis, including those requiring hemodialysis and suffering through end-stage renal disease, as well as those living with Huntington's disease, Alzheimer's disease, and HIV/AIDS. The Cooke Center works in collaboration with Mount Sinai Hospital's Department of Rehabilitation Medicine, one of America's top specialty hospitals.

- **Program of All-Inclusive Care for the Elderly**—an adult day care and continuing care facility recently opened to serve the needs of the elderly in Harlem. The facility—one of only 77 of its kind in the country—delivers the same level of care that individuals would receive in a nursing home while allowing them to keep their independence and continue living safely in the community for as long as possible.

53.     ArchCare believes profoundly in the traditions of the Roman Catholic Church. ArchCare relies on the *Ethical and Religious Directives for Catholic Health Care Services* promulgated by the United States Conference of Catholic Bishops ("*Ethical and Religious Directives*") as a guiding document detailing the application of the Catholic Church's basic theological principles to the provision of health care. These *Ethical and Religious Directives*, now in their Fifth Edition published in 2009, provide guidance for specific issues relating to the general overriding requirement to operate in accordance with the ethical and moral teachings of the Roman Catholic Church.

54. At the same time, ArchCare continues to honor its ministry by serving New Yorkers of all faiths and striving to fulfill each individual's spiritual needs by respecting their distinct beliefs. ArchCare does not know how many of those it serves are Catholic.

55. ArchCare itself does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

56. ArchCare operates a self-insured health plan. That is, ArchCare does not contract with a separate insurance company that provides health care coverage to its employees. Instead, ArchCare itself functions as the insurer underwriting its employees' medical costs.

57. More than 1,130 ArchCare employees participate in ArchCare's self-insured health plan. ArchCare does not know how many of those employees are Catholic.

58. ArchCare's medical plan is administered by Emblem Health and its pharmaceutical coverage is administered by CareMark and Catholic Mutual Group. These third parties handle the administrative aspects of ArchCare's self-insured employee health plans, but they bear none of the risks for benefits nor are they obligated to pay health care providers.

59. ArchCare's self-insured health plan does not qualify as a "grandfathered" plan because ArchCare made certain changes to the plan that caused it to lose "grandfathered" status.

60. The plan year for ArchCare begins on January 1.

**C.    The Diocese of Rockville Centre**

61. Plaintiff Diocese of Rockville Centre encompasses 134 parishes on Long Island. Formed from the Diocese of Brooklyn in 1957, the Diocese of Rockville Centre encompasses Nassau and Suffolk Counties and is the second largest diocese by population in the U.S.

62. Most Reverend Bishop William Murphy has served since 2001 as the Diocese's fourth bishop. Bishop Murphy is assisted in his ministry by two auxiliary bishops and a staff of over 370 priests, 771 religious women, 72 brothers, and 250 deacons. The Diocese corporation

-16-

directly employs 193 persons. And the Diocese of Rockville Centre, together with its hospitals, parishes, schools, and other Diocese-associated institutions employs approximately 19,800 lay employees, making it the second largest non-governmental employer on Long Island.

63.    The Diocese does not keep statistics on the number of its employees who are not Catholic.

64.    The Diocese of Rockville Centre oversees a variety of liturgical, sacramental, and faith formation programs. Parish and diocesan programs provide ongoing faith formation for its adult members, and the Diocese works for the inclusion of persons with special needs in faith formation and parish life.

65.    The Diocese conducts its educational mission through its schools. Over 33,000 students are educated in fifty-seven Catholic elementary and ten Catholic high schools in the Diocese by over 2,000 dedicated educators. The Diocese supervises the operation of fifty-three of the Catholic elementary schools and three of the high schools, overseeing the education of 17,033 elementary and 3,520 high school students. Between 99 and 100% of the Diocese's students are accepted into two- or four-year colleges.

66.    The Diocesan schools welcome students of any or no faith. There are many non-Catholics in the elementary and secondary schools within the Diocese.

67.    The Diocese of Rockville Centre is also committed to social services in the community. In 2010, more than 59,000 poor, vulnerable, and disadvantaged individuals were assisted by Catholic Charities on Long Island. Diocesan programs served a combined total of 503,856 in 2010. Through parish outreach programs supported by the Diocese, direct services were provided to more than 19,000 persons each month in 2010. That same year, the Diocese also served 345,000 individuals in hospitals, 3,000 inmates, and 45,000 people living in the

Dominican Republic. In addition, the Diocese helps make housing and supportive services available to adults with chronic mental illness and substance abuse difficulties and helps provide safe and affordable housing to people in its communities through support of 15 senior housing facilities with 1,298 affordable apartments and a residence for disabled individuals (multi-generational housing) with 31 units.

68.     Through its parishes and programs, the Diocese serves an indeterminate number of persons who are not Catholic. The Diocese's social services are not conditioned on religious faith.

69.     It is therefore unclear whether the Diocese qualifies for the exemption from compliance with the U.S. Government Mandate offered to organizations deemed "religious employers" under the U.S. Government Mandate's narrow exemption.

70.     Moreover, the process by which the Government proposes to determine whether an organization—such as the Diocese—qualifies for the exemption will require the Government to engage in an intrusive inquiry, based on principles inconsistent with the Catholic faith, into whether, in the view of the Department of Health and Human Services, (1) the Diocese's "purpose" is the "inculcation of religious values"; (2) whether the Diocese "primarily" employs "persons who share [its] religious tenets," even though it does not discriminate on the basis of religion in its hiring and does not know how many Catholics it employs; and (3) whether it "primarily" serves such people, even though its schools and social services are open to all, without regard to their religion.

71.     Regardless of the outcome, the Diocese strongly objects to such an intrusive and misguided governmental investigation into its religious mission.

-18-

72. Finally, the Diocese operates a self-insured health plan. That is, other than for the performance of administrative services only, the Diocese does not contract with a separate insurance company that provides health care coverage to its employees. Instead, the plan administered by the Diocese itself functions as the risk-bearing insurance entity underwriting its employees' medical costs. The plan year for the Diocese (and the organizations its health plan insures) begins on January 1.

73. The Diocese's current health plan does not meet the Affordable Care Act's definition of a "grandfathered" plan because the Diocese made certain changes to the plan shortly after the Act was passed, causing the plan to lose any "grandfathered" status.

74. The Diocese's health plan covers contraception and sterilization products and/or services only where they are medically necessary apart from their contraceptive or sterilizing purposes. No abortion-inducing drugs are covered.

75. For fiscal 2011-2012, the Diocese's operating budget was $30,844,000, including subsidies paid to related entities. The negative financial impact of an annual fine would be significant for the Diocese, as it struggles to balance its budget each and every year.

**D.    Catholic Charities of the Diocese of Rockville Centre**

76. As a ministry of the Roman Catholic Church, Catholic Charities of the Diocese of Rockville Centre assists in serving the basic needs of the poor, troubled, weak, and oppressed and aims to organize and empower people to secure the participation of all in the life of the community.

77. Since its founding in 1957, Catholic Charities has grown to a leadership position in human services in the region. The agency now provides a full range of services, operating out of more than sixty sites. With an operating budget of $35.5 million and over 600 employees, the agency served nearly 60,000 people who received more than 1.4 million face-to-face services in

-19-

2010 through programs that provide food and nutrition, mental health care, chemical dependency treatment, maternity services, immigrant services, HIV/AIDS services, senior services, housing, services for people with physical or developmental disabilities, or a combination of these.

78.     The services Catholic Charities provides are indispensable to the community. For example, in October 2009, the U.S. Department of Agriculture and the New York State Department of Health chose Catholic Charities of Rockville Centre to administer their only bi-county Women, Infants and Children (WIC) program to residents of Nassau and Suffolk Counties. WIC provides nutritious foods, nutrition education, and referrals to health and social services to low-income pregnant, postpartum, and breastfeeding women, and children up to the age of five who are at nutrition risk. Catholic Charities served 815 people in 2010 through the WIC program.

79.     In October 2009, Catholic Charities also opened Mary's Residence, a new transitional living facility for unwed young mothers. The home is located next to Catholic Charities' Regina Residence in Merrick and is an extension of Regina's program, which has offered housing and supportive services to single mothers and their children for over forty years. Regina Maternity Services provides optimal support for young women to help them to develop into responsible, loving, working mothers, and served 96 women in 2010.

80.     In addition, the Catholic Charities Housing Department recently opened Cabrini Gardens, which contains sixty-five units of affordable housing in Coram for low-income seniors. In total, Catholic Charities offers 1,329 total units at sixteen locations, making it one of the largest nonprofit providers of affordable housing on Long Island. In 2010, 4,227 individuals were served through Catholic Charities' housing services.

81.     Long Islanders facing difficulties, of any or no faith, come to Catholic Charities for help meeting their basic needs. Offers of services by Catholic Charities are never conditioned on religious faith, and Catholic Charities does not know how many of those it serves are Catholic.

82.     Catholic Charities has 617 employees. Catholic Charities does not inquire about the religious commitments of its applicants for employment, does not know how many of its employees are Catholic, and does not include religious faith as a basis in hiring employees.

83.     Catholic Charities employees are offered health insurance through the Diocese of Rockville Centre's health plan.

84.     Catholic Charities itself does not qualify for the exemption for "religious employers."

85.     The negative financial impact of an annual fine imposed pursuant to the U.S. Government Mandate would have a devastating impact upon Catholic Charities, and would so constrain its ability to maintain services as to preclude it from carrying out its mission of service to the poor and needy. If fines for failure to comply with the U.S. Government Mandate were imposed, Catholic Charities' current operations would become unsustainable, and it would be rendered insolvent.

E.     **Catholic Health Services of Long Island**

86.     CHSLI is a New York not-for-profit corporation that oversees the Diocese of Rockville Centre's health care ministries. CHSLI operates as the active parent organization of a healthcare system consisting of separately incorporated not-for-profit corporations located in Nassau and Suffolk Counties on Long Island, New York.

87.     CHSLI is an integral part of the Diocese's mission to provide compassion and care to all Long Islanders, while remaining faithful to the principles of the Catholic faith.

-21-

CHSLI strives to be a leader, a partner and an advocate in creating innovative health and wellness solutions that improve the lives of the individuals and communities it serves.

88.    Since 1907, Catholic healthcare on Long Island has built a distinguished tradition of operating community-based hospitals and human service organizations. These services have become widely valued for the high quality of their compassionate care for people from all walks of life and of every religious belief and ethnic group.

89.    Founded in 1997 to oversee Catholic healthcare organizations within the Diocese, CHSLI serves hundreds of thousands of Long Islanders each year that extends from providing care at the beginning of life to helping people live their final years in comfort, grace, and dignity. Since its formation as a system, and before that as individual hospitals and health care providers, CHSLI, like ArchCare, has relied on the *Ethical and Religious Directives.* These *Directives* predate the existence of CHSLI. Since the formation of CHSLI as a system, they have been considered by CHSLI's governance as one of CHSLI's core guiding documents.

90.    As stated in the Preamble to the *Ethical and Religious Directives*:

> The *Ethical and Religious Directives* are concerned primarily with
> institutionally based Catholic health care services. They address
> the sponsors, trustees, administrators, chaplains, physicians, health
> care personnel and patients or residents of the institutions or
> services. . . . The *Directives* have been refined through an
> extensive process of consultation with bishops, theologians,
> sponsors, administrators, physicians, and other health care
> providers.

91.    The *Ethical and Religious Directives* are guiding principles for Catholic healthcare institutions, including ArchCare and CHSLI. CHSLI incorporates the *Ethical and Religious Directives*, as interpreted by the Bishop of the Diocese of Rockville Centre, into hundreds of CHSLI contracts.

-22-

92.     CHSLI's 1997 Certificate of Incorporation states the purposes for which the

Corporation is formed as follows:

> [T]he Corporation is organized and shall be operated exclusively for the
> charitable purpose of supporting and strengthening the ministries of the Diocese
> of Rockville Centre ("the Diocese") and other ministries which also are
> supervised or controlled by or in connection with the Roman Catholic Church in
> the management of their spiritual, material and financial resources **in conformity
> with the ethical and moral teachings of the Roman Catholic Church,** and
> promoting efficient governance and management, cooperative planning and the
> sharing of resources among such ministries. (Article 3, section (a) Certificate of
> Incorporation dated October 23, 1997) (emphasis added).

93.     In its 1997 Certificate of Incorporation, Article 8 reads in its entirety, as follows:

"The Corporation shall operate in accordance with The Ethical and Religious Directives for

Catholic Health Services as promulgated and interpreted by the Bishop of the Roman Catholic

Diocese of Rockville Centre." (Article 8, Certificate of Incorporation dated October 23, 1997.)

94.     Section 1.02 of the By-laws of the Corporation reads in its entirety:

> *Section - 1.02 Adherence to Catholic Doctrine.*
> The Corporation shall adhere at all times to the Ethical and Religious Directives
> for Catholic Health Care Services as published and interpreted by the Bishop of
> the Diocese of Rockville Centre.

Each of the individual CHS hospitals and other affiliates has a parallel provision in its corporate

by-laws.

95.     At its inception, CHSLI was composed of four acute care hospitals, two nursing

homes, three home care companies, four hospice divisions, and numerous supporting companies.

CHSLI has continued to increase its presence on Long Island as a provider of health services,

and currently consists of six acute care hospitals, three nursing homes, certified home health and

long-term healthcare programs, a hospice service and a network of services for the mentally and

developmentally disabled, all based on Long Island.

96.     More than 17,000 staff, including 3,068 registered nurses, and more than 3,000

affiliated physicians assist patients throughout CHSLI's health care network. The CHSLI

hospitals contain approximately 1,928 licensed acute care beds. The CHSLI system administers

more than 2,700 acute and non-acute beds. CHSLI's annual operating budget is approximately

$2 billion.

97.     CHSLI is the licensed co-operator of each of the six hospitals within CHSLI. The

six high-quality and award-winning hospitals operated by CHSLI provide a full continuum of

much-needed and, in many cases, uniquely specialized care across all of Long Island:

- **St. Francis Hospital d/b/a St. Francis Hospital, The Heart Center ("St. Francis")**—a not-for-profit hospital located in Roslyn, Nassau County, New York, with 364 licensed beds, that delivers specialized cardiac and general medical acute care services and conducts cardiovascular research. St. Francis has achieved "Magnet" recognition twice and is a cardiac specialty center. St. Francis has been consistently recognized for its outstanding quality of care. Patients are transferred to St. Francis from community hospitals throughout Long Island, the New York metropolitan area, other states and abroad for emergency cardiac diagnosis and treatment. St. Francis also provides crucial diagnostic testing, such as stress testing, echocardiography, computed tomography angiography, cardiac magnetic resonance imaging and catheter-based repair of congenital heart defects.

- **Good Samaritan Hospital Medical Center ("Good Samaritan")**—a not-for-profit, regional teaching medical center located on the south shore of Long Island in West Islip, Suffolk County, New York. Good Samaritan has 537 licensed beds, including 100 nursing home beds. The hospital is also a "Magnet" recognized institution and is a New York State Designated Level II Trauma Center. Good Samaritan provides inpatient, ambulatory care, certified home health and dialysis services, as well as a full range of diagnostic and therapeutic services on an inpatient and outpatient basis. Good Samaritan recently expanded its Division of Cardiology and will soon integrate the St. Francis cardiac surgery program at Good Samaritan. Good Samaritan also operates offsite facilities, including two chronic dialysis centers, a women's imaging center, a home health agency, a nursing home and a pediatric specialty facility, in addition to staffing two community health clinics.

- **St. Catherine of Siena Medical Center ("St. Catherine")**—a not-for-profit hospital located in Smithtown, Suffolk County, New York. St. Catherine was acquired by CHSLI in 2000, and has 558 licensed beds, including 240 nursing home beds. St. Catherine is certified for ambulatory surgery, acute and chronic renal dialysis, neonatal intensive care, cardiac catheterization, and magnetic

-24-

resonance imaging. St. Catherine operates the Women's Health and Outpatient Diagnostic Pavilion and St. Catherine of Siena Nursing and Rehabilitation Care Center. St. Catherine is also the owner of Siena Medical Realty, LLC, which operates a 51,000 square foot medical office building, and is the sole member of Siena Village, Inc., which operates a 298-unit subsidized apartment complex for the elderly and disabled.

- **Mercy Medical Center ("Mercy")**—a not-for-profit community hospital located in Rockville Centre, Nassau County, New York. Founded in 1913, Mercy has 375 licensed beds, and offers a broad range of diagnostic and therapeutic services on an inpatient and outpatient basis, as well as specialized services in the areas of cardiology, oncology, maternal and neonatal intensive care, behavioral health, orthopedic surgery, and physical medicine and rehabilitation. Mercy has the only Level III Neonatal Intensive Care Unit on the south shore of Nassau County.

- **St. Charles Hospital ("St. Charles")**—a not-for-profit hospital that has provided medical, surgical and rehabilitation services since 1907. In addition to its general hospital with 231 licensed beds located in Port Jefferson, Suffolk County, New York, St. Charles operates outpatient rehabilitation facilities in Port Jefferson, Smithtown, Melville, Patchogue, Riverhead, Centereach, Setauket, Ronkonkoma, all in Suffolk County, and in Albertson, Nassau County. St. Charles was the first hospital in Suffolk County to become a designated Stroke Center. St. Charles offers a broad range of diagnostic, therapeutic and rehabilitative services for adults and children on an inpatient and outpatient basis.

- **St. Joseph Hospital ("St. Joseph")**—a not-for-profit hospital located in Bethpage, Nassau County, New York. St. Joseph was acquired by CHS in January 2010 and has 231 licensed beds and provides comprehensive inpatient and outpatient medical services, critical care and surgical services. St. Joseph specializes in wound care and is the only hospital on Long Island to have a Center for Wound Care and Hyperbaric Medicine accredited by the Undersea and Hyperbaric Medical Society—a recognition awarded to just 15% of facilities with related services. Other services offered include emergency medicine, ambulatory surgery, sleep medicine and diabetes education.

98.    CHSLI's acute care hospitals are known for providing excellence in care and committing themselves to those in need. This is evidenced by the numerous awards and national recognition they have earned. As noted, two of the six hospitals, St. Francis and Good Samaritan, have earned "Magnet" recognition status, the highest honor for nursing care. The CHSLI network won both the 2010 HANYS Pinnacle Award for Quality and Patient Safety and the 2011 HANYS Community Health Improvement Award.

99. Starting in 2007, St. Francis has achieved a *US News & World Report* ranking each year in the top 30 hospitals nationally for cardiac care; it is the only hospital on Long Island to be so ranked for the most recent five consecutive years. In 2011, St. Francis was also ranked 7th overall in New York State by *US News & World Report.*

100. Additionally, Mercy earned 5 stars from HealthGrades® for Joint Replacements, Total Knee Replacement and Hip Fracture Repair, while St. Charles has been named a Blue Distinction Center for Total Joint Replacement. Good Samaritan, St. Catherine and Mercy were named Bariatric Surgery Centers of Excellence.

101. CHSLI also has a uniquely well-developed continuum of care, providing services to those in need of a full range of health care services on Long Island to improve quality outcomes and offer patients seamless transfers. These services include an extensive system of long-term and sub-acute facilities, home health agencies (both short- and long-term), an inpatient and community hospice, a durable medical equipment company, a community-based school, residential housing and day programs for children and adults with developmental and behavioral disabilities, and an outpatient and residential substance abuse and mental health program. Among the facilities in CHSLI's continuum of health care providers are:

- **Catholic Home Care**—the largest home health organization on Long Island, Nursing Sisters Home Care (d/b/a Catholic Home Care) is a certified home health agency licensed in Nassau and Suffolk Counties, which has developed a health monitoring program, enabling the reduction of hospital length of stay and readmissions while improving patient outcomes. Catholic Home Care is also the sole member of CHS Home Support Services, a licensed durable medical equipment provider.

- **Maryhaven Center of Hope** ("Maryhaven")—provides behavioral health services to developmentally disabled individuals, and operates an intermediate care facility, a school, community residences, individual residential alternative sites and supportive living facilities, primarily in Suffolk County, New York. Maryhaven is fully interwoven into the Suffolk County community as a provider of health care and related services.

-26-

- **Our Lady of Consolation Geriatric Care Center d/b/a Our Lady of Consolation Nursing and Rehabilitative Care Center** ("Our Lady of Consolation")—a 450-bed nursing home in West Islip, Suffolk County, New York. Skilled nursing care at Our Lady of Consolation includes geriatric, rehabilitation and medically complex care. In addition, Our Lady of Consolation offers a long-term home health care program that provides critical services to Long Island's elderly and sick, while reducing the burden on area hospitals.

- **Good Shepherd Hospice** ("Good Shepherd")—operates a 16-bed inpatient hospice unit on the campus of St. Charles in Port Jefferson, Suffolk County, New York, and provides end-of-life care to patients in their homes and in skilled nursing facilities. Good Shepherd is licensed to operate in Nassau and Suffolk Counties.

102. CHSLI does not condition employment upon one's religious faith and does not track the percentage of employees who are Catholic. In carrying out their job functions, employees are required to comply with the *Ethical and Religious Directives*, but employees do not have to agree with or believe in those directives.

103. CHSLI does not condition receipt of medical services at any of its member facilities on patient affiliation with the Roman Catholic Church and/or the Diocese. CHSLI does not know how many of those it serves are Catholic.

104. While CHSLI and its member organizations are exempt organizations under 501(c)(3) of the IRS Code, neither CHSLI nor its members are currently designated as a "church[]," an "integrat[ed] auxiliar[y]" of a church, or a "religious order" pursuant to 26 U.S.C. § 6033(a)(3)(i), (iii).

105. CHSLI offers health care insurance to its employees and employees of its member corporations through a self-insured program administered by a third party, Empire BlueCross BlueShield. The plan year for CHSLI begins on January 1.

106. The health plan offered by CHSLI to its employees is not a "grandfathered" plan because CHSLI made plan design changes for January 1, 2011 that triggered the loss of

"grandfathered" status. For example, CHSLI increased its specialist office visit copay to an amount that exceeds the limits for "grandfathered" plans.

107. Consistent with its mission and the *Ethical and Religious Directives*, CHSLI's health plan does not cover abortion-inducing drugs, sterilization, or contraceptives.

108. Compliance with the proposed U.S. Government Mandate would, if followed, force CHSLI and its member institutions to violate their Catholic principles, as set forth in detail in the *Ethical and Religious Directives*.

109. As such, CHSLI could not, consistent with its Catholic identity and mission and its corporate documents, accept having to comply with the U.S. Government Mandate insofar as it concerns contraception coverage as a condition to continuing to operate as an employer and critical provider of necessary medical care.

## II.  STATUTORY AND REGULATORY BACKGROUND

### A.  <u>Statutory Background</u>

110. In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively, the "Affordable Care Act" or the "Act"). The Affordable Care Act established many new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents." 42 U.S.C. § 300gg-91(a)(1).

111. As relevant here, the Act requires an employer's group health plan to cover certain women's "preventive care." Specifically, it indicated that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for—(4)

-28-

with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4). Because the Act prohibits "cost sharing requirements," the health plan must pay for the full costs of these "preventive care" services without any deductible or co-payment.

112.   "[T]he Affordable Care Act preserves the ability of individuals to retain coverage under a group health plan or health insurance coverage in which the individual was enrolled on March 23, 2010." Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,731 (July 19, 2010) ("Interim Final Rules"); 42 U.S.C. § 18011. These so-called "grandfathered health plans do not have to meet the requirements" of the U.S. Government Mandate. 75 Fed. Reg. at 41,731. HHS estimates that "98 million individuals will be enrolled in grandfathered group health plans in 2013." *Id.* at 41,732.

113.   Violations of the Affordable Care Act can subject an employer and an insurer to substantial monetary penalties.

114.   Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual fines of $2,000 per full-time employee. *See* 26 U.S.C. § 4980H(a), (c)(1).

115.   Additionally, under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to an assessment of $100 a day per individual. *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient

Protection and Affordable Care Act (2012) (asserting that this applies to employers who violate the "preventive care" provision of the Affordable Care Act).

116.    Under the Public Health Service Act, the Secretary of HHS may impose a monetary penalty of $100 a day per individual where an insurer fails to provide the coverage required by the U.S. Government Mandate. *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i); *see also* Cong. Research Serv., RL 7-5700 (asserting that this penalty applies to insurers who violate the "preventive care" provision of the Affordable Care Act).

117.    ERISA may provide for additional penalties. Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits. 29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700. Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA. *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these penalties can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

118.    Several of the Act's provisions, along with other federal statutes, reflect a clear congressional intent that the executive agency charged with identifying the "preventive care" required by § 300gg-13(a)(4) should exclude all abortion-related services. The Act itself states that "nothing in this title (or any amendment made by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i). And the Act left it to "the issuer of a qualified health plan," not the Government, "[to] determine whether or not the plan provides coverage of [abortion]." *Id.* § 18023(b)(1)(A)(ii).

119. Likewise, the Weldon Amendment, which has been included in every HHS and Department of Labor appropriations bill since 2004, prohibits certain agencies from discriminating against an institution based on that institution's refusal to provide abortion-related services. Specifically, it states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

120. The legislative history of the Act also demonstrates a clear congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services. For example, the House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak prohibiting the use of federal funds for abortion services. *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009). The Senate version, however, lacked that restriction. S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009). To avoid a filibuster in the Senate, congressional proponents of the Act engaged in a procedure known as "budget reconciliation" that required the House to adopt the Senate version of the bill largely in its entirety. Congressman Stupak and other pro-life House members, however, indicated that they would refuse to vote for the Senate version because it failed adequately to prohibit federal funding of abortion. In an attempt to address these concerns, President Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services. *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

-31-

121. The Act was, therefore, passed on the central premise that all agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion. *Id.* That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he indicated that his Administration would honor the consciences of those who disagree with abortion, and draft sensible conscience clauses.

**B.** **Regulatory Background – Defining "Preventive Care" and the Narrow Exemption**

122. In less than two years, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience. The U.S. Government Mandate, moreover, was implemented contrary to the normal procedural rules governing the promulgation and implementation of rules of this magnitude.

123. In particular, on July 19, 2010, Defendants issued initial interim final rules concerning § 300gg-13(a)(4)'s requirement that group health plans provide coverage for women's "preventive care." Interim Final Rules, 75 Fed. Reg. 41,726. Defendants dispensed with notice-and-comment rulemaking for these rules. Even though federal law had never required coverage of abortion-inducing drugs, sterilization, or contraceptives, Defendants claimed both that the APA did not apply to the relevant provisions of the Affordable Care Act and that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process was completed." *Id.* at 41,730.

124. The interim final rules referred to the Affordable Care Act's statutory language. They indicated that "a group health plan . . . must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services: . . . (iv) With respect to

-32-

women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration." Interim Final Rules, 75 Fed. Reg. at 41,759 (codified at 45 C.F.R. § 147.130(a)(iv)).

125.    The interim final rules, however, failed to identify the women's "preventive care" that Defendants planned to require employer group health plans to cover. 42 U.S.C. § 300gg-13(a)(4). Instead, Defendants noted that "[t]he Department of HHS [was] developing these guidelines and expects to issue them no later than August 1, 2011." *Id.*

126.    Defendants permitted concerned entities to provide written comments about the interim final rules. *See id.* at 41,726. But, as Defendants have conceded, they did not comply with the notice-and-comment requirements of the APA. *Id.* at 41,730.

127.    In response, several groups engaged in a lobbying effort to persuade Defendants to include various contraceptives and abortion-inducing drugs in the "preventive care" requirements for group health plans. *See, e.g.*, Press Release, Planned Parenthood, Planned Parenthood Supports Initial White House Regulations on Preventive Care (July 14, 2010), *available at* http://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-supports-initial-white-house-regulations-preventive-care-highlights-need-new-33140.htm. Other commenters noted that "preventive care" could not reasonably be interpreted to include such practices. These groups indicated that pregnancy was not a disease that needed to be "prevented," and that a contrary view would intrude on the sincerely held beliefs of many religiously affiliated organizations. *See, e.g.*, Comments of U.S. Conference of Catholic Bishops, at 1-2 (Sept. 17, 2010), available at http://old.usccb.org/ogc/preventive.pdf.

128.    In addition to the U.S. Government Mandate that applies to group health plans for employees, on February 11, 2011, HHS also announced that, if colleges or universities contract with a health insurance issuer to provide insurance to their students, the health insurance issuer must provide these "preventive care" services in the student health plans. *See* Student Health Insurance Coverage, 76 Fed. Reg. 7,767, 7,772 (Feb. 11, 2011).

129.    On August 1, 2011, HHS announced the "preventive care" services that group health plans would be required to cover. *See* Press Release, HHS, Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost (Aug. 1, 2011), *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html.  Again acting without notice-and-comment rulemaking, HHS announced these guidelines through a press release rather than enactments in the Code of Federal Regulations or statements in the Federal Register.  The press release made clear that the guidelines were developed by a non-governmental "independent" organization, the Institute of Medicine.("IOM"). *See id.*  In developing the guidelines, IOM invited certain groups to make presentations on preventive care.  On information and belief, no groups that oppose government-mandated coverage of contraception, abortion, and related education and counseling were among the invited presenters.  Comm. on Preventive Servs. for Women, Inst. of Med., Clinical Preventive Services for Women App. B at 217-21 (2011), *available at* http://www.nap.edu/openbook.php?record_id=13181&page=R1.

130.    The IOM's own report, in turn, included a dissent that suggested that the IOM's recommendations were made on an unduly short time frame dictated by political considerations, through a process that was largely subject to the preferences of the committee's composition, and without the appropriate transparency for all concerned persons.

131.    In direct contradiction of the central compromise necessary for the Affordable

Care Act's passage and President Obama's promise to protect religious liberty, HHS's guidelines

required insurers and group health plans to cover "[a]ll Food and Drug Administration approved

contraceptive methods, sterilization procedures, and patient education and counseling for all

women with reproductive capacity." *See* Health Res. Servs. Admin., Women's Preventive

Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines/

(last visited Apr. 25, 2012). FDA-approved contraceptives that qualify under these guidelines

include drugs that induce abortions. For example, the FDA has approved "emergency

contraceptives" such as the morning-after pill (otherwise known as Plan B), which can prevent

an embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or ella),

which likewise can induce abortions.

132.    A few days later, on August 3, 2011, Defendants issued amendments to the

interim final rules that they had enacted in July 2010. See Group Health Plans and Health

Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and

Affordable Care Act, 76 Fed. Reg. 46,621 (Aug. 3, 2011). Defendants issued the amendments

again without notice-and-comment rulemaking on the same grounds that they had provided for

bypassing the APA with the original rules. *See id.* at 46,624.

133.    When announcing the amended regulations, Defendants ignored the view that

"preventive care" should exclude abortion-inducing drugs, sterilization, or contraceptives that do

not prevent disease. Instead, they noted only that "commenters [had] asserted that requiring

group health plans sponsored by religious employers to cover contraceptive services that their

faith deems contrary to its religious tenets would impinge upon their religious freedom." *Id.* at

46,623.

134.    Defendants then sought "to provide for a religious accommodation that

respect[ed]" only "the unique relationship between a house of worship and its employees in

ministerial positions." *Id.* Specifically, the regulatory exemption ignores definitions of religious

employers already existing in federal law and, instead, covers only those employers whose

purpose is to inculcate religious values, and who employ and serve primarily individuals of the

same religion.  It provides in full:

>  (A) In developing the binding health plan coverage guidelines
> specified in this paragraph (a)(1)(iv), the Health Resources and
> Services Administration shall be informed by evidence and may
> establish exemptions from such guidelines with respect to group
> health plans established or maintained by religious employers and
> health insurance coverage provided in connection with group
> health plans established or maintained by religious employers with
> respect to any requirement to cover contraceptive services under
> such guidelines.
>
> (B) For purposes of this subsection, a "religious employer" is an
> organization that meets all of the following criteria:
> (1) The inculcation of religious values is the purpose of the
> organization.
> (2) The organization primarily employs persons who share the
> religious tenets of the organization.
> (3) The organization serves primarily persons who share the
> religious tenets of the organization.
> (4) The organization is a nonprofit organization as described in
> section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the
> Internal Revenue Code of 1986, as amended.

*Id.* at 46,626 (codified at 45 C.F.R. § 147.130(a)(iv)(A)-(B)).

135.    The exemption excludes the health plans of all other religiously affiliated

employers that view their missions as providing charitable, educational, and employment

opportunities to all those who request it, regardless of their religious faith.

136.    Moreover, determining whether an organization is sufficiently "religious" to

qualify for the exemption requires an unconstitutionally invasive inquiry into an organization's

religious beliefs and practices. For example, the Government must determine the "religious tenets" of an organization and the individuals it employs and serves; it must determine whether the organization "primarily" employs and "primarily" serves individuals who "share" the organization's "religious tenets"; and it must determine whether "the purpose" of the organization is the "inculcation of religious values."

137.   When issuing this interim final rule, Defendants did not explain why they constructed such a narrow religious exemption. Nor did Defendants explain why they refused to incorporate other "longstanding Federal laws to protect conscience" that President Obama's executive order previously had promised to respect. *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010). ERISA, for example, has long excluded "church plans" from its requirements, more broadly defined to cover civil law corporations, including universities, that share religious bonds with a church. *See* 29 U.S.C. §§ 1002(33)(C)(iv), 1003. Likewise, the Affordable Care Act's requirement that all individuals maintain minimum essential coverage excludes those individuals who have a religious objection to receiving benefits from public or private insurance. 26 U.S.C. §§ 1402(g)(1), 5000A(d)(2). Nor did Defendants consider whether they had a compelling interest to require religiously affiliated employers to include services in their health plans that were contrary to their religious beliefs, or whether Defendants could achieve their views of sound policy in a more religiously accommodating manner.

138.   Suggesting that they were open to good-faith discussion, Defendants once again permitted parties to provide comments to the amended rules. Numerous organizations expressed the same concerns that they had before, noting that the mandated services should not be viewed as "preventive care." They also explained that the religious exemption was "narrower than any conscience clause ever enacted in federal law, and narrower than the vast majority of religious

exemptions from state contraceptive mandates." Comments of U.S. Conference of Catholic Bishops at 1-2 (Aug. 31, 2011), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2011-08.pdf.

139.    Three months later, "[a]fter evaluating [the new] comments" to the interim final rules, Defendants gave their response. They did not request further discussion or make attempts at compromise. Nor did they explain the basis for their decision. Instead, Defendant Sebelius issued a short, Friday-afternoon press release, announcing, with little analysis or reasoning, that HHS had decided to keep the exemption unchanged, but creating a temporary enforcement safe harbor whereby "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law." *See* Press Release, HHS, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (Jan. 20, 2012), *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html. As noted by Cardinal Timothy Dolan, the release effectively gave objecting religious institutions "a year to figure out how to violate [their] consciences." Taken together, these various rules and press releases amount to a mandate that requires most religiously affiliated organizations to provide coverage for services that are directly contrary to their religious beliefs.

140.    On February 10, 2012, after a continuing public outcry against the U.S. Government Mandate and its exceedingly narrow conscience protections, the White House held a press conference and issued another press release about the U.S. Government Mandate. The White House announced that it had come up with a policy to "accommodate" religious objections to the U.S. Government Mandate, according to which the insurance companies of religious organizations that object to providing coverage for abortion- inducing drugs,

sterilization, or contraceptives "will be required to directly offer . . . contraceptive care [to plan participants] free of charge." White House, *Fact Sheet: Women's Preventive Services and Religious Institutions* (Feb. 10, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/02/10/fact-sheet-women-s-preventive-services-and-religious-institutions.

141.    Despite objections that this "accommodation" did nothing of substance to protect the right of conscience, when asked if there would be further room for compromise, White House Chief of Staff Jacob Lew responded: "No, this is our plan." David Eldridge & Cheryl Wetzstein, *White House Says Contraception Compromise Will Stand*, The Washington Times, Feb. 12, 2012, http://www.washingtontimes.com/news/2012/feb/12/white-house-birth-control-compromise-will-stand/print/.

142.    Defendants subsequently explained in the Federal Register that they "plan[ned] to initiate a rulemaking to require issuers to offer insurance without contraception coverage to [an objecting religious] employer (or plan sponsor) and simultaneously to offer contraceptive coverage directly to the employer's plan participants (and their beneficiaries) who desire it, with no cost-sharing." Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012). The Federal Register further asserted that the rulemaking would "achieve the same goals for self-insured group health plans." *Id.*

143.    Defendants then "finalize[d], without change," the interim final rules containing the religious employer exemption, 77 Fed. Reg. at 8729, and issued guidelines regarding the previously announced "temporary enforcement safe harbor" for "non-exempted, non-profit religious organizations with religious objections to such coverage." *Id.* at 8725; *see* Ctr for Consumer Info. & Ins. Oversight, Guidance on the Temporary Enforcement Safe Harbor (Feb.

10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-
Preventive-Services-Bulletin.pdf.

144.    On March 16, 2012,  Defendants issued an Advance Notice of Proposed
Rulemaking ("ANPRM") seeking comment on various ways to structure the proposed
accommodation.  Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg.
16,501 (Mar. 21, 2012).  The proposed scenarios require an "independent entity" to provide
coverage for the objectionable services at no cost to the participants.  But private entities do not
provide insurance coverage "for free."  Moreover, even if these proposals were adopted, they
would still require religious organizations to provide, pay for, and/or facilitate access to the
objectionable services.   Finally, it is also unclear whether the Government has statutory
authority to implement each of the possibilities referenced in the ANPRM.

145.    The ANPRM does not alter existing law.  It merely states an intention to do so at
some point in the future.  But a promise to change the law, whether issued by the White House
or in the form of an ANPRM, does not, in fact, change the law.  The U.S. Government Mandate
is therefore the current, operative law.  Plaintiffs have until the start of the next plan year
following August 1, 2013, to come into compliance with this law.

## III.    THE U.S. GOVERNMENT MANDATE IMPOSES AN IMMEDIATE AND SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGIOUS LIBERTY

### A.    The U.S. Government Mandate Substantially Burdens Plaintiffs' Religious Beliefs

146.    As Cardinal Dolan observed, "we know so very well that religious freedom is our
heritage, our legacy and our firm belief, both as loyal Catholics and Americans." Indeed, since
the founding of this country, our society and legal system have recognized that individuals and
institutions are entitled to freedom of conscience and religious practice.  As noted by Thomas

Jefferson, "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of civil authority."

147. The U.S. Government Mandate seeks to require Plaintiffs to provide, pay for, and/or facilitate access to services that are contrary to their religious beliefs. It thus severely burdens Plaintiffs' firmly held religious beliefs.

148. The U.S. Government Mandate also seeks to compel Plaintiffs to fund related "patient education and counseling for all women with reproductive capacity." It therefore compels Plaintiffs to pay for, provide, and/or facilitate speech that is contrary to their firmly held religious beliefs.

149. Although the U.S. Government Mandate contains a narrow religious exemption, in order to qualify, religious organizations must submit to an invasive governmental inquiry regarding their purpose and religious beliefs. Requiring Plaintiffs to submit to this government-conducted religious test likewise substantially burdens their firmly held religious beliefs.

150. It is unclear how the Government defines or will interpret "the purpose" of an organization.

151. It is unclear how the Government defines or will interpret vague terms, such as "primarily," "share" and "religious tenets."

152. It is unclear how the Government will ascertain the "religious tenets" of an organization, those it employs, and those it serves.

153. It is unclear how much overlap the Government will require for religious tenets to be "share[d]."

154.     Any attempt by Plaintiffs to qualify for the narrow religious employer exemption by restricting their charitable, medical, and educational missions to coreligionists would have devastating effects on the communities Plaintiffs serve.

155.     Indeed, the Government does not even provide Plaintiffs the option to attempt to avoid the U.S. Government Mandate by exiting the health care market. Eliminating its employee group health plan or refusing to provide plans that cover abortion-inducing drugs, sterilization, or contraceptives would expose each Plaintiff to substantial annual fines. It is no "choice" to leave those employees scrambling for health insurance while subjecting Plaintiffs to significant fines for breaking the law. Yet that is what the U.S. Government Mandate requires for Plaintiffs to adhere to their religious beliefs.

156.     The U.S. Government Mandate also inhibits Plaintiffs' ability to hire and retain employees, attract students, and solicit charitable contributions.

157.     Nor would the opaque, promised "accommodation"—even if it were law, which it is not—relieve Plaintiffs from the unconscionable position in which the U.S. Government Mandate currently puts them, for numerous reasons.

158.     First, the promised "accommodation" would not alter the fact that Plaintiffs would be required to facilitate practices that run directly contrary to their beliefs. Catholic teaching does not simply require Catholic institutions to avoid directly paying for practices that are viewed as intrinsically immoral. It also requires them to avoid actions that facilitate those practices.

159.     Second, any requirement that insurance companies or other independent entities provide preventive services "free of charge" is illusory. For-profit entities do not provide services for free. Instead, increased costs are passed through to consumers in the form of higher

-42-

premiums or fees. Under the proposed accommodation, doctors will still have to be paid to prescribe the objectionable services and drug companies and pharmacists will still have to be paid for providing them. Hypothetical future savings cannot be used to pay those fees; rather, the money will necessarily be derived from increased premiums or fees.

160.    Third, the "accommodation" does not affect the narrow exemption applicable to "religious employers." To qualify for that narrow exemption, religious organizations must submit to an invasive governmental inquiry. Requiring Plaintiffs to submit to this government-conducted test to determine if Plaintiffs are sufficiently religious is inappropriate and substantially burdens their firmly held religious beliefs.

161.    Finally, as noted below, the U.S. Government Mandate is burdening Plaintiffs religious beliefs right now. Plaintiffs cannot possibly wait until August 1, 2013, to determine how to respond to the U.S. Government Mandate.

162.    In short, while the President claimed to have "f[ou]nd a solution that works for everyone" and that ensures that "[r]eligious liberty will be protected," in reality, his promised "accommodation" does neither. Unless and until this issue is definitively resolved, the U.S. Government Mandate does and will continue to impose a substantial burden on Plaintiffs religious beliefs.

**B.**    **The U.S. Government Mandate Is Not a Neutral Law of General Applicability**

163.    The U.S. Government Mandate is not a neutral law of general applicability. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing drugs, sterilization, contraception, and related education and counseling. It was, moreover, implemented by and at the behest of individuals and organizations who disagree with certain religious beliefs regarding abortion and contraception, and thus targets religious organizations for disfavored treatment.

164. For example, the U.S. Government Mandate exempts all "grandfathered" plans from its requirements.

165. The Government has also crafted a religious exemption to the U.S. Government Mandate that favors certain religions over others. As noted, it applies only to plans sponsored by religious organizations that have, as their "purpose," the "inculcation of religious values"; that "primarily" serve individuals that share their religious tenets; and that "primarily" employ such individuals. 45 C.F.R. § 147.130(a)(iv)(B).

166. The U.S. Government Mandate, moreover, was promulgated by Government officials, and supported by non-governmental organizations, who strongly oppose certain Catholic teachings and beliefs. For example, on October 5, 2011, Defendant Sebelius spoke at a fundraiser for NARAL Pro-Choice America. Defendant Sebelius has long supported abortion rights and criticized Catholic teachings and beliefs regarding abortion and contraception. NARAL Pro-Choice America is a pro-abortion organization that likewise opposes many Catholic teachings. At that fundraiser, Defendant Sebelius said, "we are in a war," and criticized individuals and entities whose beliefs differed from those held by her and the other attendees of the NARAL Pro-Choice America fundraiser. She added: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

167. Consequently, on information and belief, Plaintiffs allege that the purpose of the U.S. Government Mandate, including the narrow exemption, is to discriminate against religious institutions and organizations that oppose abortion and contraception.

**C.**   **The U.S. Government Mandate Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest**

168.    The U.S. Government Mandate is not narrowly tailored to promoting a compelling governmental interest.

169.    The Government has no compelling interest in forcing Plaintiffs to violate their sincerely held religious beliefs by requiring them to provide, pay for, or facilitate access to abortion-inducing drugs, sterilizations, contraceptives, and related education and counseling. The Government itself has relieved numerous other employers from this requirement by exempting grandfathered plans and plans of employers it deems to be sufficiently religious. Moreover, these services are widely available in the United States. The U.S. Supreme Court has held that individuals have a constitutional right to use such services. And nothing that Plaintiffs do inhibits any individual from exercising that right.

170.    Even assuming the interest was compelling, the Government has numerous alternatives to furthering that interest other than forcing Plaintiffs to violate their religious beliefs. For example, the Government could have provided or paid for the objectionable services itself through other programs established by a duly enacted law. Or, at a minimum, it could create a broader exemption for religious employers, such as those found in numerous state laws throughout the country and in other federal laws. The Government therefore cannot possibly demonstrate that requiring Plaintiffs to violate their consciences is the least restrictive means of furthering its interest.

171.    The U.S. Government Mandate, moreover, would simultaneously undermine both religious freedom—a fundamental right enshrined in the U.S. Constitution—and access to the wide variety of social, medical, and educational services that Plaintiffs provide. The Archdiocese of New York and the Diocese of Rockville Centre serve New Yorkers through their

many charitable programs and through the education of students in their respective school systems. Catholic Charities of the Diocese of Rockville Centre offers a host of social services to address the basic needs of the poor, troubled, weak, and oppressed in the area. CHSLI provides care for hundreds of thousands of Long Islanders each year, and ArchCare cares for frail and vulnerable people unable to fully care for themselves. As President Obama acknowledged in his February 10th announcement, religious organizations like Plaintiffs do "more good for a community than a government program ever could."

172. The U.S. Government Mandate puts these good works in jeopardy. That is unconscionable. Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

### D. The U.S. Government Mandate's Religious Employer Exemption Excessively Entangles the Government in Religion and Interferes with Religious Institutions' Religious Doctrine

173. The U.S. Government Mandate's religious employer exemption further excessively entangles the Government in defining the purpose and religious tenets of each organization and its employees and beneficiaries.

174. In order to determine whether the Archdiocese of New York, Diocese of Rockville Centre, or any other religious organization qualifies for the exemption, the Government would have to identify the organization's "religious tenets" and determine whether "the purpose" of the organization is to "inculcate" those tenets.

175. The Government would then have to conduct an inquiry into the practices and beliefs of the individuals that the organization ultimately employs and educates.

176. The Government would then have to compare and contrast those religious practices and beliefs to determine whether and how many of them are "share[d]."

177.    Regardless of the outcome, this inquiry is unconstitutional, and Plaintiffs strongly object to such an intrusive governmental investigation into an organization's religious mission.

178.    The religious employer exemption is based on an improper Government determination that "inculcation" is the only legitimate religious purpose.

179.    The Government should not base an exemption on an assessment of the "purity" or legitimacy of an institution's religious purpose.

180.    By limiting that legitimate purpose to "inculcation," at the expense of other sincerely held religious purposes, the U.S. Government Mandate interferes with religious autonomy. Religious institutions have the right to determine their own religious purpose, including religious purposes broader than "inculcation," without Government interference and without losing their religious liberties.

181.    Defining religion based on employing and serving primarily people who share the organization's religious tenets directly contradicts Plaintiffs sincerely held religious beliefs regarding their religious mission to serve all people, regardless of whether or not they share the same faith.

182.    This narrow exemption may protect some religious organizations. But it does not protect the many Catholic and other religious organizations that educate students of all faiths, provide vital social services to individuals of all faiths, and employ individuals of all faiths. The U.S. Government Mandate thus discriminates against such religious organizations because of their religious commitment to educate, serve, and employ people of all faiths.

183.    It is unclear whether, if an entity qualifies as a "religious employer" for purposes of the exemption, any affiliated corporation that provides coverage to its employees through the

exempt entity's group health plan would also receive the benefit of the exemption. 77 Fed. Reg. at 16,502.

184.    It is unclear whether, if the Archdiocese of New York or the Diocese of Rockville Centre qualify as "religious employers" under the exemption to the U.S. Government Mandate, any affiliated corporation that provides coverage to its employees through their respective group health plans would therefore also receive the benefit of the exemption.

### E.    The U.S. Government Mandate Is Causing Present Hardship to Plaintiffs That Should Be Remedied by a Court

185.    The U.S. Government Mandate is already causing serious, ongoing hardship to Plaintiffs that merits judicial relief now.

186.    Health plans do not take shape overnight. A number of analyses, negotiations, and decisions must occur each year before Plaintiffs can offer a health benefits package to their employees. For example, employers that offer health insurance coverage through a self-insured program—like the Archdiocese of New York, ArchCare, the Diocese of Rockville Centre, and CHSLI—must work with actuaries to evaluate their funding reserves, determine the products and services they want to offer their employees based on these reserves and the costs of such products and services, and then negotiate with third-party administrators with respect to their services.

187.    Under normal circumstances, Plaintiffs must begin the process of determining their health care package for a plan year at least one year before the plan year begins. The multiple levels of uncertainty surrounding the U.S. Government Mandate make this already lengthy process even more complex.

188.    For example, if Plaintiffs decide that the only tolerable option is to attempt to qualify as a "religious employer" under the U.S. Government Mandate, they will need to

-48-

undertake a major overhaul of their corporate structures, hiring practices, and the scope of their programming. This process could take years.

189.     In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to annual government fines and penalties.

190.     The U.S. Government Mandate and its uncertain legality, moreover, undermine Plaintiffs' ability to hire and retain employees.

191.     Plaintiffs therefore need judicial relief now in order to prevent the serious, ongoing harm that the U.S. Government Mandate is already imposing on them.

## IV.     CAUSES OF ACTION

### COUNT I
### Substantial Burden on Religious Exercise
### in Violation of RFRA

192.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

193.     RFRA prohibits the Government from substantially burdening an entity's exercise of religion, even if the burden results from a rule of general applicability, unless the Government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

194.     RFRA protects organizations as well as individuals from Government-imposed substantial burdens on religious exercise.

195.     RFRA applies to all federal law and the implementation of that law by any branch, department, agency, instrumentality, or official of the United States.

196.     The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.

197.    In order to qualify for the "religious employer" exemption to the U.S. Government Mandate, Plaintiffs must submit to an intrusive government inquiry into their religious beliefs.

198.    The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

199.    The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

200.    Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering a compelling governmental interest.

201.    By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, Defendants have violated RFRA.

202.    Plaintiffs have no adequate remedy at law.

203.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT II**
**Substantial Burden on Religious Exercise in Violation of**
**the Free Exercise Clause of the First Amendment**

204.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

205.    The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

206.    The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

207.    The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.

208. In order to qualify for the "religious employer" exemption to the U.S. Government Mandate, Plaintiffs must submit to an intrusive government inquiry into their religious beliefs.

209. The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

210. The U.S. Government Mandate is not a neutral law of general applicability, because it is riddled with exemptions for which there is not a consistent, legally defensible basis. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing drugs, sterilization, contraception, and related education and counseling.

211. The U.S. Government Mandate is not a neutral law of general applicability, because it discriminates against certain religious viewpoints and targets certain religious organizations for disfavored treatment. Defendants enacted the U.S. Government Mandate despite being aware of the substantial burden it would place on Plaintiffs' exercise of religion.

212. The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech and to freedom from excessive government entanglement with religion.

213. The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

214. The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

215. By enacting and threatening to enforce the U.S. Government Mandate, the Government has burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

216. Plaintiffs have no adequate remedy at law.

217. Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT III
### Excessive Entanglement in Violation of the
### Free Exercise and Establishment Clauses of the First Amendment

218. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

219. The Free Exercise Clause and the Establishment Clause of the First Amendment prohibit intrusive government inquiries into the religious beliefs of individuals and institutions, and other forms of excessive entanglement between religion and Government.

220. This prohibition on excessive entanglement protects organizations as well as individuals.

221. In order to qualify for the exemption to the U.S. Government Mandate for "religious employers," entities must submit to an invasive government investigation into an organization's religious beliefs, including whether the organization's "purpose" is the "inculcation of religious values" and whether the organization "primarily employs" and "primarily serves" individuals who share the organization's religious tenets.

222. The U.S. Government Mandate thus requires the Government to engage in invasive inquiries and judgments regarding questions of religious belief or practice.

223. The U.S. Government Mandate results in an excessive entanglement between religion and Government.

224. The U.S. Government Mandate is therefore unconstitutional and invalid.

225. The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

226. Plaintiffs have no adequate remedy at law.

227. The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT IV**
**Religious Discrimination in Violation of the**
**Free Exercise and Establishment Clauses of the First Amendment**

228. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

229. The Free Exercise Clause and the Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

230. This mandate of equal treatment protects organizations as well as individuals.

231. The U.S. Government Mandate's narrow exemption for certain "religious employers" but not others discriminates on the basis of religious views or religious status.

232. The U.S. Government Mandate's definition of religious employer likewise discriminates among different types of religious entities based on the nature of those entities' religious beliefs or practices.

233. The U.S. Government Mandate's definition of religious employer furthers no compelling governmental interest.

234. The U.S. Government Mandate's definition of religious employer is not narrowly tailored to further a compelling governmental interest.

235. The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

236. Plaintiffs have no adequate remedy at law.

237.     The U.S. Government Mandate and its impending enforcement impose an

immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT V
### Interference in Matters of Internal Church Governance in Violation of the Free Exercise and Establishment Clauses of the First Amendment

238.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

239.     The Free Exercise Clause and Establishment Clause protect the freedom of

religious organizations to decide for themselves, free from state interference, matters of church

government as well as those of faith and doctrine.

240.     Under these Clauses, the Government may not interfere with a religious

organization's internal decisions concerning the organization's religious structure, ministers, or

doctrine.

241.     Under these Clauses, the Government may not interfere with a religious

organization's internal decision if that interference would affect the faith and mission of the

organization itself.

242.     Plaintiffs are religious organizations affiliated with the Roman Catholic Church.

243.     The Catholic Church views abortion, sterilization, and contraception as

intrinsically immoral, and prohibits Catholic organizations from condoning or facilitating those

practices.

244.     Plaintiffs have abided and must continue to abide by the decision of the Catholic

Church on these issues.

245.     The Government may not interfere with or otherwise question the final decision

of the Catholic Church that its religious organizations must abide by these views.

246.     Plaintiffs have therefore made the internal decision that the health plans they offer

to their employees may not cover, subsidize, or facilitate abortion, sterilization, or contraception.

-54-

247.     The U.S. Government Mandate interferes with Plaintiffs' internal decisions

concerning their structure and mission by requiring them to facilitate practices that directly

conflict with Catholic beliefs.

248.     The U.S. Government Mandate's interference with Plaintiffs' internal decisions

affects their faith and mission by requiring them to facilitate practices that directly conflict with

their religious beliefs.

249.     Because the U.S. Government Mandate interferes with the internal decision-

making of Plaintiffs in a manner that affects Plaintiffs' faith and mission, it violates the

Establishment Clause and the Free Exercise Clause of the First Amendment.

250.     Plaintiffs have no adequate remedy at law.

251.     Defendants are imposing an immediate and ongoing harm on Plaintiffs that

warrants relief.

**COUNT VI**
**Compelled Speech in Violation of**
**the Free Speech Clause of the First Amendment**

252.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

253.     The First Amendment protects against the compelled affirmation of any religious

or ideological proposition that the speaker finds unacceptable.

254.     The First Amendment protects organizations as well as individuals against

compelled speech.

255.     Expenditures are a form of speech protected by the First Amendment.

256.     The First Amendment protects against the use of a speaker's money to support a

viewpoint that conflicts with the speaker's religious beliefs.

257.   The U.S. Government Mandate would compel Plaintiffs to provide health care plans to their employees that include or facilitate coverage of practices that violate their religious beliefs.

258.   The U.S. Government Mandate would compel Plaintiffs to subsidize, promote, and facilitate education and counseling services regarding these practices.

259.   By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs to publicly subsidize or facilitate the activity and speech of private entities that are contrary to their religious beliefs.

260.   The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

261.   The U.S. Government Mandate furthers no compelling governmental interest.

262.   The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

263.   Plaintiffs have no adequate remedy at law.

264.   Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VII
### Failure to Conduct Notice-and-Comment Rulemaking and Improper Delegation in Violation of the APA

265.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

266.   The Affordable Care Act expressly delegates to an agency within Defendant HHS, the Health Resources and Services Administration, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

267.   Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover.  Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

268.   Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.

269.   Defendants, instead, delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

270.   The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend.  The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

271.   Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

272.   Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

273.   Defendants also failed to engage in notice-and-comment rulemaking when issuing the interim final rules and the final rule incorporating the guidelines.

274.   Defendants' stated reasons for promulgating these rules without engaging in formal notice-and-comment rulemaking do not constitute "good cause."  Providing public notice

and an opportunity for comment was not impracticable, unnecessary, or contrary to the public interest for the reasons claimed by Defendants.

275.   By enacting the "preventive care" guidelines and interim and final rules through delegation to a non-governmental entity and without engaging in notice-and-comment rulemaking, Defendants failed to observe a procedure required by law and thus violated 5 U.S.C. § 706(2)(D).

276.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

277.   Plaintiffs have no adequate remedy at law.

278.   The enactment of the U.S. Government Mandate without observance of a procedure required by law and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VIII
### Arbitrary and Capricious Action in Violation of the APA

279.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

280.   The APA condemns agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

281.   The APA requires that an agency examine the relevant data and articulate an explanation for its action that includes a rational connection between the facts found and the policy choice made.

282.   Agency action is arbitrary and capricious under the APA if the agency has failed to consider an important aspect of the problem before it.

283.   A court reviewing agency action may not supply a reasoned basis that the agency itself has failed to offer.

284.    Defendants failed to consider the suggestion of many commenters that abortion-inducing drugs, sterilization, or contraception could not be viewed as "preventive care."

285.    Defendants failed adequately to engage with voluminous comments suggesting that the scope of the religious exemption to the U.S. Government Mandate should be broadened.

286.    Defendants did not articulate a reasoned basis for their action by drawing a connection between facts found and the policy decisions it made.

287.    Defendants failed to provide any standards or processes for how the Administration will decide which religious institutions will be included in the religious exemption.

288.    Defendants failed to consider the use of broader religious exemptions in many other federal laws and regulations.

289.    Defendants' promulgation of the U.S. Government Mandate violates the APA.

290.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

291.    Plaintiffs have no adequate remedy at law.

292.    Defendants are imposing an immediate and ongoing harm on the Plaintiffs that warrants relief.

### COUNT IX
### Acting Illegally in Violation of the APA

293.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

294.    The APA requires that all Government agency action, findings, and conclusions be "in accordance with law."

295.    The U.S. Government Mandate and its exemption are illegal and therefore in violation of the APA.

296. The Weldon Amendment states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

297. The Affordable Care Act states that "nothing in this title (or any amendment by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i). It adds that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion.]" *Id.* § 18023(b)(1)(A)(ii).

298. The Affordable Care Act contains no clear expression of an affirmative intention of Congress that employers with religiously motivated objections to the provision of health plans that include coverage for abortion-inducing drugs, sterilization, contraception, or related education and counseling should be required to provide such plans.

299. The U.S. Government Mandate requires employer based-health plans to provide coverage for abortion-inducing drugs, contraception, sterilization, and related education. It does not permit employers or issuers to determine whether the plan covers abortion, as the Act requires. By issuing the U.S. Government Mandate, Defendants have exceeded their authority, and ignored the direction of Congress.

300. The U.S. Government Mandate violates RFRA.

301. The U.S. Government Mandate violates the First Amendment.

302.     The U.S. Government Mandate is not in accordance with law and thus violates 5 U.S.C. § 706(2)(A).

303.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

304.     Plaintiffs have no adequate remedy at law.

305.     Defendants' failure to act in accordance with law imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.     Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under RFRA;

2.     Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under the First Amendment;

3.     Enter a declaratory judgment that the U.S. Government Mandate was promulgated in violation of the APA;

4.     Enter an injunction prohibiting the Defendants from enforcing the U.S. Government Mandate against Plaintiffs;

5.     Enter an order vacating the U.S. Government Mandate;

6.     Award Plaintiffs attorneys' and expert fees under 42 U.S.C. § 1988; and

7.     Award all other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated:   May 21, 2012
       New York, New York

Respectfully submitted,

JONES DAY

*Charles M. Carberry*

Charles M. Carberry
Todd R. Geremia
Patrick J. Smith
Julie A. Rosselot
222 East 41st Street
New York, New York  10017-6702
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Jennifer M. Bradley (*pro hac vice* pending)
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Attorneys for Plaintiffs,*
*The Roman Catholic Archdiocese of New York;*
*Catholic Health Care System; The Roman*
*Catholic Diocese of Rockville Centre, New*
*York; Catholic Charities of the Diocese of*
*Rockville Centre; and Catholic Health Services*
*of Long Island*