**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

THE ROMAN CATHOLIC ARCHDIOCESE
OF NEW YORK, *et al.*,

   Plaintiffs,

  v.

KATHLEEN SEBELIUS, in her official
capacity as Secretary, United States
Department of Health and Human Services, *et
al.*

   Defendants.

Case No. 1:12-cv-2542

**DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT,
AND REPLY IN SUPPORT OF MOTION
TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY
JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ....................................................................................................................4

    I.      Some of the Plaintiffs Lack Standing ....................................................................4

    II.     Plaintiffs' Claims Lack Merit ...............................................................................6

          A.      Plaintiffs' Religious Freedom Restoration Act Claim Is Without
Merit.........................................................................................................6

                 1.      The Regulations Do Not Substantially Burden Plaintiffs'
Exercise Of Religion .....................................................................6

                         a.      The Regulations Impose No More Than A *De
Minimis* Burden On Plaintiffs' Exercise Of Religion
Because The Regulations Require Virtually Nothing
Of Plaintiffs.......................................................................6

                         b.      Even If The Regulations Were Found To Impose
Some More Than De Minimis Burden On Plaintiffs'
Exercise Of Religion, Any Such Burden Would Be
Far Too Attenuated To Be "Substantial" Under
RFRA ...............................................................................14

                 2.      Even If There Were A Substantial Burden On Religious
Exercise, The Regulations Serve Compelling Governmental
Interests And Are The Least Restrictive Means To Achieve
Those Interests .............................................................................16

          B.      The Regulations Do Not Violate the Free Exercise Clause ......................23

          C.      The Regulations Do Not Violate the Establishment Clause .....................26

          D.      The Regulations Do Not Violate the Free Speech Clause ........................29

          E.      The Regulations Do Not Interfere with Church Governance ...................32

          F.      Plaintiffs' APA and Regulatory Interpretation Claims Fail or Have
Been Forfeited.........................................................................................33

    III.    Plaintiffs Cannot Establish Irreparable Harm, and an Injunction Would
Injure the Government and the Public ..................................................................36

CONCLUSION.................................................................................................................37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Comm'r Internal Revenue,*
    170 F.3d 173 (3d Cir. 1999)...................................................................23

*Am. Friends Serv. Comm. Corp. v. Thornburgh,*
    951 F.2d 957 (9th Cir. 1991) ....................................................................24

*Annex Medical, Inc. v. Sebelius,*
    2013 WL 101927 (D. Minn. Jan. 8, 2013)...................................................15

*Autocam Corp. v. Sebelius,*
    2012 WL 6845677 (W.D. Mich. Dec. 24, 2012) ..................................... *passim*

*Bhd. of R.R. Signalmen v. Surface Transp. Bd.,*
    638 F.3d 807 (D.C. Cir. 2011) ..................................................................34

*Bowen v. Roy,*
    476 U.S. 693 (1986)..................................................................10, 11, 13

*Briscoe v. Sebelius,*
    927 F. Supp. 2d 1109 (D. Colo. 2013) .......................................................31

*Brown v. Entm't Merchs. Ass'n,,*
    131 S. Ct. 2729 (2011) .............................................................................21

*Centro Tepeyac v. Montgomery Cnty.,*
    779 F. Supp. 2d 456 (D. Md. 2011) .....................................................31, 32

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,,*
    467 U.S. 837 (1984)................................................................................20

*Church of Scientology of Ga., Inc. v. City of Sandy Springs,*
    843 F. Supp. 2d 1328 (N.D. Ga. 2012) ......................................................11

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993)................................................................17, 24, 26

*Civil Liberties for Urban Believers v. City of Chi.,*
    342 F.3d 752 (7th Cir. 2003) ................................................................7, 9, 11

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013)..............................................................................5

*Colorado Christian University v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) .........................................................28, 29, 30

*Conestoga Wood Specialties Corp. v. Sebelius,*
    917 F. Supp. 2d 394 (E.D. Pa. 2013) .................................................. *passim*

*Cornish v. Dudas,*
    540 F. Supp. 2d 61 (D.D.C. 2008) ............................................................37

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
  483 U.S. 327 (1987)..................................................................................................28

*Droz v. Comm'r of IRS*,
  48 F.3d 1120 (9th Cir. 1995) ...................................................................................27

*Eden Foods, Inc. v. Sebelius*,
  2013 WL 1190001 (E.D. Mich. Mar. 22, 2013) ....................................................15, 23

*Elrod v. Burns*,
  427 U.S. 347 (1976).................................................................................................36

*Evergreen Ass'n v. City of New York*,
  801 F. Supp. 2d 197 (S.D.N.Y. 2011).....................................................................31, 32

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976).................................................................................................35

*Fegans v. Norris*,
  537 F.3d 897 (8th Cir. 2008) ...................................................................................23

*Felske v. Hirschmann*,
  2012 WL 716632 (S.D.N.Y. Mar. 1, 2012) .............................................................29

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
  218 F. Supp. 2d 369 (S.D.N.Y. 2002).....................................................................29

*Fisher v. Univ. of Tex.*,
  133 S. Ct. 2411 (2013)..............................................................................................22

*Forest Grove School Dist. v. T.A.*,
  557 U.S. 230 (2009).................................................................................................34

*Fraternal Order of Police v. City of Newark*,
  170 F.3d 359 (3d Cir. 1999).....................................................................................25

*Geneva Coll. v. Sebelius*,
  2013 WL 838238 (W.D. Pa. Mar. 6, 2013) .............................................................23

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
  546 U.S. 418 (2006).................................................................................................19

*Gooden v. Crain*,
  353 F. App'x 885 (5th Cir. 2009)..............................................................................23

*Graham v. Comm'r*,
  822 F.2d 844 (9th Cir. 1987) ...................................................................................23

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*,
  100 F.3d 1287 (7th Cir. 1996) .................................................................................26

*Grote Indus., LLC v. Sebelius*,
  914 F. Supp. 2d 943 (S.D. Ind. 2012) ................................................................. *passim*

*Grote v. Sebelius*,
  708 F.3d 850 (7th Cir. 2013) ...................................................................................15

*Heckler v. Mathews*,
    465 U.S. 728 (1984) ........................................................................................................... 18

*Hobby Lobby Stores, Inc. v. Sebelius*,
    870 F. Supp. 2d 1278 (W.D. Okla. 2012), ......................................................................... 23

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .................................................................... 29

*Intercommunity Ctr. for Justice & Peace v. INS*,
    910 F.2d 42 (2d Cir. 1990) ................................................................................................ 24

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008) ................................................................................. 7, 9, 11

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952) ........................................................................................................... 33

*Kissinger v. Bd. of Trs. of Ohio State Univ.*,
    5 F.3d 177 (6th Cir. 1993) ................................................................................................. 26

*Knight v. Conn. Dep't of Pub. Health*,
    275 F.3d 156 (2d Cir. 2001) .............................................................................................. 26

*Korte v. U.S. Dep't of Health & Human Servs.*,
    912 F. Supp. 2d 735 (S.D. Ill. 2012) ..................................................................... 14, 18, 23

*Larson v. Valente*,
    456 U.S. 228 (1982) ......................................................................................................... 27

*Legatus v. Sebelius*,
    901 F. Supp. 2d 980 (W.D. Mich. 2012) .......................................................................... 18

*Levitan v. Ashcroft*,
    281 F.3d 1313 (D.C. Cir. 2002) ........................................................................................ 13

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................................................................... 4

*Liberty Univ., Inc. v. Lew*,
    2013 WL 3470532 (4th Cir. July 11, 2013) ...................................................................... 27

*Living Water Church of God v. Charter Twp. of Meridian*,
    258 F. App'x 729 (6th Cir. 2007) ................................................................................. 9, 11

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ......................................................................................................... 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................................... 4

*Lusk v. Vill. of Cold Spring*,
    475 F.3d 480 (2d Cir. 2007) .............................................................................................. 36

*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360 (1989) ......................................................................................................... 20

iv

*McEachin v. McGuinnis*,
    357 F.3d 197 (2d Cir. 2004)...................................................................9, 11

*McNeilly v. Land*,
    684 F.3d 611 (6th Cir. 2012) .......................................................................37

*Mersino Mgmt. Co. v. Sebelius*,
    2013 WL 3546702 (E.D. Mich. July 11, 2013) ............................................13

*MK Chambers Co. v. U.S. Dep't of Health & Human Servs.*,
    2013 WL 1340719 (E.D. Mich. Apr. 3, 2013)...............................................31

*New Life Baptist Church Acad. v. Town of E. Longmeadow*,
    885 F.2d 940 (1st Cir. 1989).................................................................22, 23

*Norton v. Sam's Club*,
    145 F.3d 114 (2d Cir. 1998)........................................................................29

*O'Brien v. U.S. Dep't of Health & Human Servs.*,
    894 F. Supp. 2d 1149 (E.D. Mo. 2012)................................................ *passim*

*Potter v. Dist. of Columbia*,
    558 F.3d 542 (D.C. Cir. 2009) ....................................................................14

*Richards v. Napolitano*,
    642 F. Supp. 2d 118 (E.D.N.Y. 2009) ........................................................36

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc. ("FAIR")*,
    547 U.S. 47 (2006)...............................................................................31, 32

*S. Ridge Baptist Church v. Indus. Comm'n of Ohio*,
    911 F.2d 1203 (6th Cir. 1990) ....................................................................23

*Sharpe Holdings, Inc. v. HHS*,
    2012 WL 6738489 (E.D. Mo. Dec. 31, 2012) .............................................23

*Swanson v. Guthrie Indep. Sch. Dist.*,
    135 F.3d 694 (10th Cir. 1998) ....................................................................24

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981)..............................................................10, 14, 15, 16

*Tony & Susan Alamo Found. v. Sec. of Labor*,
    471 U.S. 290 (1985)..............................................................................9, 11

*Ungar v. N.Y.C. Hous. Auth.*,
    363 F. App'x 53 (2d Cir. 2010)...................................................................24

*United States v. Carlo Bianchi & Co.*,
    373 U.S. 709 (1963)...................................................................................21

*United States v. Lafley*,
    656 F.3d 936 (9th Cir. 2011) ......................................................................23

*United States v. Lee*,
    455 U.S. 252 (1982)............................................................................16, 18

*United States v. Wilgus*,
638 F.3d 1274 (10th Cir. 2011) ....................................................................19, 22

*United States v. Winddancer*,
435 F. Supp. 2d 687 (M.D. Tenn. 2006)......................................................18, 19

*University of Great Falls v. NLRB*,
278 F.3d 1335 (D.C. Cir. 2001) ............................................................................29

*Vision Church v. Vill. of Long Grove*,
468 F.3d 975 (7th Cir. 2006) ...............................................................................11

*Washington v. Klem*,
497 F.3d 272 (3d Cir. 2007)............................................................................9, 11

*Watson v. Jones*,
80 U.S. 679 (1871)..................................................................................................33

*Westchester Day Sch. v. Vill. of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007)..................................................................................11

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)................................................................................................36

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)..................................................................................................4

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................................................................................36

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)..................................................................................12, 13, 17


**STATE CASES**

*Catholic Charities of Sacramento*,
85 P.3d 67 (Cal. 2004) .....................................................................................23, 31

*Catholic Charities of the Diocese of Albany v. Serio*,
859 N.E.2d 459 (N.Y. 2006)....................................................23, 27, 28, 31


**FEDERAL STATUTES**

26 U.S.C. § 45R ...............................................................................................................19

29 U.S.C. § 1002(16) ...................................................................................................1, 5

29 U.S.C. § 1003(b)(2) .....................................................................................................5

42 U.S.C. § 18021(a)(1) .................................................................................................35

42 U.S.C. § 18023(b)(1) .................................................................................................35

I.R.C. § 6033(a)(3)(A) (1986).......................................................................................28

## **FEDERAL REGULATIONS**

26 C.F.R. § 54.9815-2713A ....................................................................................5, 32

29 C.F.R. § 2510.3-16(b) .............................................................................................5

29 C.F.R. § 2590.715-2713A(b)(1)(iii) ........................................................................32

## **FEDERAL REGISTER**

75 Fed. Reg. 34,540 (June 17, 2010) ..........................................................................18

75 Fed. Reg. 41,726 (July 19, 2010) ...........................................................................26

77 Fed. Reg. 8,725 (Feb. 15, 2012) .............................................................................37

78 Fed. Reg. 39,870 (July 2, 2013) ..................................................................... *passim*

## INTRODUCTION

Plaintiffs challenge regulations related to the provision of contraceptive coverage that require plaintiffs to take the *de minimis* step that they would have to take even in the absence of such regulations: convey to their third party administrators (TPAs) that they do not wish to provide contraceptive coverage. Plaintiffs are eligible for a regulatory accommodation that relieves them from having to contract, arrange, pay, or refer for contraceptive coverage, and that in no way prevents plaintiffs from continuing to voice their disapproval of contraceptive use or even from encouraging their employees to refrain from using contraceptive services. To avail themselves of this significant accommodation, plaintiffs need do nothing more than provide their TPAs with a copy of a self-certification that they are eligible for the accommodations. Such a minimal requirement is no "burden" at all, let alone one sufficient to invalidate the regulations. In response to this reality, which defendants described in their opening brief, plaintiffs contend that the challenged regulations *do* require them to change their behavior in a significant way and that, even if the Court disagrees, even a *de minimis* change in behavior can amount to a substantial burden under the Religious Freedom Restoration Act (RFRA).

Plaintiffs' arguments fail for several reasons. First, as a threshold matter, four of the six plaintiffs—the Roman Catholic Archdiocese of New York (the "Archdiocese"); Cardinal Spellman High School ("Cardinal Spellman") and Monsignor Farrell High School ("Monsignor Farrell"), as participants in the Archdiocese's health plan; and the Roman Catholic Diocese of Rockville Centre (the "Diocese")—lack standing to assert their claims. For the first time in the long history of this litigation, these plaintiffs (hereinafter referred to as the "church plan plaintiffs") have alleged that the health plans that they provide to their employees qualify as "church plans" as defined under Section 3(33) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(33). *See* Statement of Material Facts in Support of Pls.' Mot. for Summ. J. ("Pls.' Statement of Facts") ¶¶ 4, 21, ECF No. 86. While defendants continue to consider potential options to fully and appropriately extend the consumer protections provided by the regulations to self-insured church plans, they acknowledge that, at this time, they lack

1

authority to require the TPAs of self-insured church plans to make the separate payments for contraceptive services for participants and beneficiaries in such plans under the accommodation. This acknowledgement does not in any way change the fact that the church plan plaintiffs remain entirely exempt from the contraceptive coverage regulations (as to the Archdiocese and the Diocese), or eligible for the accommodations (as to Monsignor Farrell and Cardinal Spellman) and therefore not required to contract, arrange, pay, or refer for contraceptive coverage. It means only that their TPAs are not required to make the separate payments for contraceptive services for their employees under the accommodation. Thus, the injury of which plaintiffs complain—that the regulations somehow require them to facilitate access to contraceptive services to which they object on religious grounds—simply does not apply to the church plan plaintiffs and, as a result, the church plan plaintiffs lack standing to assert their claims.

Second, the regulations impose no more than *de minimis* requirements on the two remaining plaintiffs—Catholic Health Care System ("ArchCare") and Catholic Health Services of Long Island (CHSLI). Ultimately, plaintiffs object to the fact that their religious opposition to providing contraceptive coverage to their employees no longer has the effect of preventing their employees from receiving such coverage. But the scheme of separate payments for contraceptive services under the accommodation does not amount to a substantial burden under RFRA. In plaintiffs' view, RFRA is violated whenever they believe that the requirements of a law violate their religious beliefs, as long as those requirements are enforced with substantial penalties. In other words, plaintiffs attempt to convert the "substantial burden" standard into a "substantial pressure" standard. But in determining whether an alleged burden is substantial, courts look not only to the magnitude of the penalty imposed, but also to the *objective* character of the actions required by the challenged law and the magnitude of the burden imposed by those requirements. Despite plaintiffs' insistence to the contrary, defendants do not themselves undertake, not do they ask this Court to undertake, a theological inquiry of any kind. The Court need not doubt the sincerity or centrality of plaintiffs' religious beliefs, parse the content of those beliefs, or make a value judgment about those beliefs. Instead, the Court must examine the alleged burden imposed

by the challenged regulations on plaintiffs' religious exercise as a legal matter, outside the context of their religious beliefs—that is, from the perspective of an objective observer.

Third, any impact of the regulations is too attenuated to impose a substantial burden under RFRA. Cases that find a substantial burden uniformly involve a *direct* burden on the plaintiff. Here, by contrast, plaintiffs object to the fact that the consequence of their refusal to provide contraceptive coverage to their employees is that a third party will provide such coverage in their stead. Plaintiffs remain free to refuse to contract, arrange, pay, or refer for contraceptive coverage; to voice their disapproval of contraceptive use; and to encourage their employees to refrain from such use. The preventive services coverage regulations therefore affect plaintiffs' religious practice, if at all, in a highly attenuated way, which is little different from plaintiffs' payment of salaries to their employees, which those employees can also use to purchase contraceptive services if they so choose. And finally, even if the challenged regulations were deemed to impose a substantial burden on plaintiffs' religious exercise, the regulations would not violate RFRA because they are narrowly tailored to serve two compelling governmental interests.

Plaintiffs' other claims also lack merit. Plaintiffs' free exercise claim fails because the regulations are neutral and generally applicable. And plaintiffs' other First Amendment claims are also unsupported. Indeed, nearly every court to consider similar First Amendment challenges to the prior version of the regulations rejected the claims, and their analysis applies here. Plaintiffs forfeit all but one of their APA claims, and their remaining claim is based on some fundamental misunderstandings of the applicable law. Finally, plaintiffs cannot satisfy the remaining requirements for obtaining a permanent injunction.

For these reasons, and those explained below and in the government's opening brief, plaintiffs' motion for summary judgment should be denied, and defendants' motion to dismiss or, in the alternative, for summary judgment should be granted.

## ARGUMENT

## I.    SOME OF THE PLAINTIFFS LACK STANDING

At the outset, the claims of the church plan plaintiffs should be dismissed because they lack standing. "[T]he irreducible constitutional minimum of standing" requires that a plaintiff (1) have suffered an injury in fact, (2) that is caused by the defendant's conduct, and (3) that is likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As to the injury prong, a plaintiff must demonstrate that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotations omitted). Allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quotation omitted).

The harm alleged by plaintiffs in this case is that, in order to avail themselves of the accommodations, the challenged regulations require them to engage in actions—in particular, the execution of the self-certification—that make plaintiffs "the trigger and but-for cause of the provision of the objectionable products and services." Am. Compl. ¶ 10, ECF No. 69. While the government has explained at length—in their opening brief and in this brief—why this alleged injury does not amount to a substantial burden under RFRA, defendants have not previously contested the sufficiency of this allegation for the purposes of Article III standing. However, things have changed. *See Lewis v. Casey*, 518 U.S. 343, 349 n.1 (standing "is jurisdictional and not subject to waiver"). For the first time in the long history of this litigation, the church plan plaintiffs have alleged that the health plans that they provide to their employees qualify as "church plans" under the Employee Retirement Income Security Act (ERISA). *See* Pls.' Statement of Facts ¶¶ 4, 21. While defendants continue to consider potential options to fully and appropriately extend the consumer protections provided by the regulations to self-insured church plans, they acknowledge that, at this time, they lack regulatory authority to require the TPAs of self-insured church plans to make the separate payments for contraceptive services for participants and beneficiaries in such plans under the accommodation.

4

In general, under the challenged regulations, when a TPA receives a copy of the self-certification from an eligible employer that sponsors a self-insured group health plan, that TPA becomes an ERISA Section 3(16), 29 U.S.C. § 1002(16), plan administrator and claims administrator for the purpose of providing the separate payments for contraceptive services. *See* 29 C.F.R. § 2510.3-16(b). Thus, the contraceptive coverage requirements can be enforced against such TPAs through defendant Department of Labor's ERISA enforcement authority. *See* 78 Fed. Reg. 39,870, 39,879-39,880 (July 2, 2013), AR at 11-12. However, church plans are specifically excluded from the ambit of ERISA. *See* 29 U.S.C. § 1003(b)(2). Thus, ERISA enforcement authority is not available with respect to the TPAs of self-insured church plans under the accommodation, and the government cannot compel such TPAs under such authority to provide contraceptive coverage to self-insured church plan participants beneficiaries under the accommodation, including the employees of the church plan plaintiffs and their covered dependents in this case.

The Archdiocese and the Diocese remain entirely exempt from the challenged regulations, and the two plaintiff high schools that share the Archdiocese church plan remain eligible for the accommodations under the final regulations promulgated by defendant Department of Treasury, 26 C.F.R. § 54.9815-2713A and therefore need not contract, arrange, pay, or refer for contraceptive services.[1] But their TPAs need not provide separate payments for contraceptive services, and thus, under the challenged regulations, there is absolutely no connection between the church plan employer and contraceptive coverage.[2] Thus, the injury of which plaintiffs complain—that the regulations somehow require them to facilitate access to contraceptive services to which they object on religious grounds—simply does not apply to the

---

[1] The same can be said of any other eligible organization that participates in the church plan of the Archdiocese or the Diocese, whether or not that organization is a plaintiff in this action.

[2] Nor can plaintiffs complain that their TPAs might voluntarily elect to provide contraceptive coverage notwithstanding the fact that defendants do not have the authority to require them to do so, as this allegation would be far too speculative for the purposes of Article III standing. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).

church plan plaintiffs and, as a result, the church plan plaintiffs lack standing to assert their claims.[3]

## II.     PLAINTIFFS' CLAIMS LACK MERIT

### A.     Plaintiffs' Religious Freedom Restoration Act Claim Is Without Merit

#### 1.     The regulations do not substantially burden plaintiffs' exercise of religion

##### a.     *The regulations impose no more than a* de minimis *burden on plaintiffs' exercise of religion because the regulations require virtually nothing of plaintiffs*

As defendants explained in their opening brief, in determining whether a law imposes a substantial burden on a plaintiff's religious exercise under RFRA, courts must determine (1) whether the plaintiff's religious objection to the challenged law is sincere, (2) whether the law applies significant pressure to comply, and (3) whether the challenged regulations actually require plaintiffs to modify their behavior in a significant—or more than *de minimis*—way. *See* Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Pre. Inj. & in Support of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Defs.' Br.") at 16, ECF No. 80-1. Although plaintiffs continue to describe the RFRA substantial burden inquiry as if it involves only the first two prongs of the test described above, *see* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. & in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") at 5, ECF No. 88, they agree that, for a law to impose a substantial burden on plaintiffs, it "must compel them to act," *id.* at 7. According to plaintiffs, that requirement is satisfied in this case for two alternative reasons. First, they contend that the challenged regulations *do* require them to substantially modify their religious behavior. *See id.* at 7-10, 13-14. And second, they argue that, even if the regulations require only *de minimis* action

---

[3] Even if the Court were to determine that the church plan plaintiffs do have standing to assert their claims, those claims would fail—along with the claims of the remaining plaintiffs, ArchCare and CHSLI—for the reasons stated in Section II below.

on their part, this is sufficient to impose a substantial burden under RFRA. *See id.* at 10-13.

Plaintiffs are wrong on both counts.[4]

First, the regulations do not require plaintiffs to modify their religious behavior. The Archdiocese and the Diocese are entirely exempt from the contraceptive coverage requirement. And the remaining plaintiffs (the "non-diocese plaintiffs"), as eligible organizations, are not required to contract, arrange, pay, or refer for such coverage. To the contrary, these plaintiffs are free to continue to refuse to do so, to voice their disapproval of contraceptive use, and to encourage their employees to refrain from using contraceptive services. The non-diocese plaintiffs need only fulfill the self-certification requirement and provide a copy to their TPAs. Plaintiffs need not provide payments for contraceptive services for their employees. Instead, third parties—plaintiffs' TPAs—provide separate payments for contraceptive services on behalf of plaintiffs' employees, at no cost to plaintiffs. In short, with respect to contraceptive coverage, plaintiffs need do what they did prior to the promulgation of the challenged regulations—that is, to convey to their TPAs that they do not wish to provide contraceptive coverage in order to ensure that they are not contracting, arranging, paying, or referring for such coverage. Thus, the regulations do not require plaintiffs "to modify [their] religious behavior in any way." *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008). The Court's inquiry should end here. A law cannot be a substantial burden on religious exercise when "it involves no action or forbearance on [plaintiffs'] part, nor . . . otherwise interfere[s] with any religious act in which [plaintiffs] engage[]." *Id.*; *see also Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003) (holding, in the context of the Religious Land Use and Institutionalized Persons Act (RLUIPA), that "a substantial burden on religious exercise is one that necessarily

---

[4] In addition to the arguments raised below, the church plan plaintiffs cannot possibly show that the challenged regulations burden their religious exercise under RFRA for the same reason that they have not even alleged an injury sufficient for purposes of Article III standing. In short, because the church plan plaintiffs are either exempt or eligible for the accommodation, and the government cannot require the church plan plaintiffs' TPAs to provide contraceptive coverage, the regulations impose absolutely no burden on their religious exercise, let alone a substantial burden.

bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable").

Plaintiffs argue that the regulations do in fact require them to take certain actions. Specifically, plaintiffs allege that they "must locate and identify a third party administrator willing to provide the very services they deem objectionable, and they must enter into a contract with that party that will result in the provision or procurement of those services." Pls.' Opp'n at 8; *see also id.* at 13 ("Under the Mandate, . . . plaintiffs must now identify and contract with third party administrators or insurance companies that *will* provide the objectionable products and services."). But these activities—locating and entering into a contract with a TPA—are not attributable to the regulations, but instead are activities that plaintiffs, which are self-insured, already engage in in order to provide health coverage to their employees. Each of the plaintiffs is already in an existing relationship with at least one TPA, *see* Am. Compl. ¶¶ 48, 66, 95, 117, which is presumably governed by a contract between the plaintiff and the TPA. Plaintiffs do not need to find new TPAs, nor do they need to modify their existing contracts with their current TPAs. Once plaintiffs satisfy the self-certification requirement, their TPAs will provide separate payments for contraceptive services for plaintiffs' employees.

Nor does the self-certification requirement itself impose a substantial burden. The non-diocese plaintiffs need *only* self-certify that they are non-profit religious organizations with a religious objection to providing contraceptive coverage and to share that self-certification with their TPAs. Thus, plaintiffs are required to convey to their TPAs that they do not intend to cover or pay for contraceptive services, which they presumably have done or would have to do voluntarily anyway even absent these regulations in order to ensure that they are not contracting, arranging, paying, or referring for contraceptive coverage. The sole difference in the communication is that they must inform their TPAs that their intention not to cover contraceptive services is due to their religious objections—a statement which they have already made repeatedly in this litigation and elsewhere. Any burden imposed by this purely administrative self-certification requirement is, at most, *de minimis*, and thus cannot be "substantial" under

RFRA. *See* Defs.' Br. at 14-15; *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007); *Kaemmerling*, 553 F.3d at 678 ("An inconsequential or *de minimis* burden on religious practice does not rise to this level [of a substantial burden]."); *Washington v. Klem*, 497 F.3d 272, 279-81 (3d Cir. 2007); *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004); *Civil Liberties for Urban Believers*, 342 F.3d at 761; *see also Tony & Susan Alamo Found. v. Sec. of Labor*, 471 U.S. 290, 303-04 (1985) (noting that application of the challenged law would "work little or no change in [the plaintiffs'] situation").

In short, plaintiffs' behavior need not change in any significant way as a result of the regulations. Ultimately, plaintiffs' complaint is that their informing their TPAs of their intention not to provide contraceptive coverage to their employees no longer has the effect of preventing their employees from receiving such coverage. Prior to the adoption of the challenged regulations, plaintiffs' refusal to provide contraceptive coverage to their employees effectively meant that those employees went without it. In effect, plaintiffs had a veto over the health coverage that their employees received. Now, plaintiffs no longer exercise such a veto over their employees' health coverage. In other words, plaintiffs' religious objection to offering and funding contraceptive coverage remains effective as to them, but their employees will receive such coverage from another source. But contrary to plaintiffs' argument, the fact that their employees will now receive contraceptive coverage does not mean that plaintiffs are put in the position of "authoriz[ing]," Pls.' Opp'n at 8, or in any other way condoning, the provision of such coverage to employees. Plaintiffs' employees will receive coverage for contraceptive services from another source *despite* plaintiffs' religious objections, not *because* of those objections.

To put it another way, plaintiffs seem to object to the fact that, while the regulations do not require them to substantially change their behavior, the *consequences* of their behavior have changed because their employees will now receive contraceptive coverage from a third party. But this objection only serves to illustrate the problem with plaintiffs' argument. Plaintiffs have not alleged that they have any inherent religious objection to the self-certification requirement—

9

their objection stems entirely from the actions of *other* parties once plaintiffs satisfy the self-certification requirement.[5]

Instead, not only do plaintiffs want to be free from contracting, arranging, paying, or referring for contraceptive coverage for their employees—which, under these regulations, they are—but plaintiffs also want to prevent *anyone else* from providing such coverage to their employees, who might not subscribe to plaintiffs' religious beliefs. They thus want to project their personal religious exercise onto third parties to dictate the third parties' conduct. That this is the *de facto* impact of plaintiffs' stated objections is made clear by their assertion that RFRA is violated whenever they are the "but-for cause of the provision of the objectionable products and services." Am. Compl. ¶ 10. This theory would mean, for example, that even if the government could realistically provide contraceptive coverage to plaintiffs' employees directly (as plaintiffs elsewhere suggest), such benefits would be impermissible because they would be "trigger[ed]," *id.*, by plaintiffs' refusal to provide such coverage themselves. In fact, under plaintiffs' theory, the government would be unable to provide any benefit to employees of an entity with religious objections to that benefit in an effort to accommodate the religious beliefs of the entity, which would leave the employees with only those benefits that their employers do not to object to. But RFRA is a shield, not a sword, *see O'Brien v. U.S. Dep't of Health & Human Servs.*, 894 F. Supp. 2d 1149, 1158-60 (E.D. Mo. 2012), *appeal pending*, No. 12-3357 (8th Cir.), and it does not give religious objectors both the right to a religious accommodation *and* the right to demand that no one else fill in any gaps left by that accommodation. The government remains able to provide alternative means of achieving important statutory objectives once it has provided such a religious accommodation. *Cf. Bowen* v. *Roy*, 476 U.S. 693, 699 (1986) ("The Free Exercise

---

[5] The nature of plaintiffs' objection distinguishes this case from the other examples offered by plaintiffs. *See* Pls.' Opp'n at 12; *see also infra* Section II.A.1.b. For example, a law that forced an Orthodox Jew "to flip a light switch on the Sabbath," Pls.' Opp'n at 12, or required plaintiffs "to sign a single piece of paper renouncing their views on contraception," *id.*, would likely impose a substantial burden on religious exercise because it would require the religious adherent to engage directly in an activity that he or she finds inherently objectionable. Similarly, in *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981), the plaintiff had an inherent objection to the direct production of armaments, as opposed to the production of material that would eventually be used to fabricate armaments. *See id.* at 710-11.

Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.").[6]

Plaintiffs' alternative argument is similarly flawed. In short, plaintiffs contend that, even if the regulations require only a *de minimis* change in behavior on their part, this would be sufficient for purposes of the RFRA substantial burden inquiry. *See* Pls.' Opp'n at 10. In plaintiffs view, "what matters for purposes of RFRA is that plaintiffs sincerely believe that these actions violate their religious beliefs." *Id.* at 8. Thus, according to plaintiffs, the Court's inquiry is limited to the magnitude of the penalty imposed by the challenged regulations—if this penalty is "substantial," then so is the burden. *See id.* at 10.

This is not how RFRA works. In determining whether an alleged burden is substantial, courts look not only to the magnitude of the penalty imposed, but to the character of the actions required by the challenged law and the magnitude of the burden imposed by those requirements. *See, e.g.*, *Living Water Church of God*, 258 F. App'x at 734-36; *Kaemmerling*, 553 F.3d at 678; *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348-49 (2d Cir. 2007); *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1353-54 (N.D. Ga. 2012); *Klem*, 497 F.3d at 279-81; *McEachin*, 357 F.3d at 203 n.6; *Civil Liberties for Urban Believers*, 342 F.3d at 761; *Alamo Found.*, 471 U.S. at 303-04. It is telling that plaintiffs repeatedly attempt to re-label the "substantial burden" test as the "substantial pressure" test. *See, e.g.*, Pls.' Opp'n at 6, 13. If plaintiffs' were correct that the only relevant question under RFRA is whether the challenged law imposes substantial pressure on the religious adherent, then one would expect court opinions in RFRA cases to focus primarily on the magnitude of the penalty imposed by the law. But they

---

[6] Plaintiffs contend that *Bowen* supports their argument, because "[a] majority of the Court would have held that" the requirement that the plaintiff "provide the government with his daughter's social security number in order for her to receive benefits . . . imposed a substantial burden on his exercise of religion." Pls.' Opp'n at 9 n.3. But plaintiffs misread *Bowen*. Although the record is somewhat uncertain on this point, the plaintiffs in *Bowen* objected not only to providing their daughter's social security number because of the *consequences* of doing so (*i.e.*, that it would then be used by the government), but appeared also to have "an independent religious objection to the requirement that *they* provide a social security number for their daughter." 476 U.S. at 714 (Blackmun, J., concurring in part); *see also id.* at 718 (Stevens, J., concurring in part and concurring in the result). It is not at all clear that a majority of the Court would have found a substantial burden in *Bowen* absent this "independent objection."

do not. For example, in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the plaintiffs were fined $5 for failure to comply with Wisconsin's compulsory school-attendance law. *See id.* at 207-08. Although the Court noted that this fine was a criminal sanction, it spent virtually no time on the question of whether the magnitude of the penalty was sufficient to amount to a substantial burden, *see id.* at 218—the only relevant question in plaintiffs' view. Instead, the Court focused on the character of the burden imposed by the challenged law. *See id. Yoder* and other cases make clear that, under RFRA, plaintiffs must show not only that the challenged regulations exert substantial *pressure—i.e.* a penalty of sufficient magnitude—but also that the *burden* imposed on plaintiffs' religious exercise is more than *de minimis*.

Under plaintiffs' alternative theory, the mere fact that plaintiffs claim that they sincerely believe that the challenged regulations violate their religious beliefs, *see* Pls' Opp'n at 10, would be sufficient to amount to a substantial burden on their religious exercise under RFRA. Courts would play virtually no role in determining whether an alleged burden is "substantial"—as long as a plaintiff's religious belief is sincere, that would be the end of the inquiry. Courts have rejected such a hollow interpretation of the substantial burden standard. *See Conestoga Wood Specialties Corp. v. Sebelius*, 917 F. Supp. 2d 394, 413 (E.D. Pa. 2013) ("[W]e reject the notion . . . that a plaintiff shows a burden to be substantial simply by claiming that it is."), *aff'd*, 724 F.3d 377 (3d Cir. 2013); *Autocam Corp. v. Sebelius*, No. 1:12-cv-1096, 2012 WL 6845677, at *6 (W.D. Mich. Dec. 24, 2012) ("The Court does not doubt the sincerity of Plaintiff Kennedy's decision to draw the line he does, but the Court still has a duty to assess whether the claimed burden—no matter how sincerely felt—really amounts to a substantial burden on a person's exercise of religion."), *aff'd*, 730 F.3d 618 (6th Cir. 2013); *see also Grote Indus., LLC v. Sebelius*, 914 F. Supp. 2d 943, 949 (S.D. Ind. 2012), *appeal pending*, No. 13-1077 (7th Cir.). "If every plaintiff were permitted to unilaterally determine that a law burdened their religious beliefs, and courts were required to assume that such burden was substantial, simply because the plaintiff claimed that it was the case, then the standard expressed by Congress under the RFRA would convert to an 'any burden' standard." *Conestoga*, 917 F. Supp. 2d at 413-14; *see also*

*Autocam*, 2012 WL 6845677, at *7; *Grote*, 914 F. Supp. 2d at 952; *Mersino Mgmt. Co. v. Sebelius*, No. 13-cv-11296, 2013 WL 3546702, at *16 (E.D. Mich. July 11, 2013).[7]

Contrary to plaintiffs' suggestions, *see* Pls.' Opp'n at 2-3, 11-12, the inquiry that the government asks this Court to undertake is not a theological one. The Court need not doubt the sincerity or centrality of plaintiffs' religious beliefs, *see id.* at 11, parse the content of plaintiffs' beliefs, or make a "value judgment" about those beliefs, *id.* at 2. Instead, the Court must examine the alleged burden imposed by the challenged regulations *as a legal matter* outside the context of plaintiffs' religious beliefs (which need not be, and are not in this case, disputed)—that is, from the perspective of an objective observer. *See, e.g.*, *Bowen*, 476 U.S. at 701 n.6 ("Roy's religious views may not accept this distinction between individual and governmental conduct. . . . It is clear, however, that the Free Exercise Clause, and the Constitution generally, recognize such a distinction; for the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference."); *Yoder*, 406 U.S. at 218 ("Nor is the impact of the compulsory-attendance law confined to grave interference with important Amish religious tenets from a *subjective* point of view. It carries with it precisely the kind of *objective* danger to the free exercise of religion that the First Amendment was designed to prevent." (emphasis added)); *Levitan v. Ashcroft*, 281 F.3d 1313, 1321 (D.C. Cir. 2002) (suggesting that, even where the religious "practice at issue is indisputably an important component of the litigants' religious scheme," any alleged interference with such practice is not substantial where "the impact of the challenged law is *de minimis*"). Under RFRA, plaintiffs are entitled to their sincere religious beliefs, but they are not entitled to decide as a matter of law what does and does not impose a substantial burden on such beliefs. Although "[c]ourts are not arbiters of scriptural interpretation," *Thomas*, 450 U.S. at 716, "RFRA still requires the court to determine whether

---

[7] RFRA's legislative history makes clear that Congress did not intend such a relaxed standard. The initial version of RFRA prohibited the government from imposing *any* "burden" on free exercise, substantial or otherwise. Congress amended the bill to add the word "substantially," "to make it clear that the compelling interest standards set forth in the act" applies "only to Government actions [that] place a substantial burden on the exercise of" religious liberty. 139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy); *see also id.* (text of Amendment No. 1082).

the burden a law imposes on a plaintiff's stated religious belief is 'substantial.'" *Conestoga*, 917

F. Supp. 2d at 413.

> b.    *Even if the regulations were found to impose some more than* de
> minimis *burden on plaintiffs' exercise of religion, any such burden
> would be far too attenuated to be "substantial" under RFRA*

In their opening brief, defendants also argued that, even if the regulations were found to

impose some burden on plaintiffs' religious exercise, any such burden would be too attenuated to

amount to a *substantial* burden under RFRA. *See* Defs.' Br. at 18-22. As defendants explained, a

burden cannot be substantial when it is attenuated. Cases that find a substantial burden uniformly

involve an alleged burden that applies more directly to the plaintiff than the alleged burden in

this case. *See, e.g.*, *Potter v. Dist. of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009); *Grote*, 914

F. Supp. 2d at 950-52; *Conestoga*, 917 F. Supp. 2d at 413-14; *Korte v. U.S. Dep't of Health &

Human Servs.*, 912 F. Supp. 2d 735, 748 (S.D. Ill. 2012), *appeal pending*, No. 12-3841 (7th

Cir.); *Autocam*, 2012 WL 6845677, at *7.

Here, not only are plaintiffs separated from the use of contraception by "a series of

events" that must occur before the use of contraceptive services to which plaintiffs object would

"come into play," *Conestoga*, 917 F. Supp. 2d at 414-15, but plaintiffs are also further insulated

by the fact that a third party—plaintiffs' TPAs—and *not* plaintiffs, will make separate payments

for such services, at no cost to plaintiffs, and thus plaintiffs are in no way subsidizing or

arranging for (much less paying for)—even indirectly—the use of preventive services that they

find objectionable. Under plaintiffs' theory, their religious exercise is substantially burdened

when one of their employees and her health care provider make an independent determination

that the use of certain contraceptive services is appropriate, and such services are paid for

exclusively by plaintiffs' TPAs, with none of the cost being passed on to plaintiffs, and no

administration of the payments by plaintiffs, solely because plaintiffs self-certified and informed

their TPAs that they have religious objections to providing contraceptive coverage.

Plaintiffs' only response to this argument is to argue, again, that the government

14

"mischaracterizes plaintiffs' religious objections," Pls.' Opp'n at 16, and asks this Court to engage in impermissible line drawing regarding plaintiffs' religious beliefs, *id.* at 14-15. Not so. Defendants understand that plaintiffs have a religious objection to what they view as their "complicity" in providing contraceptive products and services to which they object. *Id.* at 15. The Court need not question the nature of these beliefs nor their sincerity. But the Court must determine whether the alleged burden is too indirect and attenuated—viewed from the perspective of an objective observer—and therefore fails to rise to the level of "substantial." *See, e.g.*, *Conestoga*, 917 F. Supp. 2d at 414-15; *Autocam*, 2012 WL 6845677, at *6; *O'Brien*, 894 F. Supp. 2d at 1158-60; *Grote v. Sebelius*, 708 F.3d 850 (7th Cir. 2013) (Rovner, J., dissenting); *Eden Foods, Inc. v. Sebelius*, No. 13-cv-11229, 2013 WL 1190001, at *4 (E.D. Mich. Mar. 22, 2013); *Annex Medical, Inc. v. Sebelius*, No. 12-cv-2804, 2013 WL 101927, at *4-*5 (D. Minn. Jan. 8, 2013), *appeal pending*, No. 13-1118 (8th Cir.); *Grote*, 914 F. Supp. 2d at 949-52.

The cases cited by plaintiffs all involve far more direct burdens than the burden alleged in this case, and involve a significant alteration of plaintiffs' own conduct as the means to avoid a large economic penalty. *See Conestoga*, 917 F. Supp. 2d at 415 (explaining that the indirect nature of any burden imposed by the regulations distinguished them from the statutes challenged in *Yoder*, *Sherbert*, *Thomas*, and *O Centro*). Plaintiffs rely substantially on *Thomas*. *See* Pls.' Opp'n at 14. But in *Thomas*, the alleged burden was not attenuated, as the plaintiff objected to his actual participation in the manufacture of armaments. *See supra* note 5, 450 U.S. at 710-11. To be sure, the Supreme Court recognized that "a compulsion may certainly be indirect and still constitute a substantial burden, such as the denial of a benefit found in *Thomas*." *Conestoga*, 917 F. Supp. 2d at 415 n.15. But that is not so where the burden itself is too attenuated—that is, where the plaintiff's objection is not inherent to the act allegedly required by the challenged law, but is inextricably intertwined with the actions of a third party. *See id.* Similarly, in *United States v. Lee*, 455 U.S. 252 (1982), on which plaintiffs also rely, *see* Pls.' Opp'n at 14, the plaintiff had an inherent objection to filing social security tax returns, withholding social security taxes from his employees' pay, and paying his share of social security taxes. *See Lee*, 455 U.S. at 254-55;

*see also id.* at 257 (noting that "both payment and receipt of social security benefits is forbidden by the Amish faith"). Here—unlike in *Thomas* and *Lee*—plaintiffs object to the fact that the *consequence* of their refusal to provide contraceptive coverage to their employees is that a third party will provide such coverage in their stead. Plaintiffs remain free to refuse to contract, arrange, pay, or refer for contraceptive coverage; to voice their disapproval of contraceptive use; and to encourage their employees to refrain such use. The preventive services coverage regulations therefore affect plaintiffs' religious practice, if at all, in a highly attenuated way.

Finally, plaintiffs object to the government's observation that the impact of the challenged regulations is even less direct than plaintiffs' payment of salaries to their employees, which those employees can also use to purchase contraceptives if they are so inclined. *See* Pls.' Opp'n at 15; *see also* Defs.' Br. at 18, 21. Again, plaintiffs suggest that the government is engaging in impermissible religious line drawing, *see* Pls.' Opp'n at 15, and again, plaintiffs are wrong. Defendants do not question plaintiffs' assertion that the challenged regulations violate their religious beliefs while the payment of wages does not. But as explained above, that is not the end of the inquiry. Because the Court must determine whether the alleged burden imposed by the challenged regulations is attenuated—and thus not substantial—it can properly consider the fact that plaintiffs voluntarily engage in behavior that is objectively less attenuated than anything required by the regulations.[8]

## 2. Even if there were a substantial burden on religious exercise, the regulations serve compelling governmental interests and are the least restrictive means to achieve those interests

Because plaintiffs have not established a "substantial burden" on their religious exercise, the Court's analysis should end there. But even if the Court were to determine that plaintiffs had made out a *prima facie* case under RFRA, the challenged regulations are justified by compelling governmental interests and are the least restrictive means to achieve them.

---

[8] For similar reasons, the fact that at least some of the plaintiffs already directly contribute funds to contraceptive coverage for their unionized employees—which plaintiffs do not dispute and failed to address in their brief—is also relevant. *See* Defs.' Br. at 21 n.14.

Defendants have identified two unquestionably compelling interests: the promotion of public health, and ensuring that women have equal access to health-care services. *See* Defs.' Br. at 22-24. Although plaintiffs attempt to portray these interests as too "broadly formulated" or "sweeping" to be characterized as compelling, Pls.' Opp'n at 17-18, plaintiffs ignore that the regulations promote those interests even with respect to plaintiffs' employees specifically by ensuring that plaintiffs' thousands of employees have access to the clinically recommended contraceptive services to which plaintiffs—but not necessarily plaintiffs' employees—object. The contraceptive coverage requirement furthers the government's compelling interest in promoting public health by "expanding access to and utilization of recommended preventive services for women," including plaintiffs' employees (and covered dependents), and in promoting gender equality by helping to assure that plaintiffs' employees (and covered dependents) "have equal access to health care services." 78 Fed. Reg. at 39,887, AR at 19. The government has shown with "particularity," therefore, that these interests "would be adversely affected by granting an exemption," as plaintiffs' employees would not enjoy the full range of recommended preventive services coverage if not for the challenged regulations. *Yoder*, 406 U.S. at 236.

The government's compelling interests, moreover, are not undermined by any of the so-called "exemptions" that plaintiffs point to. An exemption undermines an allegedly compelling interest only if "it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993). But the "exemptions" relied on by plaintiffs—unlike the exemption that plaintiffs seek—do no appreciable damage to the government's compelling interests. *See* Defs.' Br. at 25-28. In fact, aside from the religious employer exemption, the "exemptions" referred to by plaintiffs are not specific exemptions from the contraceptive coverage requirement at all, but are instead provisions of the ACA that exclude individuals and entities from various requirements imposed by the ACA. They reflect the government's attempt to balance other significant interests

supporting the complex administrative scheme created by the statute. *See Lee*, 455 U.S. at 259; *United States v. Winddancer*, 435 F. Supp. 2d 687, 695-98 (M.D. Tenn. 2006).

Plaintiffs focus on the grandfathering provision of the ACA to suggest that the government's interests cannot be truly compelling. *See* Pls.' Opp'n at 19-20. That provision is transitional in effect and was adopted for reasons relating to the entire ACA and not just preventive care services in general or contraceptive coverage in particular. Unlike the relief that plaintiffs seek, grandfathering does not effect a permanent exemption to the regulations. This difference is not, as plaintiffs argue, mere "semantics." Pls.' Opp'n at 19. While plaintiffs may prefer to focus only on the present for their own purposes, as a practical matter, fewer and fewer group health plans will be grandfathered over time, mitigating any perceived effect on the government's compelling interests. *See* 78 Fed. Reg. at 39,887 n. 49, AR at 19; 75 Fed. Reg. 34,540, 34,542 (June 17, 2010). And plaintiffs continue to cite nothing to suggest that, in order for an interest to be compelling, the government must achieve its goals immediately. To the contrary, such a holding would undermine any rational attempt to phase in important and large-scale government programs over time, "perversely encourag[ing] Congress in the future to require immediate and draconian enforcement of all provision of similar laws, without regard to pragmatic considerations, simply in order to preserve 'compelling interest' status." *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 994 (W.D. Mich. 2012); *Korte*, 912 F. Supp. 2d at 744 (S.D. Ill. 2012) ("Like the district court in *Legatus*, this Court does not perceive how a gradual transition undercuts the neutral purpose or general applicability of the mandate."); *cf. Heckler v. Mathews*, 465 U.S. 728, 746-48 (1984) (noting that "protection of reasonable reliance interests is . . . a legitimate governmental objective" that Congress may permissibly advance through phased implementation of regulatory requirements).[9]

---

[9] Plaintiffs also accuse the government of "minimiz[ing]" the significance of the fact that small employers are not subject to the employer responsibility provision of the ACA. Pls.' Opp'n at 20 n.8. Plaintiffs ignore entirely, however, that the ACA encourages small employers to provide health insurance coverage to their employees through a system of tax incentives. *See* 26 U.S.C. § 45R. The government's compelling interests are not diminished merely because Congress chose a different mechanism—incentives rather than assessable payments—to promote the competing interest in promoting small businesses. *See United States v. Wilgus*, 638 F.3d 1274, 1290-94 (10th Cir. 2011); *Winddancer*, 435 F. Supp. 2d at 695-98.

Similarly, contrary to plaintiffs' assertions, the government's one-year delay in enforcement of the employer responsibility provision of the ACA does not undermine the government's compelling interests. Here again, plaintiffs ignore the important difference between the permanent exemption that they seek and a pragmatic step to usher in a complex statute over time. Moreover, even though large employers will not be subject to assessable payments until 2015 for declining to offer health insurance to their employees, there has been no such delay with respect to the preventive services coverage regulations themselves, meaning that employees whose employers offer health care coverage will reap the benefits of those regulations in their upcoming plan year.

Finally, despite seeking a much broader exemption, plaintiffs perversely insist that the narrow existing exemption for religious employers undermines the government's interests in promoting public health and gender equality. But such a conclusion, as defendants have pointed out, would discourage the government from attempting to accommodate religion for fear that its actions would then cause its regulations to fail strict scrutiny. *See* Defs.' Br. at 28. It would also undermine defendants' ability to administer the regulatory scheme in any rational manner. *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 435 (2006). Although plaintiffs attempt to elide the distinction between houses of worship and their integrated auxiliaries that are exempted under the regulations and eligible organizations that are accommodated under (but not exempted from) the regulations, it is simply not true that "everything the Government says" about religious employers "applies in equal measure" to eligible organizations. Pls.' Opp'n at 21 (quoting *O Centro*, 546 U.S. at 433). Employees of the Archdiocese, for example, would surely be less likely as a group to use contraceptive services, even if such services were covered under the plan, than would be the employees of CHSLI, an institutional provider of health care services that employs over 17,000 people, including a large number of medical professionals. *See* Am. Compl. ¶ 110; *see also* 78 Fed. Reg. at 39,874, 39,887, AR at 19. Given the rational distinction between these two types of entities, plaintiffs'

19

argument that the religious employer exemption must be extended to eligible organizations must fail.

Plaintiffs also question whether the regulations will actually further the government's public health goals, and they flyspeck the IOM Report to suggest that the regulations will not do so. *See* Pls.' Opp'n at 23-25. But the IOM Report and its recommendations are the work of independent experts in the field of public health. After undertaking an extensive science-based review of the available evidence, IOM determined that access to the full range of FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity is necessary for women's health and well-being. The HRSA Guidelines based on the IOM's expert, scientific recommendations are entitled to deference. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989) (emphasizing that deference is particularly appropriate when an interpretation implicates scientific and technical judgments within the scope of agency expertise).

Plaintiffs' second guessing of IOM's expert conclusions, moreover, misses the mark. For example, plaintiffs suggest that access to contraception is not "an actual problem." *See* Pls.' Br. at 24-25. But the IOM—which, unlike plaintiffs, is an expert scientific body—reached the opposite conclusion. Plaintiffs fail to mention the IOM's findings that, based on 2001 data, "an estimated 49 percent of all pregnancies in the United States were unintended," and that "[u]nintended pregnancy is highly prevalent in the United States" and "[t]he unintended pregnancy rate is much lower in other developed countries." IOM REP. at 102, AR at 400. Similarly, pointing to evidence in the IOM Report that eliminating cost sharing allows women who may already use some types of contraception to switch to higher-cost forms of contraception that perhaps are more effective or better-tailored to the individual's specific health care needs, plaintiffs argue that the government has failed to show that eliminating cost sharing increases the use of "contraception generally" and that the government has therefore failed to prove that there is "an actual problem in need of solving." Pls.' Opp'n at 24-25 (quoting *Brown v. Entm't*

*Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011)). This one-size-fits-all conception of contraception ignores, of course, that certain contraceptive methods may be more appropriate than others depending on a woman's personal medical history and health needs. It also ignores that the decision about which form of contraceptive to use is a personal medical decision that is made by a woman in consultation with her health care provider. The IOM Report indicates that "[f]or women with certain medical conditions or risk factors, some contraceptive methods may be contraindicated." IOM Rep. at 105, AR at 403. For example, for some women, hormonal contraceptives (like birth control pills) may be contraindicated because of certain risk factors, such as uncontrolled hypertension or coronary artery disease, so a doctor may instead prescribe a copper IUD, which does not contain hormones. Accordingly IOM recommended that the HRSA Guidelines include, among other things, "the full range of [FDA]-approved contraceptive methods," and the challenged regulations promote public health and gender equality by expanding access to *all* of these contraceptive methods.[10] Plaintiffs' clumsy attempts to draw conclusions from their cherry-picked data only illustrates the importance of giving proper deference to the public health experts at IOM, who were able to reach science-based recommendations after surveying a wide-range of evidence in the field.

The challenged regulations are also the least restrictive means of furthering the government's compelling interests. As defendants have explained, to satisfy the least restrictive means test, the government need not refute every conceivable alternative to a regulatory scheme; rather, it need only "refute the alternative schemes offered by the challenger." *Wilgus*, 638 F.3d at 1289-95. Defendants have done so here.

---

[10] In addition to flyspecking the IOM Report, plaintiffs rely on a law review article for the proposition that studies show the regulations are "unlikely to have any significant impact on effective contraceptive use." Pls.' Opp'n at 25-26 (quoting Helen M. Alvare, *No Compelling Interest: The "Birth Control" Mandate and Religious Freedom*, 58 Vill. L. Rev. 379, 380 (2013)). Of course, a law review article is a poor substitute for the scientific studies relied on by the IOM. Furthermore, it was not part of the administrative record, and therefore should not be considered in the course of the Court's review of agency regulations. *See, e.g.*, *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963); *see also* Defs.' Br. at 32 n.18. The Court should disregard this law review article and any other such extra-record material offered by plaintiffs in their briefs and their Statement of Material Facts, ECF No. 86.

Plaintiffs incorrectly argue that RFRA requires defendants to have considered non-employer-based alternatives that are inconsistent with the relevant statutory structure. Pls.' Opp'n at 27. In implementing the preventive services coverage provision of the ACA, defendants were required to work within the statutory framework established by Congress, which built on the existing system of employment-based health care coverage. Thus, even if plaintiffs' non-employer-based alternatives were otherwise feasible, defendants could not have considered them because they were beyond defendants' statutory authority. Plaintiffs' attempt to rebut this common-sense point is unsuccessful. If, under the hypothetical that plaintiffs pose, *see id.*, Congress were to pass a statute requiring law enforcement agents to conduct warrantless searches, the appropriate course would be to challenge the statute itself; it would not be to fault the law enforcement officers for exercising their duties under the law. The same logic applies here. To the degree that plaintiffs object to the provision of preventive services coverage through the existing employer-based system, their objection is to the ACA—a fundamental underpinning of which is that coverage will continue to be provided through the employer-based system— which they do not challenge in this lawsuit, and not the preventive services coverage regulations.

Because plaintiffs' proposed alternatives are incompatible with the ACA, and well outside of defendants' statutory authority, defendants would be prohibited by law from adopting them. For this reason, all of plaintiffs' proposed alternatives are not feasible, and therefore do not constitute less restrictive means. A proposed alternative scheme is not an adequate alternative— and thus not a viable less restrictive means to achieve the compelling interest—if it is not "workable." *Fisher v. Univ. of Tex.*, 133 S. Ct. 2411, 2420 (2013); *see also, e.g.*, *New Life Baptist Church Acad. v. Town of E. Longmeadow*, 885 F.2d 940, 947 (1st Cir. 1989) (Breyer, J.); *Graham v. Comm'r*, 822 F.2d 844, 852 (9th Cir. 1987); *S. Ridge Baptist Church v. Indus. Comm'n of Ohio*, 911 F.2d 1203, 1206 (6th Cir. 1990); *Fegans v. Norris*, 537 F.3d 897, 905-06 (8th Cir. 2008); *United States v. Lafley*, 656 F.3d 936, 942 (9th Cir. 2011); *Gooden v. Crain*, 353 F. App'x 885, 888 (5th Cir. 2009); *Adams v. Comm'r Internal Revenue*, 170 F.3d 173, 180 n.8 (3d Cir. 1999).

Moreover, plaintiffs continue to fail to explain how their proposed alternatives—in addition to being inconsistent with the ACA's continuation of the existing employer-based system of coverage, less effective, and otherwise unworkable, *see* Defs.' Br. at 30-32—would, in fact, be "less restrictive." As defendants have shown, under plaintiffs' own logic, even assuming defendants could provide contraceptive services directly to plaintiffs' employees, that action would violate plaintiffs' religious beliefs because plaintiffs' refusal to provide or pay for the services to which they object would still "trigger[]" or "facilitate" their provision or payment. *See* Am. Compl. ¶¶ 146, 152, 160. Plaintiffs admit as much, explaining that they would object even to their own proposals. Pls.' Opp'n at 21. Plaintiffs cannot have it both ways, claiming that defendants should have taken a different approach while simultaneously saying that the different approach would still be objectionable. *See New Life Baptist*, 885 F.2d at 950-51.

### B.    The Regulations Do Not Violate the Free Exercise Clause

Nearly every court to have considered a free exercise challenge to the prior version of the regulations has rejected it, concluding that the regulations are neutral and generally applicable.[11] This Court should do the same.

Plaintiffs contend that the regulations are not generally applicable because they contain exceptions for certain objectively defined categories of entities, like grandfathered plans and religious employers. But, as defendants pointed out in their opening brief, this Circuit and others have made clear that such categorical exceptions do not negate general applicability. *See* Defs.' Br. at 33-34. In *Ungar v. N.Y.C. Hous. Auth.*, 363 F. App'x 53, 56 (2d Cir. 2010), for example, the plaintiffs, orthodox Jews, challenged a city housing authority's policy of acting on tenant applications on a first-come, first-served basis. The plaintiffs argued that the policy violated the

---

[11] *See MK Chambers Co. v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-11379, 2013 WL 1340719, at *5 (E.D. Mich. Apr. 3, 2013); *Eden Foods*, 2013 WL 1190001, at *4-*5; *Conestoga*, 917 F. Supp. 2d at 409-10; *Grote*, 914 F. Supp. 2d at 952-53; *Autocam*, 2012 WL 6845677, at *5; *Korte*, 912 F. Supp. 2d at 744-47; *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1289-90 (W.D. Okla. 2012), *rev'd on other grounds*, 723 F.3d 1114; *O'Brien*, 894 F. Supp. 2d at 1160-62; *see also Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 468-69 (N.Y. 2006) (rejecting similar challenge to state law); *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 81-87 (Cal. 2004) (same). *But see Sharpe Holdings, Inc. v. HHS*, 2012 WL 6738489, at *5 (E.D. Mo. Dec. 31, 2012); *Geneva Coll. v. Sebelius*, No. 2:12–cv–00207, 2013 WL 838238, at *24-26 (W.D. Pa. Mar. 6, 2013).

Free Exercise Clause because it made exceptions for certain individuals, like victims of domestic violence and individuals living in substandard housing, but refused to exempt the plaintiffs based on religious hardship. The Second Circuit rejected this argument, concluding that the exceptions, which were "only for specified categories" and were available to the plaintiffs on the same terms as everyone else, did not negate general applicability. *Ungar*, 363 F. App'x at 56; *see also Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 698, 701 (10th Cir. 1998) (concluding school district's attendance policy was generally applicable despite exemptions for "strict categories of students," such as fifth-year seniors and special education students); *Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 961 (9th Cir. 1991) (concluding employer verification statute was generally applicable even though it exempted independent contractors, household employees, and employees hired prior to November 1986 because exemptions "exclude[d] entire, objectively-defined categories of employees"); *Intercommunity Ctr. for Justice & Peace v. INS*, 910 F.2d 42, 45 (2d Cir. 1990) (same). Defendants cited many of these cases in their opening brief, *see* Defs.' Br. at 33-34, and plaintiffs make no effort to distinguish, much less address, them in their opposition.

The regulations also are neutral, as explained in defendants' opening brief. Plaintiffs' reliance on *Lukumi*, 508 U.S. 520, is of no help, as this case is a far cry from *Lukumi*, where the legislature specifically targeted the religious exercise of members of a single church (Santeria) by enacting ordinances that used terms such as "sacrifice" and "ritual," *id*. at 533-34, and prohibited few, if any, animal killings other than Santeria sacrifices, *id*. at 535-36. Here, there is no indication that the regulations are anything other than an effort to increase women's access to and utilization of recommended preventive services. *See, e.g.*, *O'Brien*, 894 F. Supp. 2d at 1161; *Conestoga*, 917 F. Supp. 2d at 410; *Grote*, 914 F. Supp. 2d at 952-53. And it cannot be disputed that defendants have made extensive efforts—through the religious employer exemption and the eligible organization accommodations—to accommodate religion in ways that will not

undermine the goal of ensuring that women have access to coverage for recommended preventive services without cost sharing.[12]

Plaintiffs posit that the regulations must have been designed to target plaintiffs' religious practice of refusing to facilitate access to contraception because, prior to the promulgation of the regulations, "85 percent of health plans already cover[ed] contraception." Pls.' Opp'n at 36.[13] As an initial matter, this 85 percent figure represents only large employers, not small employers (only 62 percent of which covered contraception prior to issuance of the regulations) or plans on the individual market. IOM REP. at 109, AR at 407. More importantly, many of the plans that covered contraceptive services imposed cost-sharing requirements that often resulted in women forgoing preventive care. *Id.* at 19-20, 109. The regulations eliminate that cost-sharing. Finally, even if plaintiffs could show that the regulations have a disproportionate effect on them (and they have not), it would not destroy the regulations' neutrality. *See O'Brien*, 894 F. Supp. 2d at 1161 (rejecting identical argument). "[A] neutral and perfectly constitutional law may have a disproportionate impact upon religiously inspired behavior . . . . The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct." *Id.* (citing cases). Indeed, by plaintiffs' logic, the government also was "specifically target[ing]," Pls.' Opp'n at 36, those with religious objections to vaccinations, as a similar or even greater percentage of health plans covered vaccinations prior to promulgation of the challenged regulations. *See* 75 Fed. Reg. 41,726, 41,732 (July 19, 2010), AR at 232.[14]

---

[12] *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), on which plaintiffs also rely (Pls.' Opp'n at 35), addressed a policy that created a secular exemption but refused all religious exemptions. The preventive services coverage regulations, in contrast, contain an exemption and accommodations that specifically seek to accommodate religion. Thus, unlike in *Fraternal Order*, there is simply no basis here to infer a discriminatory object behind the regulations. *See Conestoga*, 917 F. Supp. 2d at 409-10.

[13] The Federal Register page plaintiffs cite for this proposition does not support it. But the IOM Report cites a 2010 survey of employers that found that 85 percent of large employers and 62 percent of small employers offered coverage of FDA-approved contraceptives. IOM REP. at 109.

[14] Plaintiffs' reliance on a table in the Administrative Record to attempt to show targeting of plaintiffs' Catholic religious beliefs, *see* Pls.' Opp'n at 36-37 is similarly unavailing. Defendants created the table as part of the process of determining the regulatory impact of the challenged regulations. Because there are no centralized sources of statistics for non-profit religious organizations of all denominations that oppose some or all contraceptive services, defendants used the most comprehensive statistical data they could find from public sources, which happened to be data made available by the Catholic entities cited as sources in the table. Defendants' use of these data in no way

Finally, plaintiffs maintain that the challenged regulations are subject to strict scrutiny under a "hybrid rights" theory because they purportedly also infringe on plaintiffs' freedom of speech and association. This Circuit, however, has specifically rejected this so-called "hybrid rights theory." *See Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) (characterizing *Smith*'s hybrid rights language as "dicta and not binding on this court" and declining to apply hybrid rights analysis); *see also Lukumi*, 508 U.S. at 567 (Souter, J., concurring in part and concurring in the judgment) (noting the hybrid rights exception would either swallow the *Smith* rule or be entirely unnecessary); *Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) (characterizing the hybrid rights exception as "completely illogical"). "The allegation that a [government action] infringes more than one of [an entity's] constitutional rights does not warrant more heightened scrutiny than each claim would warrant when viewed separately." *Knight*, 275 F.3d at 167.[15]

### C.    The Regulations Do Not Violate the Establishment Clause

Plaintiffs attempt to re-write Establishment Clause jurisprudence by arguing that the Clause prohibits the government from making not only denominational preferences but also any distinctions among "types of institution[s]" based on their structure and purpose. Pls.' Opp'n at 42. This is simply not the law. The Establishment Clause prohibits laws that "officially prefer[]" "one religious *denomination*" over another, *Larson v. Valente*, 456 U.S. 228, 244 (1982) (emphasis added); it does not prohibit the government from distinguishing between different

---

suggests that they were targeting Catholic religious beliefs. Indeed, certain religious organizations of other denominations also oppose providing contraceptive coverage on religious grounds and have similarly challenged the regulations. *See, e.g.*, *East Tex. Baptist Univ. v. Sebelius*, No. 4:12-cv-03009 (S.D. Tex.).

 Furthermore, it is not only wrong as a matter of law, but also absurd to suggest, as plaintiffs do, *see* Pls.' Opp'n at 37, that discriminatory intent with respect to the challenged regulations can be inferred from the supposed intent of one California legislator who sponsored a California law. *See, e.g.*, *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1292-94 & n.3 (7th Cir. 1996) ("The subjective motivations of government actors should . . . not be confused with what the Supreme Court referred to, in [*Lukumi*], as the 'object' of a law." (quoting *Lukumi*, 508 U.S. at 533)); *see also Lukumi*, 508 U.S. at 558 (Scalia, J., concurring in part and concurring in the judgment) (observing that the Free Exercise Clause "does not put [courts] in the business of invalidating laws by reason of the [supposed] evil motives of their authors").

[15] Furthermore, plaintiffs do not even assert a separate free association claim in this case, and, as defendants have explained, their free speech claims are meritless.

types of organizations—based on an organization's structure and purpose—when the government is attempting to accommodate religion. *See* Defs.' Br. at 34-36; *see also Liberty Univ., Inc. v. Lew*, 2013 WL 3470532, at *17-18 (4th Cir. July 11, 2013) (upholding another religious exemption contained in the ACA against an Establishment Clause challenge because the exemption "makes no explicit and deliberate distinctions between sects" (quotation omitted)); *Droz v. Comm'r of IRS*, 48 F.3d 1120, 1124 (9th Cir. 1995) (concluding exemption did not violate the Establishment Clause even though "some individuals receive exemptions, and other individuals with identical beliefs do not"); *Grote*, 914 F. Supp. 2d at 954 ("[T]he Establishment Clause does not prohibit the government from [differentiating between organizations based on their structure and purpose] when granting religious accommodations as long as the distinction[s] drawn by the regulations . . . [are] not based on religious affiliation."); *Catholic Charities of the Diocese of Albany v. Serio*, 859 N.E.2d 459, 468-69 (N.Y. 2006) ("[T]his kind of distinction—not between denominations, but between religious organizations based on the nature of their activities—is not what *Larson* condemns."). Indeed, the problem in *Larson*, on which plaintiffs rely, was not that the challenged statute distinguished between types of organizations based on their structure and purpose, but rather that it "was drafted with the explicit intention of including particular religious *denominations* and excluding others." *Larson*, 456 U.S. at 254 (emphasis added). The same is not true here. The religious employer exemption is available on equal terms to employers of all denominations.

Plaintiffs' effort to recast the religious employer exemption as distinguishing between "religious denominations that primarily rely on traditional categories of 'houses of worship'" and denominations "like plaintiffs" that "express their faith by operating health care facilities and schools," Pls.' Opp'n at 43, is baseless. Plaintiffs are all Catholic entities. *See* Am. Compl. ¶ 1. Therefore, the fact that some plaintiffs are exempt while others are accommodated, *see id.* ¶¶ 10, 14, does not amount to discrimination among *denominations*.

Plaintiffs stretch *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008), well beyond its facts in asserting that the case stands for the proposition that the

Establishment Clause prohibits the government from distinguishing among different types of organizations that adhere to the same religion. The court's decision in *Weaver* was limited to "laws that facially regulate religious issues," *id*. at 1257, and, particularly, those that do so in a way that denies certain religious institutions public benefits that are afforded to all other institutions, whether secular or religious. The court in *Weaver* said nothing about the constitutionality of exemptions from generally applicable laws that are designed to accommodate religion, as opposed to discriminate against religion. A requirement that any religious exemption that the government creates must be extended to all organizations—no matter their structure or purpose—would severely hamper the government's ability to accommodate religion. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334 (1987) ("There is ample room under the Establishment Clause for 'benevolent' neutrality which will permit religious exercise to exist without sponsorship and without interference."); *Diocese of Albany*, 859 N.E.2d at 464 ("To hold that any religious exemption that is not all-inclusive renders a statute non-neutral would be to discourage the enactment of any such exemptions—and thus to restrict, rather than promote, freedom of religion.").

Every court to have considered an Establishment Clause challenge to the prior version of the regulations—which also included a requirement that the organization be an organization as described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended—has rejected it. *See, e.g.*, *O'Brien*, 894 F. Supp. 2d at 1162 (upholding prior version of religious employer exemption because it did "not differentiate between religions, but applie[d] equally to all denominations"); *Conestoga*, 917 F. Supp. 2d at 416-17 (same); *Grote*, 914 F. Supp. 2d at 954 (same). This court should do the same.

Plaintiffs' excessive entanglement claim also fails. Defendants' opening brief explained that this claim is not ripe because it challenges non-binding Internal Revenue Service guidance that has not been—and likely never will be—applied by the government to plaintiffs. *See* Defs.' Br. at 36-37. Plaintiffs make no effort to respond to this argument in their opposition, and thus, the Court should deem it conceded and dismiss this claim for lack of jurisdiction. *See, e.g.*,

*Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (holding that a plaintiff who does not respond to a point raised by a defendant on a motion to dismiss "concedes" that point "through silence"); *Felske v. Hirschmann*, No. 10 Civ. 8899(RMB), 2012 WL 716632, *4 (S.D.N.Y. Mar. 1, 2012) (concluding that plaintiffs "effectively conceded that there is no basis for jurisdiction" by failing to respond to defendants' argument); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-93 & n. 116 (S.D.N.Y. 2002).

Moreover, even if the Court were to determine that it had jurisdiction over this claim notwithstanding plaintiffs' concession, the claim lacks merit. As defendants pointed out in their opening brief, the Supreme Court has upheld laws that require considerably more intrusive government monitoring than any limited inquiry that may be required to enforce the religious employer exemption. *See* Defs.' Br. at 38 (citing cases). Plaintiffs ignore this authority and instead resort to their oft repeated, but never supported, refrain that the exemption will require "intrusive" inquiries. Pls.' Opp'n at 45. But plaintiff's speculation about future government inquiries is unripe, *see* Defs.' Br. at 36-37, and their claim that such speculative future inquiries will be excessive in violation of the Establishment Clause is contrary to Supreme Court authority, *see id.* at 38.[16]

### D. The Regulations Do Not Violate the Free Speech Clause

Defendants explained in their opening brief that the preventive services coverage regulations do not violate the Free Speech Clause. Defs.' Br. at 38-40. Plaintiffs contend that the regulations violate their free speech rights in three ways, none of which has merit.

First, plaintiffs are simply wrong to assert that the regulations require plaintiffs to "support 'counseling' in *favor* of" preventive services to which they object. Pls.' Opp'n at 39-40.

---

[16] The manner in which the laws (or judicial decisions) at issue in *Weaver* and *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2001), were administered required the government to make intrusive inquiries into a school's religious beliefs and practices by, for example, reading syllabi to determine if the theology courses offered by the school were likely to convince students of religious truths. *Weaver*, 534 F.3d at 1261-62. The religious employer exemption requires no such inquiry. Qualification for the exemption does not require the government to make any determination, much less an unconstitutionally intrusive one. *See* Defs.' Br. at 37.

The regulations require coverage of "education and counseling for women with reproductive capacity." HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines ("HRSA Guidelines"), AR at 283-84. There is no requirement that such education and counseling be "in favor of" any particular contraceptive service, or even in support of contraception in general. The conversations that may take place between a patient and her health care provider cannot be known or screened in advance and may cover any number of approaches to women's health. To the extent that plaintiffs intend to argue that the covered education and counseling is objectionable because some of the conversations between a doctor and one of plaintiffs' employees *might* be supportive of contraception, this theory would extend to all interactions between an employee and her health care provider based on the mere possibility of an employer's disagreement with a potential subject of discussion, and would allow the employer to impose a prior restriction on any doctor-patient dialogue. The First Amendment does not require such a drastic result. *See, e.g.*, *Conestoga*, 2013 WL 140110, at *17; *O'Brien*, 894 F. Supp. 2d at 1166.

Furthermore, the argument that the education and counseling component of the regulations somehow compels plaintiffs to speak at all is simply bizarre. It is not plaintiffs, but their employees and their health care providers, who are engaged in speech. The challenged regulations do not require plaintiffs—or any other person, employer, or entity—to say anything. Nor is the conduct required by the regulations "inherently expressive," *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006), such that it is entitled to First Amendment protection. *See, e.g.*, *Autocam,* 2012 WL 6845677, at *8 ("Including contraceptive coverage in a health care plan is not inherently expressive conduct."); *O'Brien*, 894 F. Supp. 2d at 1166-67 ("Giving or receiving health care is not a statement in the same sense as wearing a black armband or burning an American flag." (internal citations omitted)). In fact, under the accommodations, plaintiffs are not even *subsidizing* education and counseling, as it is their TPAs that will make separate payments for these services. In short, this case is a far cry from the circumstances in the cases plaintiffs cite, in which the laws at issues mandated that specific

messages be posted on conspicuous signs throughout an organization's building, be printed prominently in any advertisements, and be delivered to the organization's clients. *See* Pls.' Opp'n at 40 n.23 (citing *Evergreen Ass'n v. City of New York*, 801 F. Supp. 2d 197 (S.D.N.Y. 2011), and *Centro Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456 (D. Md. 2011)).

Similarly, execution of the simple self-certification form is "plainly incidental to the . . . regulation of conduct," *FAIR*, 547 U.S. at 62, not speech. In fact, every court to review a free speech challenge to the prior contraceptive-coverage regulations has rejected it, in part, because the regulations deal with conduct. *See MK Chambers Co. v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-11379, 2013 WL 1340719, at *6 (E.D. Mich. Apr. 3, 2013) ("Like the [law at issue in *FAIR*], the contraceptive requirement regulates conduct, not speech." (quotations omitted)); *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1120 (D. Colo. 2013) ("The plaintiffs cite no authority and I am not aware of any authority holding that [preventive services coverage] qualifies as speech so as to trigger First Amendment protection."); *Conestoga*, 917 F. Supp. 2d at 418; *Grote*, 914 F. Supp. at 955; *Autocam*, 2012 WL 6845677, *8; *O'Brien*, 894 F. Supp. 2d at 1165-67; *see also Catholic Charities of Sacramento*, 85 P.3d at 89 ("[A] law regulating health care benefits is not speech."); *Diocese of Albany*, 859 N.E.2d at 465. The scheme of accommodations regulates conduct by relieving an eligible organization of the obligation "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections. 78 Fed. Reg. at 39,874, AR at 6.[17] Plaintiffs' suggestion that the mere act of self-certifying their eligibility for that accommodation violates their speech rights is baseless. *See FAIR*, 547 U.S. at 61-63.

---

[17] Indeed, self-certifying eligibility for a religious accommodation is a far cry from the circumstances in the cases plaintiffs cite, in which the laws at issues mandated that specific messages be posted on conspicuous signs throughout an organization's building, be printed prominently in any advertisements, and be delivered to the organization's clients. *See* Pls.' Opp'n at 40 n.23 (citing *Evergreen Ass'n v. City of New York*, 801 F. Supp. 2d 197 (S.D.N.Y. 2011), and *Centro Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456 (D. Md. 2011)). Here, in marked contrast, the accommodations require virtually nothing of plaintiffs, and "[n]othing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78 Fed. Reg. at 39,879, AR at 12.

Finally, defendants have already refuted plaintiffs' claim that the regulations impose a so-called "gag order." *See* Defs.' Br. at 39-40. Plaintiffs are free to, in their words, "express[]" their "conviction[s]" about contraceptives to their "fellow citizens." Pls.' Opp'n at 41. Defendants have made clear, for example, that "[n]othing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraception." 78 Fed. Reg. at 39,880 n.41, AR at 12. The regulations merely prohibit an employer's improper attempt to interfere with its employees' ability to obtain contraceptive coverage (to which they are entitled) from a third party by, for example, threatening a TPA with a termination of its relationship with the employer because of the TPA's "arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries." *See* 26 C.F.R. § 54.9815-2713A(b)(1)(iii); 29 C.F.R. § 2590.715-2713A(b)(1)(iii); Defs.' Br. at 39. In other words, plaintiffs may not interfere with the TPA's compliance with its legal obligations under the regulations. Because the regulations do not prevent plaintiffs from expressing their views regarding the use of contraceptive services, but, rather, protect employees' right to obtain separate payments for contraceptive services through TPAs, there is no infringement of plaintiffs' right to free speech.[18]

**E.    The Regulations Do Not Interfere with Church Governance**

Plaintiffs claim that, by requiring them to facilitate practices in violation of their religious beliefs, the regulations interfere with plaintiffs' "internal church governance" in violation of the Religion Clauses. *See* Pls.' Opp'n at 45-47. But, as defendants noted in their opening brief, *see* Defs.' Br. at 22 n.15, that is merely a restatement of plaintiffs' substantial burden theory, which fails for reasons explained already. Nor, as plaintiffs appear to suggest, is this case about any law that regulates the structure of the Catholic Church; plaintiffs may choose whatever organizational

---

[18] Furthermore, even if the Court were to find, over the government's objection, that the non-interference provision violates the First Amendment, the appropriate remedy would be to strike down that particular provision, not the regulations in their entirety.

structure they wish.[19] Thus, Count VI of the Amended Complaint should be dismissed or summary judgment granted to defendants.

### F.    Plaintiffs' APA and Regulatory Interpretation Claims Fail or Have Been Forfeited

In their Complaint, plaintiffs claimed that the regulations violate the APA because they conflict with two federal statutes dealing with abortion: section 1303(b)(1) of the ACA, and the Weldon Amendment. They also claimed that defendants have incorrectly interpreted the religious employer exemption with respect to "multi-employer plans"—plans that, as relevant here, are established or maintained by an entity that qualifies for the religious employer exemption but in which non-exempt entities also participate. Defendants moved for summary judgment on all of these claims, and plaintiffs have responded in support of only their claim regarding the Weldon Amendment. Because plaintiffs have failed to respond to defendants' arguments as to why the regulations are not inconsistent with the ACA and as to defendants' interpretation of the religious employer exemption, summary judgment should be granted to defendants on these issues.

Turning to the Weldon Amendment, plaintiffs brush aside decades of regulatory policy and practice. As explained in defendants' opening brief, that policy has consistently considered FDA-approved contraception and emergency contraception not to be abortifacient drugs and not to cause abortions, and is entitled to deference. Defs.' Br. at 42-43; *Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, 638 F.3d 807, 815 (D.C. Cir. 2011) (giving particular deference to an agency's longstanding interpretation). Plaintiffs claim that such policy did not purport to apply the Weldon Amendment, but the fact is that the Weldon Amendment—which has been attached as a rider to federal appropriations bills for the Departments of Health and Human Services,

---

[19] For this reason, plaintiffs' reliance on *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952), and *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871), is misplaced. *Kedroff* involved a state law that expressly sought to transfer control of St. Nicholas Cathedral from one church authority to another, when use and occupancy of the Cathedral depended upon the church's "choice of its hierarchy," a purely ecclesiastical issue. 344 U.S. at 119. Similarly, *Watson* involved a dispute over control of church property that turned, in part, on matters "strictly and purely ecclesiastical in character." 80 U.S. at 733. Unlike *Kedroff* and *Watson*, this case does not involve any regulation of church property or purely ecclesiastical issues.

Labor, and Education since 2005, *see* Pub. L. No. 108-447, div. F, tit. V, § 508(d), 118 Stat. 2809 (Dec. 8, 2004)—was enacted against the background of that regulatory policy and practice. Moreover, that regulatory policy has not changed since the enactment of the Weldon Amendment, while the Weldon Amendment has been repeatedly reenacted, likewise without change. This suggests that Congress has acted, then and now, consistent with and in recognition of this regulatory policy. *See Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).

Indeed, Representative Weldon made quite clear from the very beginning that the language of the Weldon Amendment reflected the definitional approach taken in regulatory policy, while seeming to have anticipated and rejected plaintiffs' argument. Speaking in support of, and as a co-sponsor of, what was then an independent bill with essentially identical language, *see* Abortion Non-Discrimination Act, H.R. 4691, 107th Cong. (2002), he called it "a tremendous misinterpretation or a tremendous stretch of the imagination" to suggest that the statutory language would affect the provision of contraceptive services. 148 Cong. Rec. H6566, H6580 (daily ed. Sept. 25, 2002). And he explained that:

> The morning-after pill is not defined by the FDA as abortion. It is defined as contraception. It is something different. So to interpret this statute to claim that it is going to prohibit access is to take essentially a religious entity's doctrine and put that into the statute, and it is just not there. It is not in the language.

*Id.* at H6571; *see also id.* at H6580 ("Now, some religious groups may interpret [emergency contraception] as abortion, but we make no reference in this statute to religious groups or their definitions; and under the current FDA policy that is considered contraception, and it is not affected at all by this statute."). Plaintiffs disregard all of this as a set of randomly selected floor statements from 2002, ignoring both the fact that the language of the Abortion Non-Discrimination Act discussed in 2002 is nearly identical to the language of the Weldon Amendment enacted in 2004, and the fact that Representative Weldon was the author, sponsor,

34

and namesake of the nearly identical Weldon Amendment. The Supreme Court has made clear that the statements of the sponsor of a piece of legislation deserve to be accorded substantial interpretive weight. *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976).

Finally, plaintiffs fall wide of the mark when they contend that the ACA gives them and other plan providers the right to define abortion for purposes of the statute in any manner they choose. The ACA provides, in part, that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage" of abortion services. 42 U.S.C. § 18023(b)(1)(A)-(B). But plaintiffs misunderstand that provision. First, that provision is plainly relevant only to an "issuer of a qualified health plan," *id.*, and a "qualified health plan" is defined, in part, as a health plan that has been certified by the health insurance Exchange "through which such plan is offered." 42 U.S.C. § 18021(a)(1). Plaintiffs' health plan is not offered through a health insurance Exchange, so it is not a "qualified health plan" and plaintiffs are not "issuer[s]" of a qualified health plan as they are not licensed to sell health insurance policies and are not subject to state health insurance law. Second, even with respect to issuers of a qualified health plan, that provision does not give them the right to define what is and is not an "abortion" as a matter of law. Indeed, in context, the provision is clear: subsection (a) of the statute provides that states may prohibit abortion coverage in qualified health plans offered through an Exchange; subsection (b) provides that, "subject to" any such prohibition of abortion coverage in an Exchange by a state, the issuer retains the authority to decide simply whether its plan will offer such coverage. In other words, the statute ensures only that the issuer may decide whether to offer coverage for abortion, unless the state prohibits it. But the statute does not delegate to issuers—let alone employers—the sort of authority to definitively interpret the term "abortion" in the statute that plaintiffs argue it does. There is absolutely no suggestion that Congress intended to so dramatically shift to regulated entities themselves the locus of statutory interpretation that is generally left to agencies charged with implementing the statute and, if need be, to the courts. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes.").

Because the regulations are consistent with the Weldon Amendment and with the regulatory practice informing and following both its enactment and re-enactment, and because the ACA does not delegate to issuers the authority to interpret statutory terms, the Court should grant defendant's motion as to plaintiffs' remaining APA claim.

## III.   PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM, AND AN INJUNCTION WOULD INJURE THE GOVERNMENT AND THE PUBLIC

As this Court has explained, the standard for granting a permanent injunction is essentially the same as that for a preliminary injunction, except that the moving party must demonstrate *actual*, rather than likely, success on the merits of its claim. *See Richards v. Napolitano*, 642 F. Supp. 2d 118, 134 (E.D.N.Y. 2009) (citing *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007)). Thus, the Court must consider: (1) success on the merits; (2) whether the movant will suffer irreparable injury absent an injunction; (3) the balance of hardships between the parties; and (4) whether the public interest supports granting the requested injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

As demonstrated above and in defendants' opening brief, plaintiffs cannot succeed on the merits of their claims, and, thus, they are not entitled to an injunction for that reason alone. Similarly, even assuming for the sake of argument that a violation of RFRA constitutes an irreparable injury, "for even minimal periods of time," as it does for a First Amendment violation, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), plaintiffs' inability to prevail on their claims means that plaintiffs also cannot satisfy the irreparable injury prong, which in this case depends on acceptance of their merits arguments. *See McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012).

Nor can plaintiffs satisfy the remaining two factors for an injunction: that the balance of the equities tips in their favor or that the public interest would be served by an injunction. With respect to the former, defendants would be "inherent[ly] harm[ed]" by an injunction, because it would prohibit the defendant agencies from implementing duly promulgated regulations that Congress required them to develop and enforce. *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65

36

(D.D.C. 2008). In attempting to undermine this interest, plaintiffs fall back on their familiar refrain that the so-called "exemptions" from the regulations, such as the grandfathering provision, undermine defendants' interest in enforcing those regulations. *See* Pls.' Opp'n at 32. But, as defendants have explained, aside from the religious employer exemption, which is a narrow exemption designed to *accommodate* religious exercise, these "exemptions," which are not specific to the preventive service coverage regulations, are, in effect, temporary measures to allow employers to adapt to the significant changes brought about by the ACA, whereas the injunction that plaintiffs seek would *permanently* prevent defendants from enforcing the regulations as to plaintiffs.

Finally, the public interest also tips in defendants' favor because a permanent injunction would deprive the non-diocese plaintiffs' employees of the benefits required by the challenged regulations, which include improved healthcare outcomes and reduced disparity in the financial burden of health care costs for women. *See* IOM Rep. at 20, 102-04, AR at 318, 400-02; 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012), AR at 215; *see also* 155 Cong. Rec. S12106-02, S12114 (daily ed. Dec. 2, 2009). Plaintiffs all but ignore this harm to the public interest and suggest, implausibly, that the non-diocese plaintiffs' thousands of employees would be unlikely to use contraceptive services even if they were available to them. *See* Pls.' Opp'n at 33. The Court, however, must consider the very real harm that would befall these employees as a result of an injunction and weigh that harm against the burden on the non-diocese plaintiffs—if any—of having a third party provide separate payments for contraceptive services for the non-diocese plaintiffs' employees. Even assuming that plaintiffs could succeed on the merits of their claims (which defendants have shown they cannot do), defendants respectfully submit that the balancing of these factors weighs against plaintiffs' request for an injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully ask that the Court deny plaintiffs' motion for summary judgment, and grant defendants' motion to dismiss or, in the alternative, for summary judgment on all of plaintiffs' claims.

Respectfully submitted this 1st day of November, 2013,

STUART F. DELERY
Assistant Attorney General

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

JENNIFER RICKETTS
Director

SHEILA M. LIEBER
Deputy Director

 _/s/ Benjamin L. Berwick_
BENJAMIN L. BERWICK (MA Bar No. 679207)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W., Room 7306
Washington, D.C. 20530
Tel: (202) 305-8573
Fax: (202) 616-8470
Email: Benjamin.L.Berwick@usdoj.gov

*Attorney for Defendants*

38