UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                   :
THE ROMAN CATHOLIC ARCHDIOCESE        :
OF NEW YORK, *et al.*,                            :
                                                   :
                              Plaintiffs,         :       **MEMORANDUM**
                                                   :       **DECISION AND ORDER**
                 - against -                       :
                                                   :       12 Civ. 2542 (BMC)
KATHLEEN SEBELIUS, in her official       :
capacity as Secretary, United States         :
Department of Health and Human Services,  :
*et al.*,                                         :
                                                   :
                             Defendants.          :
                                                   :
------------------------------------------------------------ X

**COGAN,** District Judge.

         The Patient Protection and Affordable Care Act (the "ACA"), Pub. L. No. 111-148, 124

Stat. 119 (2010), requires that group health insurance plans cover certain preventative medical

services without cost-sharing, such as a copayment or a deductible.  Pursuant to regulations

subsequently issued, the preventative services that must be covered include contraception,

sterilization, and related counseling (the "Coverage Mandate" or "Mandate").  Certain religious

employers, primarily churches, are exempt from this requirement.  Further, the Government has

recently promulgated regulations that seek to accommodate the religious objections of "eligible

organizations," namely religious non-profits.  Under this accommodation, "eligible

organizations" do not have to pay for a health plan that covers contraceptive services; instead, an

eligible organization must provide its issuer or third party administrator ("TPA") with a self-

certification form stating its objection to the Mandate on religious grounds.  The issuer or TPA is

then required to provide contraceptive coverage without charging the eligible organization any fees or premiums, and without imposing any cost-sharing on the beneficiary.

Plaintiffs are six New York-area organizations affiliated with the Roman Catholic Church. Plaintiffs state that their Catholic beliefs prohibit them from providing, subsidizing, facilitating, or sponsoring the provision of contraception, sterilization, or abortion-inducing products and services. The Mandate, they argue, requires them to violate these core religious beliefs, regardless of the exemption for religious employers or the accommodation for eligible organizations. Plaintiffs bring claims under the Religious Freedom Restoration Act ("RFRA") and Administrative Procedures Act, as well as under the Establishment, Free Exercise, and Free Speech clauses of the First Amendment.

Plaintiffs have moved for summary judgment as to all of their claims, seeking a preliminary and permanent injunction against enforcement of the Mandate against them. Defendants have cross-moved for summary judgment. For the reasons set forth below, plaintiffs' motion for summary judgment on their RFRA claims is granted in part and denied in part, and defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I.      The Plaintiffs

The six plaintiffs are all entities affiliated with the Roman Catholic Church. In their complaint, they allege that the Coverage Mandate forces them to choose between violating the tenets of their religious faith or paying substantial penalties. In particular, if plaintiffs want to avoid the penalties for non-compliance with the Mandate, they must authorize a third party to engage in activity, namely the provision of contraceptives, in which they themselves are religiously forbidden from engaging.

A.    The Archdiocese of New York

The Roman Catholic Archdiocese of New York (the "Archdiocese") is a non-profit organization that encompasses 370 parishes located in the New York area.  It administers numerous charitable and educational programs, which, in line with Catholic teachings, are not aimed solely at Catholics, but are meant to benefit the broader community.  The Archdiocese, its parishes, and its institutions employ nearly 10,000 people, almost 8,000 of whom are lay people. The Archdiocese does not know how many of its employees are Catholic.

The Archdiocese operates a self-insured health plan, underwriting its employees' medical costs.  Its health plan and pharmaceutical coverage are administered by third parties.  The plan year for the Archdiocese's plan begins on January 1.  Consistent with Catholic teaching, the plan currently does not cover abortifacients, sterilization, or contraception.[1]  Including the Archdiocese's affiliated charitable and educational organizations, nearly 9,000 people, both Catholic and non-Catholic, are covered under the Archdiocese's health plan.

B.    Cardinal Spellman High School and Monsignor Farrell High School

Cardinal Spellman High School ("Cardinal Spellman") and Monsignor Farrell High School ("Monsignor Farrell") are two Catholic high schools located in the Bronx and Staten Island, respectively.  Monsignor Farrell has 74 employees, and Cardinal Spellman has over 100. These schools both employ and educate individuals of all faiths.  Employees at both high schools are currently covered under the Archdiocese's health plan, which, as stated, does not currently provide contraceptive coverage.

---

[1] Although contraceptives generally are not covered under the Archdiocese's plan, the medication may be covered when provided for medically necessary, non-contraceptive purposes.

C.    ArchCare

Catholic Health Care System and its affiliates, the Continuing Care Community of the Archdiocese of New York (collectively, "ArchCare"), are non-profit organizations that provide faith-based health care to the poor and disadvantaged, including elderly and disabled individuals, consistent with Catholic values.  ArchCare operates a self-insured health plan for its employees, underwriting the plan while contracting with a TPA for administration of the plan.  The plan covers approximately 3,000 people and ArchCare does not know how many of those covered are Catholic.  Contraception, abortion, and sterilization are not covered.

D.    The Diocese of Rockville Centre

The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese") is a non-profit organization that encompasses 134 parishes in Nassau and Suffolk counties.  The Diocese is responsible for numerous charitable and educational programs for the benefit of Catholics and non-Catholics alike.  Together with its hospitals, schools, parishes and other associated institutions, the Diocese employs nearly 20,000 people.

Employees of both the Diocese and its affiliated charitable and educational organizations receive health care coverage through the Diocese's health plan, which covers over 4,500 people. The Diocese operates a self-insured health plan, administered by a TPA, underwriting its employees' medical costs.  The plan does not cover abortifacients, sterilization, or contraception.

E.    CHSLI

Catholic Health Services of Long Island ("CHSLI") is a non-profit organization that oversees Catholic health care organizations within the Diocese, including six hospitals, three nursing homes, and a hospice service.  Neither CHSLI nor its member institutions condition employment or receipt of medical services on being Catholic.

CHSLI operates a self-insured health plan for its employees and employees of its member institutions, underwriting the plan while contracting with third parties for administration of the plan. The plan covers approximately 25,000 people. Like the other plaintiffs, consistent with Catholic teaching, CHSLI's plan does not cover abortifacients, sterilization, or contraception.

## II.     The Relevant Statutes and Regulations

The Coverage Mandate is the result of a complex history of Congressional legislation and agency rulemaking involving the Department of Labor ("DoL"), the Department of the Treasury ("DoT"), and the Department of Health and Human Services ("HHS") (collectively, the "Departments").

In March 2010, Congress enacted the ACA as well as the Health Care and Education Reconciliation Act. These acts established a number of requirements relating to "group health plans," a term which encompasses employer plans that provide health care coverage to employees, regardless of whether the plans are insured or self-insured. See 42 U.S.C. § 300gg-91(a)(1); Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,727 (July 19, 2010) ("Interim Final Rules"). As is relevant here, the ACA requires that group health plans provide coverage for a number of preventative medical services at no charge to the patient. § 300gg-13. Specially, the ACA provides that a group health plan must "at a minimum provide coverage for and shall not impose any cost sharing requirements for[,]" among other things, women's "preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration[.]" § 300gg-13(a)(4).[2]

The ACA's preventative services coverage requirement does not apply, however, to

_____

[2] The Health Resources and Services Administration ("HRSA") is an agency within HHS.

group health plans that are "grandfathered." See 42 U.S.C. § 18011(a)(2). A group health plan is grandfathered when at least one person was enrolled in the plan on March 23, 2010 and the plan has continually covered at least one individual since that date. See 26 C.F.R. § 54.9815-1251T(a)(1)(i) (DoT); 29 C.F.R. § 2590.715-1251(a)(1)(i) (DoL); 45 C.F.R. § 147.140(a)(1)(i) (HHS). A plan may lose its grandfathered status if, when compared to the terms of the plan as of March 23, 2010, it eliminates benefits, increases a percentage cost-sharing requirement, significantly increases a fixed-amount cost-sharing requirement, significantly decreases an employer's contribution rate, or imposes or lowers an annual limit on the dollar value of benefits. See 26 C.F.R. § 54.9815-1251T(g)(1) (DoT); 29 C.F.R. § 2590.715-1251(g)(1) (DoL); 45 C.F.R. § 147.140(g)(1) (HHS). It is undisputed that none of plaintiffs' plans qualify as grandfathered due to changes made within the past two years.

The Departments began issuing regulations implementing the ACA in phases. On July 19, 2010, they announced that HHS was developing the HRSA guidelines and expected to issue them by August 1, 2011. See Interim Final Rules, 75 Fed. Reg. at 41,728. Because there were no existing HRSA guidelines concerning preventative care and screenings for women at the time of the Interim Final Rules, HHS commissioned the Institute of Medicine ("IOM"), a Congressionally-funded body, with "review[ing] what preventative services are necessary for women's health and well-being" and recommending comprehensive guidelines, as called for by the ACA. On July 19, 2011, IOM published a report recommending the inclusion of certain preventative medical services in HRSA's guidelines. Among other things, IOM recommended that group health plans be required to cover "the full range of Food and Drug Administration ["FDA"]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." FDA-approved contraceptive methods

encompass oral conceptive pills, diaphragms, intrauterine devices, and emergency contraceptives such as Plan B, which, according to plaintiffs, can cause abortions.

HRSA adopted IOM's recommendations on August 1, 2011. Two days later, the Interim Final Rules were amended to "provide HRSA additional discretion to exempt certain religious employers from the [HRSA] Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46,623 (Aug. 3, 2011). See also 45 C.F.R. § 147.130(a)(1)(iv)(A). In order to qualify for the religious employer exemption under the Interim Final Rules, an organization was required to meet certain criteria.[3] HRSA exercised its discretion under the amended Interim Final Rules and exempted the religious employers that satisfy these criteria from the requirement of covering contraceptive services. See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012).

The Departments received over 200,000 responses to their request for comments on the amended Interim Final Rules. Many of the comments were submitted by religiously-affiliated institutions and asserted that the religious employer exemption was too narrow and that the limited scope of the exemption raised religious liberty concerns. Id. at 8,727. On February 15, 2012, the Departments finalized the amended Interim Final Rules without making any changes to the criteria used to determine whether an organization qualified for the religious employer exemption. Id.

---

[3] These criteria were:

    (1) The inculcation of religious values is the purpose of the organization.
    (2) The organization primarily employs persons who share the religious tents of the organization.
    (3) The organization serves primarily persons who share the religious tenets of the organization.
    (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B).

At the same time that they finalized the Interim Final Rules, however, the Departments announced a "temporary enforcement safe harbor" period during which they planned "to develop and propose changes to these final regulations that would meet two goals – providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services[.]" Id. Consistent with their announced plan "to develop and propose changes" to the Interim Final Rules, on March 21, 2012, the Departments filed an advance notice of proposed rulemaking ("ANPRM") in the Federal Register concerning possible means of accommodating religious organizations' objections to the Coverage Mandate. See Certain Preventative Services under the Affordable Care Act, 77 Fed. Reg. 16,501 (Mar. 21, 2012). The stated purpose of the ANPRM was to "amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths," and to "establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage." 78 Fed. Reg. 8459 (Feb. 6, 2013). Defendants received over 400,000 comments (many of them standardized form letters) in response to the proposals set forth in the ANPRM and, in July 2013, issued rules finalizing the Mandate. See 78 Fed. Reg. 39,870, 39,871 (July 2, 2013) (the "Final Rules").

The Final Rules purport to accommodate religious objections to the Mandate in two ways. First, the Final Rules revised the definition of "religious employers," who are entirely exempt from the Mandate. The Final Rules define "religious employer" as a non-profit referred

to in § 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code, which in turn refers to churches, their integrated auxiliaries, associations of churches, and the exclusively religious activities of religious orders. 78 Fed. Reg. at 39,874. The Archdiocese and Diocese (the "Diocesan plaintiffs" or "exempt plaintiffs") meet this definition and are thus exempt from the Mandate. The remaining plaintiffs (the "non-Diocesan plaintiffs" or "non-exempt plaintiffs") are not exempt. This includes the plaintiffs that participate in the Archdiocese's health plan, because non-exempt entities cannot avail themselves of the religious employer exemption unless they "independently meet the definition of religious employer." Id. at 39,886.

Second, the Final Rules provide for an accommodation for "eligible organizations" that do not meet the definition of "religious employer" (the "accommodation"). An "eligible organization" is one that satisfies the following criteria:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

> (2) The organization is organized and operates as a nonprofit entity.

> (3) The organization holds itself out as a religious organization.

> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b).

There is no dispute that all of the non-Diocesean plaintiffs in this action qualify for this accommodation. The Final Rules state that an eligible organization is not required to "contract, arrange, pay, or refer for contraceptive coverage" as to which it has religious objections. 78 Fed.

Reg. at 39,874. Instead, the eligible organization must complete a self-certification form stating that it is an eligible organization, and provide a copy of that form to its issuer or, where an eligible organization self-insures, as do all plaintiffs here, to their TPA. The TPA is then required to provide or arrange for payments for contraceptive services, a requirement imposed through the Department of Labor's ERISA enforcement authority. See id. at 39,879-39,880. The self-certification "will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." Id. at 39,879. The TPA is required to provide these services "without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan." Id. at 39,879-80. The TPA may seek reimbursement for such payments through adjustments to its Federally-Facilitated Exchange ("FFE") user fees. Id. at 39,882.

## III.     Procedural History

In December 2012, this Court denied in large part defendants' motion to dismiss for lack of standing. See Roman Catholic Archdiocese of New York v. Sebelius, 907 F. Supp. 2d 310 (E.D.N.Y. 2012).[4] After discovery began, defendants requested a stay of all proceedings in light of their pending rulemaking proceedings described above, which would alter the requirements of the Mandate. The Court granted that request.

After the Final Rules were promulgated, the parties agreed to a complicated briefing schedule, which the Court approved. First, plaintiffs filed an Amended Complaint, at the same time moving for a preliminary injunction based on their RFRA claims. After that, the Government filed its opposition to a preliminary injunction and simultaneously moved for

---

[4] Specifically, defendants' motion was granted only as to plaintiffs the Diocese of Rockville Center and Catholic Charities of the Diocese of Rockville Center ("Catholic Charities"), because those two plaintiffs had failed to allege adequately that their health plans failed to qualify as grandfathered. See Roman Catholic Archdiocese of New York, 907 F. Supp. 2d at 323-24. The Amended Complaint no longer lists Catholic Charities as a plaintiff, and the Government no longer disputes that the Diocese's plan does not qualify as grandfathered.

summary judgment on the administrative record[5] as to all of plaintiffs' claims.  Plaintiffs

subsequently cross-moved for summary judgment; the Government then put in papers in

opposition to that motion, and plaintiffs then submitted their Reply.  The Government then

requested and received permission to file a sur-reply addressing decisions by the Seventh and

D.C. Circuits issued after defendants filed their last Opposition papers.  In addition to the parties'

papers on this motion, the Court has received and considered a brief filed by the American Civil

Liberties Union ("ACLU") as *amicus curiae*.  No party requested an evidentiary hearing.  After

over 200 pages of briefing, these motions are now ready for decision.

## DISCUSSION

### I.    Article III Standing

Late in the briefing of these motions – specifically, in their opposition to plaintiffs'

motion for summary judgment filed November 1, 2013 – the Government "realized" for the first

time that all of the plaintiffs' health plans are "church plans" as defined under Section 3(33) of

the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(33).  As mentioned,

the challenged regulations enforce the contraceptive coverage requirements against the TPAs of

eligible organizations with self-insured group plans through the Department of Labor's ERISA

enforcement authority.  See 78 Fed. Reg. at 39,879-39,880.  Church plans, however, are

specifically excluded from the ambit of ERISA.  See 29 U.S.C. § 1003(b)(2).  The Government

states that it thus has no authority to require the plaintiffs' TPAs to provide contraceptive

coverage at this time.  Therefore, the Government argues, all of the plaintiffs lack standing

---

[5] The parties dispute whether the Court may consider any materials beyond the administrative record in deciding these motions.  Because plaintiffs bring constitutional challenges to the Mandate, the Court has considered all of the materials submitted by the parties.  See Nat'l Med. Enters., Inc. v. Shalala, 826 F. Supp. 558, 565 n.11 (D.D.C. 1993) ("In reviewing a constitutional claim to an agency's decision, a court may make an independent assessment of the facts and the law and may consider additional affidavits which were not before the agency upon administrative review.") (quotation omitted).

because the regulations will not actually force plaintiffs' TPAs to provide coverage for the objectionable services.

The Government's belated "realization" that the challenged regulations may not actually result in the provision of contraceptive coverage to plaintiffs' employees is difficult to fathom. Not only did the Archdiocese and Diocese state, in declarations filed in August with their initial moving papers, that they (and therefore the plaintiff high schools also covered by the Archdiocese's health plan) participate in church plans, but in both the Interim Final Rules and ANPRM, defendants noted proposals to define both "religious employer" and "eligible organization" as organizations that have health plans qualifying as church plans under ERISA. See 77 Fed. Reg. at 8,727 ("[C]ommenters referenced alternative standards, such as tying the [religious employer] exemption to the definition of 'church plan'"); 77 Fed. Reg. at 16,504 ("[T]he intended regulations could base their definition [of an eligible organization] on another Federal law, such as section 414(e) the Code and section 3(33) of ERISA, which set forth definitions for purposes of 'church plans.'"). It is unclear how citizens like plaintiffs and their TPAs are supposed to know what the law requires of them if the Government itself is unsure. After almost 18 months of litigation, defendants now effectively concede that the regulatory tale told by the Government was a *non-sequitur*.

Regardless, plaintiffs have alleged an injury-in-fact sufficient for Article III standing. It is well established that a plaintiff "may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause." Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 154, 90 S. Ct. 827, 830 (1970). The Government misunderstands the nature of plaintiffs' alleged injury. Plaintiffs do not object simply to the provision of contraceptive coverage to their employees. If

that were plaintiffs' claim, then perhaps the uncertainty over whether their TPAs would actually provide such coverage would run afoul of the Article III requirement that "threatened injury must be <u>certainly impending</u> to constitute injury in fact, and that [a]llegations of <u>possible</u> future injury are not sufficient." <u>Clapper v. Amnesty Int'l USA</u>, 133 S. Ct. 1138, 1147 (2013) (quotation omitted; emphasis and alteration in original).

But plaintiffs' alleged injury is that the Mandate renders them complicit in a scheme aimed at providing coverage to which they have a religious objection. This alleged spiritual complicity is independent of whether the scheme actually succeeds at providing contraceptive coverage. It is undisputed that all of the non-exempt plaintiffs will still have to either comply with the Mandate and provide the objectionable coverage or self-certify that they qualify for the accommodation. <u>See</u> 78 Fed. Reg. at 39,893, 39,894-95. Plaintiffs allege that their religion forbids them from completing this self-certification, because to them, authorizing others to provide services that plaintiffs themselves cannot is tantamount to an endorsement or facilitation of such services. Therefore, regardless of the effect on plaintiffs' TPAs, the regulations still require plaintiffs to take actions they believe are contrary to their religion. As for the plaintiffs that qualify for the religious employer exemption, plaintiffs allege that the Diocese and Archdiocese will have to choose between complying with the Mandate by providing the objectionable coverage or ejecting their non-exempt affiliates from their health plans. Leaving aside for now the merits of these claims, as a court must, <u>see</u> <u>Ross v. Bank of America, N.A.</u>, 524 F.3d 217, 222 (2d Cir. 2008), plaintiffs have adequately alleged an injury-in-fact.

## II.    RFRA

### A.    Summary Judgment Standard

Summary judgment is warranted where there are no genuine disputes of material fact, such that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  No genuine factual issue exists when the moving party demonstrates, on the basis of the pleadings and admissible evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir. 1996).  A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995).  "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."  Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003).  Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986).

### B.    RFRA Background

Congress adopted the RFRA in response to the Supreme Court's decision in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595 (1990).  There, the Supreme Court upheld an Oregon statute that denied unemployment benefits to drug users over a challenge by Native Americans who used peyote in religious ceremonies.  The Court held that the First Amendment's Free Exercise Clause does not prohibit burdens on religious practices if they are imposed by neutral laws of general applicability, and declined to apply the "compelling government interest" test to claims brought

14

solely under the Free Exercise Clause.  "In effect, Smith create[d] a 'safe harbor' – if the law is 'a valid and neutral law of general applicability,' then it must simply be rationally related to a legitimate government end."  United States v. Hardman, 297 F.3d 1116, 1126 (10th Cir. 2002).

Congress enacted the RFRA three years later.  Finding that Smith "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," and that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests," 42 U.S.C. § 2000bb(a), Congress declared that the purpose of the RFRA was to "restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b).

In City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157 (1997), the Supreme Court held the RFRA unconstitutional as applied to state and local governments because it exceeded Congress's authority under § 5 of the Fourteenth Amendment.  The Court did not, however, address the RFRA's constitutionality as applied to federal law.  After Boerne, "[e]very appellate court that has squarely addressed the question has held that the RFRA governs the activities of federal officers and agencies."  Hankins v. Lyght, 441 F.3d 96, 105-06 (2d Cir. 2006) (collecting cases).

Under the RFRA, the federal Government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)."  42 U.S.C. § 2000bb-1(a).  Subsection (b) of § 2000bb-1 qualifies the ban on substantially burdening the free exercise of religion, providing that the "[g]overnment

may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). In 2000, Congress expanded the definition of "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). The RFRA applies retrospectively and prospectively to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" its effective date. 42 U.S.C. § 2000bb–3(a). The statute does not apply to a subsequently enacted law if it "explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb–3(b). The ACA does not exclude application of the RFRA.

This case is not the first challenge to the Mandate on religious grounds. Secular, for-profit corporations have brought a number of suits alleging that the Mandate violated the RFRA and the Free Exercise clause. The Seventh, Tenth, and D.C. Circuit Courts of Appeal have granted preliminary injunctions to some of these plaintiffs, holding that they had demonstrated a strong likelihood of success on their claim that the Mandate violates the RFRA. See Korte v. Sebelius, 735 F.3d 654 (7th Cir. 2013); Gilardi v. U.S. Dep't. of Health and Human Servs., 733 F.3d 1208 (D.C. Cir. 2013); Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir. 2013) (en banc), cert. granted, ___ S. Ct. ____, 2013 WL 5297798 (Nov. 26, 2013). The Third and Sixth Circuits have reached the opposite conclusion, reasoning that secular, for-profit corporations cannot engage in "religious exercise." See Autocam Corp. v. Sebelius, 730 F.3d 618 (6th Cir. 2013); Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Human Servs., 724 F.3d 377 (3d Cir. 2013), cert. granted, ___ S. Ct. ____, 2013 WL 5297800

(Nov. 26, 2013). However, none of the plaintiffs in these cases were eligible for the accommodation, and thus none of these cases bear directly on the issue at hand. To this Court's knowledge, only one district court has ruled on whether the Mandate violates the RFRA as applied to religious non-profits; that court entered a preliminary injunction in two related actions, enjoining enforcement of the Mandate against non-profit Catholic entities similarly situated to the plaintiffs here. See Zubik v. Sebelius, Nos. 13-cv-1459, 13-cv-0303, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013).

### C. Substantial Burden

#### 1. Standard

In order to prevail on their RFRA claim, plaintiffs must first demonstrate that the Mandate has placed a substantial burden on their sincerely held religious beliefs. Plaintiffs state that their religious beliefs prohibit them from "facilitating access to abortion-inducing products, contraception, sterilization, and related counseling."[6] The Government does not challenge the sincerity of this belief.

Rather, the core of the parties' dispute is how a court should determine whether a law imposes a "substantial burden" on religious exercise under the RFRA. It is undisputed – and indeed indisputable – that the substantial burden inquiry does not permit a court to determine the centrality of a particular religious practice to an adherent's faith. The RFRA states that explicitly, see 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A), and the Supreme Court's Free Exercise cases are equally clear. See Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S.

---

[6] For example, the "Ethical and Religious Directives for Catholic Health Care Services" published by the United States Conference of Catholic Bishops states that "Catholic health institutions may not promote or condone contraceptive practices." This concept of responsibility for the actions of others, familiar in many religious traditions besides Catholicism, is also present in our secular law. Criminal defendants may be convicted for aiding and abetting the crimes of others, see 18 U.S.C. § 2, and attorneys may be disciplined for violating their ethical duties through third parties. See Model Rules of Professional Conduct Rule 5.3(c) (2013).

707, 717, 101 S. Ct. 1425, 1431 (1981) ("Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.  Courts are not arbiters of scriptural interpretation."); see also United States v. Ballard, 322 U.S. 78, 86, 64 S. Ct. 882, 886 (1944) ("Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs.  Religious experiences which are as real as life to some may be incomprehensible to others.").

Drawing on this principle and the recent decisions of the Seventh and Tenth Circuits, plaintiffs contend that the Court's "only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."  Hobby Lobby, 723 F.3d at 1137; see also Korte, 735 F.3d at 683.  The Government contends that, in addition to analyzing the magnitude of the pressure exerted on a plaintiff, a court must independently analyze the character and nature of the acts required by the challenged law, an "objective" inquiry for which "the Constitution, rather than an individual's religion, must supply the frame of reference."  Bowen v. Roy, 476 U.S. 693, 701 n.6, 106 S. Ct. 2147 (1986).  According to the Government, under plaintiffs' formulation, "the standard expressed by Congress under the RFRA would convert to an 'any burden' standard."  Conestoga Wood Specialities Corp. v. Sebelius, 917 F. Supp. 2d 394, 413-14 (E.D. Pa. 2013).

The RFRA does not define the term "substantial burden."  The legislative history surrounding the 2000 passage of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and amendment of the RFRA indicates that this was an intentional omission, reflecting Congress's intent to incorporate the Supreme Court's jurisprudence in defining a

"substantial burden."[7]  The Second Circuit, meanwhile, has stated that "a substantial burden

exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to

violate his beliefs.'" Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996) (quoting Thomas, 450

U.S. at 718).  In Jolly, a Rastafarian inmate claimed that a tuberculosis screening test violated his

religion's prohibition on taking artificial substances into his body.  The Circuit held that the

choice forced on the plaintiff – endure the test in violation of his religion, or be confined in a

medical keeplock – was sufficient to show a substantial burden.  Given that Jolly involved a

government-enforced choice between a religiously forbidden bodily violation and indefinite

confinement to a medical keeplock, that case does not directly answer the question of whether

"substantial burden" may be treated as equivalent to "substantial pressure" under the RFRA.  As

noted, the Seventh and Tenth Circuits have explicitly applied the "substantial pressure" test

advocated by plaintiffs here.  See Korte, 735 F.3d at 683; Hobby Lobby, 723 F.3d at 1137.  This

Court holds that, regardless of whether this "substantial pressure" test should apply in all RFRA

cases, it applies to the instant case.

Courts have identified three broad ways in which religious exercise may be substantially

burdened.  Government action may: (1) compel the plaintiff to do something that is inconsistent

with his religious beliefs; (2) forbid the plaintiff from doing something that his religion motivates

him to do; or (3) not directly compel the plaintiff to do something forbidden by his religious

_____

[7] Specifically, Senators Hatch and Kennedy, principal sponsors of the RLUIPA, issued a Joint Statement that
discussed the definition of "substantial burden":

> [t]he Act does not include a definition of the term "substantial burden" because it is not the intent
> of this Act to create a new standard for the definition of "substantial burden" on religious exercise.
> Instead, that term as used in the Act should be interpreted by reference to Supreme Court
> jurisprudence.  Nothing in the Act, including the requirement in Section 5(g) that its terms be
> broadly construed, is intended to change that principle.  The term "substantial burden" as used in
> this Act is not intended to be given any broader interpretation than the Supreme Court's
> articulation of the concept of substantial burden or religious exercise.

146 Cong. Rec. S7774, 7776 (July 27, 2000).

beliefs or to refrain from doing something motivated by those beliefs, but instead put substantial pressure on the plaintiff to do so. See Hobby Lobby, 723 F.3d at 1138 (citing Abdulhaseeb v. Calbone, 600 F.3d 1301, 1315 (10th Cir. 2010)). This case could be placed into the third category, as the Tenth Circuit did, if viewed as applying indirect pressure to force plaintiffs into a "Hobson's choice" between violating their religious beliefs and paying substantial fines. See Hobby Lobby, 723 F.3d at 1141. However, it seems that the first category is a better fit – the Mandate directly compels plaintiffs, through threat of onerous penalties, to undertake actions that their religion forbids. See id. at 1151-52 (Hartz, C.J., concurring); Korte, 735 F.3d at 707 (Rovner, C.J., dissenting).

Rather than whether the pressure is indirect or direct, it seems that the more important distinction for the case at bar is between government action that pressures an individual to <u>act inconsistently</u> with his beliefs, and government action that discourages a plaintiff from <u>acting consistently</u> with those beliefs. See Sherbert, 374 U.S. at 402-03 (noting that although the government may not "compel affirmation of a repugnant belief," the Court "has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs"); Braunfeld v. Brown, 366 U.S. 599, 603, 81 S. Ct. 1144, 1146 (1961) ("The freedom to hold religious beliefs and opinions is absolute. . . .  However, the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions."). Cases where the Supreme Court has declined to apply strict scrutiny have generally involved laws that make a religious activity more difficult, without pressuring the individual to actively violate their religious beliefs. See Lyng v. Nw. Indian Cemetery Protective Ass'n., 485 U.S. 439, 449-50, 108 S. Ct. 1319, 1325-26 (1988) (noting that although "the challenged Government action would interfere significantly with private persons'

ability to pursue spiritual fulfillment according to their own religious beliefs," the plaintiffs would not "be coerced by the Government's action into violating their religious beliefs; nor would . . . governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens"); Tony and Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 303-04, 105 S. Ct. 1953, 1962-63 (1985) (rejecting Free Exercise challenge to Fair Labor Standards Act, where law did not require payment of cash wages in violation of plaintiffs' religious beliefs). Where the government does not compel a plaintiff to act contrary to his stated beliefs, a court might be able to determine that a burden on religious practice is insubstantial – for example, if the challenged law only makes engaging in that religious practice somewhat more expensive. See Hernandez v. C.I.R., 490 U.S. 680, 699, 109 S. Ct. 2136, 2149 (1989); Braunfield, 366 U.S. at 605-06.[8] But is difficult to comprehend any situation where a court could rule that a plaintiff facing government compulsion to engage in affirmative acts forbidden by his religion has not suffered a substantial burden, without implicitly ruling that the belief he has been forced to violate is just not that important.

Take, for example, religious objections to the payment of taxes. Where Amish plaintiffs asserted that the act of paying social security taxes was forbidden by their religion, the Supreme Court's burden analysis was succinct: "Because the payment of the taxes or receipt of benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights." See United States v. Lee, 455 U.S. 252, 257, 102 S. Ct. 1051, 1055 (1982). However, where a plaintiff does not "allege[ ] that the mere act of paying the tax, by itself, violates its sincere religious beliefs," but that "imposition of a generally applicable tax

---

[8] See also Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) (noting that RFRA decisions found that an "individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion" but not where "religion did not require particular means of expressing religious view[s] and alternative means of religious expression were available").

merely decreases the amount of money [plaintiff] has to spend on its religious activities, any such burden is not constitutionally significant." Jimmy Swaggart Ministries v. Bd. of Equalization of California, 493 U.S. 378, 391-92, 110 S. Ct. 688, 696-97 (1990); see also Hernandez, 490 U.S. at 694-700.

This distinction between laws pressuring action and those pressuring forbearance is far from precise, and may in some circumstances verge on the metaphysical.[9] Nor does the Court mean to suggest that only laws that compel action may violate the RFRA. Nonetheless, this distinction is helpful in reconciling the Supreme Court's somewhat disparate Free Exercise cases, and is in accord with the Founders' embrace of "the philosophical insight that government coercion of moral agency is odious." Gilardi, 733 F.3d at 1217. It also determines the standard to be applied here. Where government action coerces a religious adherent to undertake affirmative acts contrary to his religious beliefs, the "substantial burden" inquiry under RFRA should focus primarily on the "intensity of the coercion applied by the government to act." Korte, 735 F.3d at 683; Hobby Lobby, 723 F.3d at 1137. Whether this analytical approach should apply where the government pressures a plaintiff to refrain from acting in accordance with his religion is not before the Court in this case.

### 2. Application

Plaintiffs argue that the Mandate requires them to act in two specific ways. First, in order to qualify as an "eligible organization," plaintiffs must complete a self-certification form stating their religious objection, and provide that form to their TPA. Plaintiffs argue that completing

---

[9] For example, Sherbert and Thomas are perhaps best read as holding that substantial, although indirect, government pressure to act in violation of religious conscience – whether by working on tanks in Thomas or working on Saturdays in Sherbert – establishes a substantial burden. See Thomas, 450 U.S. at 717-18; Sherbert, 374 U.S. at 404. But Sherbert could also be read as a case involving substantial government pressure on the plaintiff to forbear from her Saturday worship. See Sherbert, 374 U.S. at 404 ("Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.").

this form authorizes the TPA to provide contraceptive coverage to plaintiffs' employees, thereby making plaintiffs complicit in the scheme by which those employees receive contraception. Second, plaintiffs state that although they previously sought to identify and contract with TPAs that would not provide contraceptive coverage to their employees, the Mandate would require them to identify and contract with TPAs that would do so. Both actions violate plaintiffs' religious beliefs, which preclude them from "facilitating access to abortion-inducing products, contraception, sterilization, and related counseling."

In response, the Government argues that any burden placed on plaintiffs' beliefs by the Mandate is too "*de minimis*" or "attenuated" to be substantial under the RFRA. The Government stresses that the Mandate does not require plaintiffs to "contract, arrange, pay, or refer for [contraceptive] coverage." Completing the self-certification form is a purely administrative task that would take a matter of minutes, according to the Government, and is tantamount to stating a religious objection to contraceptive coverage, a statement that plaintiffs already make to their TPAs in order to ensure their plans do not cover contraception. As for identifying and contracting with a TPA, the Government argues that this activity is not attributable to the challenged regulations. Plaintiffs are self-insured, and thus already have TPAs; they will not be forced to find new ones, nor modify their existing contracts with their current TPAs. According to the Government, the regulations therefore do not require plaintiffs to do anything at all with regard to their TPAs.

Plaintiffs' suggestion that they will be forced to identify and contract with TPAs who will provide contraceptive coverage is indeed somewhat speculative.[10] But ultimately, this argument

---

[10] For example, plaintiffs have given no indication that their current TPAs will refuse to provide contraceptive coverage upon receipt of the self-certification form, although the regulations do give them that option. See 78 Fed. Reg. at 39,879 ("Upon receipt of the copy of the self-certification, the third party administrator may decide not to enter into, or remain in, a contractual relationship with the eligible organization."). Indeed, in opposing defendants'

depends on whether the self-certification requirement itself passes muster under the RFRA. If plaintiffs cannot be compelled to complete the self-certification, they necessarily will not be required to contract with any TPA who will provide contraceptive coverage. If they can be compelled to self-certify, it seems unlikely that placing new legal obligations on the third-parties with whom plaintiffs contract could be a substantial burden on <u>plaintiffs</u>' religion. Because the Court concludes below that the self-certification requirement itself places a substantial burden on plaintiffs' religion, the Court need not and does not reach this issue.

As for the self-certification requirement, the Court rejects the Government's position that plaintiffs may be compelled to perform affirmative acts precluded by their religion if a court deems those acts merely "*de minimis*." This argument – which essentially reduces to the claim that completing the self-certification places no burden on plaintiffs' religion because "it's just a form" – finds no support in the case law. As discussed, where a law places substantial pressure on a plaintiff to perform affirmative acts contrary to his religion, the Supreme Court has found a substantial burden without analyzing whether those acts are *de minimis*. <u>See</u> <u>Lee</u>, 455 U.S. 252 (Payment of social security taxes); <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 92 S. Ct. 1526 (1972) (Compulsory public school attendance). Instead, in each case the Supreme Court held that the plaintiffs had demonstrated a burden on religion where a law compels them "to perform acts undeniably at odds with fundamental tenets of their religious beliefs," and then proceeded to analyze whether the Government had adequately justified that burden. <u>Yoder</u>, 406 U.S. at 218.

Again, the Government does not contest that completing the self-certification violates plaintiffs' religious beliefs. But beyond its repeated insistence that this is an "objective" inquiry, the Government provides no framework for how a court could determine whether an act that

---

standing arguments, <u>supra</u>, plaintiffs take the logical position that it is highly unlikely that their TPAs would refuse to comply with the Mandate.

concededly violates a plaintiff's religious beliefs is actually only "*de minimis*."  Inquiring into the relative importance of a particular act to a particular plaintiff would necessarily place the court in the unacceptable "business of evaluating the relative merits of differing religious claims."  Lee, 455 U.S. at 263 n. 2 (Stevens, J. concurring).  There is no way that a court can, or should, determine that a coerced violation of conscience is of insufficient quantum to merit constitutional protection.

"Government may neither compel affirmation of a repugnant belief, nor penalize or discriminate against individuals because they hold religious views abhorrent to the authorities."  Sherbert, 374 U.S. at 402 (citation omitted).  Requiring, for example, a Jehovah's Witness to salute the flag may seem like a *de minimis* act to an "objective observer," but to a believer that action may be very significant indeed.  Cf. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S. Ct. 1178 (1943) (striking down such a law on free speech grounds).  The same could be said of requiring adherents to swear to, rather than affirm the veracity of their testimony, but those with religious objections have been largely exempt from doing so since before the Bill of Rights.  See Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 HARV. L. REV. 1409, 1466-73 (1990) ("By 1789, virtually all of the states had enacted oath exemptions.").

The Government's "it's just a form" argument suffers from the same infirmity.  The non-exempt plaintiffs are required to complete and submit the self-certification, which authorizes a third-party to provide the contraceptive coverage to which they object.  They consider this to be an endorsement of such coverage; to them, the self-certification "compel[s] affirmation of a repugnant belief."  Sherbert, 374 U.S. at 402.  It is not for this Court to say otherwise.

The Government's argument that any burden placed on plaintiffs is too "attenuated" to be substantial is similarly flawed. Defendants argue that plaintiffs' self-certification would only result in the use of contraception after a series of independent decisions by plaintiffs' employees. Although factually accurate, this argument rests on a misunderstanding (or mischaracterization) of plaintiffs' religious objection. Plaintiffs' religious objection is not only to the use of contraceptives, but also to being required to actively participate in a scheme to provide such services. The Government feels that the accommodation sufficiently insulates plaintiffs from the objectionable services, but plaintiffs disagree. Again, it is not the Court's role to say that plaintiffs are wrong about their religious beliefs. See Thomas, 450 U.S. at 715 ("Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs."); Hobby Lobby, 723 F.3d at 1142 ("[T]he question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity."); Korte, 735 F.3d at 685 (rejecting similar "attenuation" argument, because "[n]o civil authority can decide" the question of whether "providing this coverage impermissibly assist[s] the commission of a wrongful act in violation of the moral doctrines of the Catholic Church").

The Government's contention that the self-certification simply requires plaintiffs to inform their TPAs of their religious objection to contraceptive coverage, just as they would without the Mandate, is unpersuasive for similar reasons. Even if this were true, the self-certification would still transform a voluntary act that plaintiffs believe to be consistent with their religious beliefs into a compelled act that they believe forbidden. Clearly, plaintiffs view the

latter as having vastly different religious significance than the former.[11]  The Court cannot say

that "the line [plaintiffs] drew was an unreasonable one."  Thomas, 450 U.S. at 715.

Of course, as plaintiffs correctly concede, the Mandate could not place a substantial

burden on their religious beliefs if it involved "no action or forbearance" on their part.

Kaemmerling v. Lappin, 553 F.3d 669, 679 (D.C. Cir. 2008) ("[R]eligious exercise necessarily

involves an action or practice.").  But that is not the case here, and the Government's reliance on

Kaemmerling is therefore misplaced.  In Kaemmerling, the plaintiff objected only to the

Government's collection, storage and analysis of his DNA; he did not object to the collection of

any particular DNA carrier from his body, such as blood, saliva, skin or hair.  Id. at 678.  Noting

that "[t]he extraction and storage of DNA information are entirely activities of the FBI, in which

Kaemmerling plays no role and which occur after the BOP has taken his fluid or tissue sample

(to which he does not object)", the court held that the plaintiff had failed to allege a substantial

burden because he identified "no religious observance that the DNA Act impedes, or acts in

violation of his religious beliefs that it pressures him to perform."  Id. at 678-79.  Just as

Kaemmerling's objection to the activities of third parties in which he played "no role" failed to

allege a substantial burden under the RFRA, plaintiffs could not object if the Government simply

provided contraceptive coverage to plaintiffs' employees, or worked with a third party to do so

without requiring plaintiffs to do anything.  What the Government cannot do – absent a

compelling interest and narrow tailoring – is compel plaintiffs to act in violation of their

religious beliefs.

---

[11] The similarly-situated Catholic plaintiffs in Zubik described the distinction "by analogy to a neighbor who asks to borrow a knife to cut something on the barbecue grill, and the request is easily granted.  The next day, the same neighbor requests a knife to kill someone, and the request is refused.  It is the reason the neighbor requests the knife which makes it impossible for the lender to provide it on the second day." Zubik, 2013 WL 6118696 at *25.

The Diocesan plaintiffs, however, are entirely exempt from the Mandate as religious employers. The parties have made little effort to distinguish the claims of the Diocesan plaintiffs from those of the non-exempt plaintiffs. The Government merely states that the Mandate does not require the Diocesan plaintiffs to do anything; plaintiffs argue, with little elaboration, that the Diocese and Archdiocese will be forced to either comply with the Mandate or "expel" non-exempt plaintiffs like Cardinal Spellman from their health plans. Plaintiffs' argument suffers from two major flaws. First, it is not at all clear why the Diocesan plaintiffs would have to "expel" their non-exempt affiliates from their health plans. The regulations treat eligibility for either the religious employer exemption or the accommodation on an "employer-by-employer" basis, and specifically contemplate that some group health plans would cover both religious employers and eligible organizations. See 78 Fed. Reg. at 39,886. If the Diocesan plaintiffs do nothing at all, their health plan remains unchanged and their employees will not receive contraceptive coverage. That the non-exempt plaintiffs must either provide coverage or complete the self-certification cannot be a burden on the exempt plaintiffs' religion. This is particularly true because, based on the remainder of this Court's opinion, those non-exempt affiliates will not even be faced with that choice.

Second, even if the law did pressure the Diocesan plaintiffs to "expel" their affiliates, plaintiffs do not state that the Diocesan plaintiffs' religious beliefs require them to have all their affiliate organizations on a single health plan, such that "expelling" the non-exempt affiliates would be an act forbidden by their religion. Rather, their claim is that expelling the non-exempt organizations could force those affiliates to provide coverage or self-certify, which in turn could mean that the Diocesan plaintiffs' prior act of expulsion facilitated the provision of contraception. This religious objection – which is not to the act itself, but instead is entirely

dependent on the conduct of third parties occurring after that act – is quite similar to the claim rejected in Kaemmerling. 553 F.3d at 678. The Diocesan plaintiffs have therefore failed to demonstrate that the Mandate imposes a substantial burden on their religious exercise, and defendants are entitled to summary judgment on the Diocesan plaintiffs' RFRA claims.

The non-Diocesan plaintiffs have demonstrated that the Mandate, despite the accommodation, compels them to perform acts that are contrary to their religion. And there can be no doubt that the coercive pressure here is substantial. If plaintiffs do not comply with the Mandate, they are subject to fines of $100 per day per affected beneficiary. See 26 U.S.C. § 4980D(b)(1). If they seek to cease providing health insurance altogether, they face an annual fine of $2,000 per full-time employee. See 26 U.S.C. § 4980H(a), (c)(1). The only other option available to plaintiffs is to violate their religious beliefs, by either providing the objectionable coverage or completing the objectionable self-authorization. Although the Government disagrees with some of plaintiffs' calculations as to the amount of fines to which they would potentially be exposed, the Government does not actually argue that the coercive effect of the Mandate is insubstantial. The non-Diocesan plaintiffs have demonstrated a substantial burden under the RFRA, requiring the Government to demonstrate that the Mandate is narrowly tailored to serve a compelling governmental interest.

### D. Compelling Interest Test

Because plaintiffs have demonstrated a substantial burden on their religious beliefs, the Government bears the onus of demonstrating that the Mandate "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb–1(b). The "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise

of religion is being substantially burdened." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 430-31, 126 S. Ct. 1211, 1220-21 (2006) (quoting 42 U.S.C. § 2000bb-1(b)). "In other words, under RFRA's version of strict scrutiny, the Government must establish a compelling and specific justification for burdening these claimants." Korte, 735 F.3d at 685 (emphasis in original). It bears noting that, confronted with markedly similar arguments, every Circuit court to reach the issue in ruling on RFRA challenges brought by secular, for-profit corporations held that the Mandate fails the RFRA's test of strict scrutiny. See id.; Gilardi, 733 F.3d at 1219-23; Hobby Lobby, 723 F.3d at 1143-44. For much the same reasons, the Government's arguments fail here as well.

The Government identifies two interests served by the Mandate: "the promotion of public health, and ensuring that women have equal access to health-care services." These interests are certainly important.[12] But the Supreme Court instructs courts interpreting the RFRA to "look[ ] beyond broadly formulated interests justifying the general applicability of government mandates" and "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." O Centro, 546 U.S. at 431.[13]

The Government argues that granting plaintiffs the exemption they seek would "undermine defendants' ability to enforce the regulations in a rational manner." If "any

---

[12] To some extent, the arguments advanced by defendants and *amicus* can be read as suggesting that the Mandate is an all-or-nothing proposition – either it is upheld, or women will be denied their right to contraception. Although the record is disputed as to the degree to which the Mandate would increase access to and use of contraception, it is clear that the governmental interest at stake is actually the difference between providing such access through the Mandate rather than through the current situation of public and private providers.

[13] Plaintiffs appear to take this language one step further, arguing that a "broadly formulated" interest simply "cannot be characterized as compelling." O Centro did not set down such a broad rule, which would seem to call into question interests found compelling elsewhere in the Supreme Court's Free Exercise jurisprudence. See, e.g., Bob Jones Univ. v. United States, 461 U.S. 574, 604, 103 S. Ct. 2017, 2035 (1983) (finding "a fundamental, overriding interest in eradicating racial discrimination in education"). Rather, the Supreme Court in O Centro held that "invocation of such general interests, standing alone, is not enough" under the RFRA. 546 U.S. at 438 (emphasis added). Where the asserted interest is broadly formulated, a court must scrutinize closely the asserted harm an exemption would bring about. In other words, broadly formulated governmental interests invite closer scrutiny, not outright rejection.

organization with a religious objection were able to claim an exemption," defendants could not "administer the regulations in a manner that would achieve Congress's goals of improving the health of women and newborn children and equalizing the coverage of preventive services for women," because women who work for employers like plaintiffs would face negative health outcomes simply by virtue of their employment. In simpler terms, the Government argues that many fewer women will be covered.

The Supreme Court has made clear that a general interest in uniformity is not enough to show a compelling interest; rather, the Government "can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." O Centro, 546 U.S. at 435-36 (collecting cases). For example, the Court has found a sufficiently compelling interest where the "tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief." Lee, 455 U.S. at 258; see also Hernandez, 490 U.S. at 700 (same). Similarly, in Braunfield, "[t]he whole point of a uniform day of rest for all workers would have been defeated by exceptions." O Centro, 546 U.S. at 435 (discussing Braunfield).

The Government has not made a similar showing of a compelling interest in uniform enforcement of the Mandate, for the simple reason that enforcement of the Mandate is currently anything but uniform. Tens of millions of people are exempt from the Mandate, under exemptions for grandfathered health plans, small businesses, and "religious employers" like the Diocesan plaintiffs here. Millions of women thus will not receive contraceptive coverage without cost-sharing through the Mandate. Having granted so many exemptions already, the Government cannot show a compelling interest in denying one to these plaintiffs. See Church of

Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 547, 113 S. Ct. 2217, 2234 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."); see also Korte, 735 F.3d at 686 (holding that ACA's myriad exemptions meant that the Government could not pass the compelling interest test of the RFRA); Gilardi, 733 F.3d at 1222-23 (same); Hobby Lobby, 723 F.3d at 1144 (same).

The Government does not contest the existence or breadth of the ACA's exemptions, but instead justifies each one individually – the grandfathering provisions are intended only to be temporary; small employers are not exempt from the Mandate, but from the mechanisms that impose penalties if they do not provide health coverage, which they are encouraged to do through tax and other incentives; fully exempting religious employers but not religious non-profit organizations is rational because employees of the former are less likely to use contraception than employees of the latter. Assuming all this to be true, it misses the point – the RFRA requires the Government to identify a compelling interest in applying the law to "the particular claimant whose sincere exercise of religion is being substantially burdened." O Centro, 546 U.S. at 431-32. The fact that these exemptions work the same harm to the Government's interests as would any exemption granted to plaintiffs greatly undermines the Government's assertion that it has a compelling interest in enforcing the Mandate against plaintiffs. See id. at 434.

The cases upon which the Government relies do not support its position. In rejecting a Rastafarian's claim that the RFRA required a religious exemption for probationers to smoke marijuana, the court in United States v. Israel, 317 F.3d 768, 772 (7th Cir. 2003), noted that "[a]ny judicial attempt to carve out a religious exemption in this situation would lead to

32

significant administrative problems for the probation office and open the door to a weed-like proliferation of claims for religious exemptions." No exemptions existed that allowed federal probationers to smoke marijuana, and granting one would undermine not only the federal probation scheme, but also federal criminal prohibitions on marijuana use. <u>South Ridge Baptist Church v. Industrial Com'n of Ohio</u>, 911 F.2d 1203, 1208-09 (6th Cir. 1990), held that the existence of narrow religious exemptions to a workers' compensation law did not undermine the state's interest in uniformity. But that decision rested heavily on <u>Lee</u>, where the Government fended off a strict-scrutiny challenge by demonstrating that granting any exemptions to social security taxes beyond the narrow ones Congress had already created would render "a comprehensive national social security system . . . difficult, if not impossible, to administer." <u>Lee</u>, 455 U.S. at 258. The exemptions here are not nearly so narrow as in <u>Lee</u> or <u>South Ridge</u>, and the Government has not demonstrated that its interest in uniform application of the Mandate is as strong as in the uniform application of the tax laws.

Finally, but very significantly, the Government's belated revelation that the regulations <u>do not even require plaintiffs' TPAs to provide contraceptive coverage</u>[14] fatally undermines any claim that imposing the Mandate on these plaintiffs serves a compelling governmental interest. To demonstrate a compelling interest in remedying an identified harm, defendants must show "that the regulation will in fact alleviate these harms in a direct and material way." <u>Turner Broadcasting Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 664, 114 S. Ct. 2445, 2470 (1994). Here, the Government implicitly acknowledges that applying the Mandate to plaintiffs may in fact do nothing at all to expand contraceptive coverage, because plaintiffs' TPAs aren't actually required to do anything after receiving the self-certification. In other words, the Mandate forces plaintiffs

---

[14] <u>See</u> <u>supra</u>, discussing defendants' argument that plaintiffs lack Article III standing because defendants did not have authority under ERISA to require the TPAs of "church plans" to provide coverage.

to fill out a form which, though it violates their religious beliefs, may ultimately serve no purpose whatsoever. A law that is totally ineffective cannot serve a compelling interest.

Nor is the Mandate the least restrictive means by which the Government can improve public health and equalize women's access to healthcare. "A statute or regulation is the least restrictive means if 'no alternative forms of regulation would [accomplish the compelling interest] without infringing [religious exercise] rights.'" Kaemmerling, 553 F.3d at 684 (quoting Sherbert, 374 U.S. at 407). At this point, it is important to recall the nature of the burden on plaintiffs' religion. The Mandate does not burden plaintiffs' religion because it allows their employees to receive and use contraception at no cost; indeed, "it goes without saying that [plaintiffs] may neither inquire about nor interfere with the private choices of their employees on these subjects." Korte, 735 F.3d at 684. Rather, the Mandate burdens plaintiffs' religion by coercing them into authorizing third parties to provide this coverage through the self-certification requirement, an act forbidden by plaintiffs' religion.

In view of this burden, numerous less restrictive alternatives are readily apparent. The Government could provide the contraceptive services or insurance coverage directly to plaintiffs' employees, or work with third parties – be it insurers, health care providers, drug manufacturers, or non-profits – to do so without requiring plaintiffs' active participation. It could also provide tax incentives to consumers or producers of contraceptive products. Many of these options have been recognized as feasible alternatives by other courts. See Korte, 735 F.3d at 686.

It is true that a proposed alternative scheme must be workable in order to qualify as a viable less restrictive means. See Fisher v. Univ. of Texas at Austin, ___ U.S. ___, 133 S. Ct. 2411, 2420 (2013). The Government first argues that the alternatives above are infeasible because the defendants lack statutory authority to enact some of them. This argument makes no

sense; in any challenge to the constitutionality of a federal law, the question is whether the federal government could adopt a less restrictive means, not any particular branch within it. It would set a dangerous precedent to hold that if the Executive Branch cannot act unilaterally, then there is no alternative solution. If defendants lack the required statutory authority, Congress may pass appropriate legislation.

The Government also argues that these alternatives would impose new administrative costs or not be as effective in advancing the Government's goals. As for the first argument, the Government has not identified these costs with any specificity, and in any event a less restrictive alternative is not infeasible simply because it is somewhat more expensive for the Government. See Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 799-800, 108 S. Ct. 2667, 2680 (1988) (noting that a state "may vigorously enforce its antifraud laws" as a less restrictive alternative to compelled disclosures). As for the second, the Government argues that the proposed alternatives would be less effective because they require women to take extra, burdensome steps including "find[ing] out about the availability of and sign[ing] up for a new benefit," rather than the "minimal logistical and administrative obstacles" they would enjoy under the Mandate. The Government does not, however, further explain these steps and why they would be burdensome on plaintiffs' employees. If these steps only entail filling out a form, it seems that the burden of filling out that form should fall on those who have no religious objection to doing so. If finding out about these benefits is burdensome, the Government could make a stronger effort to inform the public about them.

Relatedly, the Government and the ACLU as *amicus* argue that exempting plaintiffs from the Mandate would deny to plaintiffs' employees the benefits that Congress sought to provide them, effectively allowing plaintiffs to impose their religious beliefs on employees who might

not share them.  The potential burden that granting an exemption would impose upon third parties is certainly a relevant consideration in Free Exercise cases.  See e.g., Sherbert, 374 U.S. at 409 (noting that granting exemption did not "serve to abridge any other person's religious liberties"); see also Korte, 735 F.3d at 719-20 (Rovner, C.J., dissenting) (collecting cases).  But this is not a case where, for example, plaintiffs claim a religious right to engage in invidious discrimination that Congress has sought to remedy.  Cf. Dole v. Shenandoah Baptist Church, 899 F.2d 1389, 1398 (4th Cir. 1990) (religiously-motivated disparate pay for female employees). The Court is cognizant of the fact that, if plaintiffs were exempt, their employees would not be able to receive a benefit that Congress intended to grant them, at least temporarily.  But the availability of less restrictive means by which Congress can provide this benefit means that the burden on plaintiffs' employees does not change the result here.

In sum, the non-Diocesan plaintiffs have demonstrated that there is no genuine issue of material fact as to whether the Mandate substantially burdens their religious exercise, and the Government has failed to show that the Mandate is the least restrictive means of advancing a compelling governmental interest.  The non-Diocesan plaintiffs are therefore entitled to summary judgment on their RFRA claims.  This holding renders the remainder of the non-Diocesan plaintiffs' claims moot.

### III. Diocesan Plaintiffs' Non-RFRA Claims

As discussed, the parties made little effort to distinguish between the RFRA claims brought by the exempt and non-exempt plaintiffs; they have made almost none with regard to plaintiffs' other claims.  The Court's ruling that the Diocesan plaintiffs have not suffered a substantial burden on their religion under the RFRA because they are exempt from the Mandate

largely compels the conclusion that these plaintiffs cannot succeed on their remaining claims. Defendants are entitled to summary judgment as to these claims.

Having failed to meet the more lenient standard of the RFRA, the Diocesan plaintiffs cannot succeed on their Free Exercise constitutional claim, Count II of the Amended Complaint. Count VI of the Amended Complaint alleges that the Mandate unconstitutionally interferes with the Catholic Church's internal governance by "artificially splitting the Catholic Church in two," dividing its religious arm from its charitable and educational arms. This is little more than a restatement of the Diocesan plaintiffs' RFRA claim, and fails for much the same reasons. The Mandate does not "split" the Catholic Church in two – it does not require any change to the religious structure, hierarchy or organization of the Church and its affiliated organizations. At most, it could "split" the Church's health plan in two.[15] The prohibition on interference with internal church governance applies to ecclesiastical matters such as the selection and supervision of ministers by religious authorities, and plaintiffs have not cited any case that even remotely suggests that a health plan may constitute a matter of "internal church governance" protected by the First Amendment. Cf. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 132 S. Ct. 694, 706 (2012) ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church."); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S. Ct. 143 (1952) (striking down state law that sought to transfer the right to use St. Nicholas Cathedral from one archbishop to another by requiring every Russian Orthodox church in New York to recognize the determination of the governing body of the North American churches as authoritative); Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666

---

[15] As noted supra, it is not clear why it would even do that. The Diocesan plaintiffs are exempt from the Mandate, and in any event this decision enjoins enforcement of the Mandate against the affiliated non-exempt plaintiffs.

(1871) (declining to interfere with decision by church authorities in a dispute between antislavery and proslavery factions over who controlled the property of a specific Presbyterian church).

The Diocesan plaintiffs' Free Speech claims must fail because the none of the claimed infringements – that paying for contraceptive and other counseling is compelled speech; that self-certification requirement is also compelled speech; or that the prohibition on an eligible organization seeking to "influence" a TPA's decision to provide contraceptive benefits imposes a "gag order" – actually apply to the Diocesan plaintiffs, who qualify as exempt religious employers. Plaintiffs also claim that the Mandate is invalid under Administrative Procedure Act because it violates the Weldon Amendment to the Consolidated Appropriations Act of 2012, which states that funds cannot be made available to a Federal agency or program if it "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 112-74, §§ 506, 507, 125 Stat. 786, 1111-12. This claim fails as to the Diocesan plaintiffs because, again, they are entirely exempt from the Mandate. The Mandate thus cannot discriminate against them. Finally, the Diocesan plaintiffs' Establishment Clause challenges to the religious employer exemption must also fail because it is undisputed that they qualify for the exemption, and thus cannot claim to be harmed by it.[16]

### IV.    Injunctive Relief

The standard for granting a permanent injunction is essentially the same as that for a preliminary injunction, except that the moving party must demonstrate actual, rather than likely, success on the merits of its claim. See Richards v. Napolitano, 642 F. Supp. 2d 118 (E.D.N.Y.

---

[16] Plaintiffs did not oppose defendants' motion for summary judgment on Count VIII of the Amended Complaint, which alleged that defendants improperly interpreted the religious employer exemption. That portion of the motion is therefore also granted.

2009).  In determining whether to grant a permanent injunction, therefore, a court must consider: (1) success on the merits; (2) whether the movant will suffer irreparable injury absent an injunction; (3) the balance of hardships between the parties; and (4) whether the public interest supports granting the requested injunction.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365 (2008).

As set forth above, the non-Diocesan plaintiffs have demonstrated success on the merits of their RFRA claims.  For the same reasons, they have also demonstrated that they will suffer irreparable injury absent an injunction.  "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."  New York Progress and Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673 (1976)).  Indeed, the Government concedes that resolution of these first two prongs depends on the merits of plaintiffs' RFRA claims.

Plaintiffs have also satisfied the remaining two prongs.  The balance of equities weighs in favor of plaintiffs.  Although it is true that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce," Cornish v. Dudas, 540 F. Supp. 2d 61, 65 (D.D.C. 2008), entering an injunction in this case would simply maintain the status quo, and therefore would not place any significant additional burden on the Government.  See Tyndale House Publishers, Inc. v. Sebelius, 904 F. Supp. 2d 106, 129-30 (D.D.C. 2012).  And though the Government argues that granting injunctive relief to plaintiffs would "would undermine the Government's ability to achieve Congress's goals of improving the health of women and newborn children and equalizing the coverage of preventive services for women and men," the Court has already held that the Government has not demonstrated a compelling interest in advancing these interests by

burdening these particular plaintiffs in this particular manner. By contrast, denying injunctive relief would force plaintiffs to choose between violating their stated religious beliefs and paying onerous financial penalties.

The public interest similarly weighs in favor of granting an injunction. "[S]ecuring First Amendment rights is in the public interest." Walsh, 733 F.3d at 488. The countervailing public interests cited by the Government – in uniform enforcement of the Mandate and in allowing plaintiffs' employees to enjoy its benefits – do not outweigh the public interest in protecting plaintiffs' religious liberty. First, as described earlier, the Government has not shown a compelling interest in uniform enforcement of the Mandate; enjoining its enforcement simply adds plaintiffs to the large number of employers not subject to the Mandate.

Second, the Government is correct that, as the Ninth Circuit has held, "[t]here is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications." Stormans Inc. v. Selecky, 586 F.3d 1109, 1139 (9th Cir. 2009). But Stormans, which involved a Free Exercise challenge brought by religious pharmacists against enforcement of a state regulation requiring pharmacies to fill prescriptions of Plan B, actually demonstrates why this public interest does not change the result here. The Ninth Circuit in Stormans vacated the district court's preliminary injunction in part because it was vastly overbroad; the district court had enjoined enforcement of the regulation against all pharmacies and pharmacists who refused to fill Plan B prescriptions, without limitation to the parties before the court or even those with religious objections to doing so. The Ninth Circuit noted that enjoining enforcement only against the plaintiffs themselves, as the plaintiffs in this case request, would not present great hardship to the public. In addition, the public interest identified in Stormans was access to prescribed medications, which would indeed be curtailed if pharmacies refused to fill

prescriptions.  Here, the public interest identified by the Government is in access to <u>free</u> contraception.  An injunction will not prevent or unreasonably delay plaintiffs' employees from accessing prescribed medications; rather, an injunction would simply require them to pay for it, as they would have to without the Mandate.  The non-Diocesan plaintiffs have demonstrated that they are entitled to an injunction against enforcement of the Mandate against them.

## CONCLUSION

The non-Diocesan plaintiffs' motion for summary judgment on their RFRA claims is granted, and their remaining claims are dismissed as moot.  The Government's motion for summary judgment is granted as to the Diocesan plaintiffs' claims.  Pursuant to Federal Rule of Civil Procedure 58, a Final Judgment and Injunction shall issue separately.


**SO ORDERED.**

_____
                                                          U.S.D.J.

Dated:  Brooklyn, New York
           December 13, 2013